1    **WO**

2

3

4

5

6                **IN THE UNITED STATES DISTRICT COURT**

7                   **FOR THE DISTRICT OF ARIZONA**

8    Sharmila Kirwin, *et al.*,                No. CV-22-00471-TUC-RCC-BGM

9                              Plaintiff,      **REPORT AND RECOMMENDATION**

10   v.                                        **RE:  DCS Defendants' Motion to Dismiss**
                                               **(Doc. 44)**
     Dariusz Kot, *et al.*,
11                             Defendant.

12          Pending before the Court is DCS Defendants Motion to Dismiss and Alternative

13   Motion for More Definitive Statement ("Motion to Dismiss") (Doc. 44).  Plaintiffs filed

14   Plaintiffs' Memorandum In Opposition ("Opposition") (Doc. 54); and DCS Defendants

15   replied ("Reply") (Doc. 58).  This matter was referred to Magistrate Judge Bruce G.

16   Macdonald for Report and Recommendation (R&R) pursuant to 28 U.S.C. § 636(b)(1),

17
     Fed. R. Civ. P. 72, and 72.2 of the Rules of Practice of the United States District Court for
18
     the District of Arizona.  (Doc. 26.)  A motion(s) hearing was held before Magistrate Judge
19

20   Macdonald on May 31, 2023.  ME 5/31/23 (Doc. 59).  The Magistrate Judge recommends

21   that the District Court, after its independent review, **grant** DCS Defendants' Motion to
22
     Dismiss (Doc. 44) and dismiss, with prejudice, Claims One, Three, Six, Nine, Eleven,
23

24   Twelve, Thirteen, Fourteen, and Fifteen, against DCS Defendants; and dismiss, without

25   prejudice, Claims Four and Eight, and grant Plaintiffs leave to amend, limited to
26
     Defendants Fuentes, Egbert, and Chamberlain.
27

28

# I.   INTRODUCTION

Collectively, DCS Defendants move to dismiss all claims alleged against DCS Defendants under Federal Rules of Civil Procedure (Fed.R.Civ.P.) 12(b)(1), and 12(b)(6), and alternatively, for a more definitive statement under 12(e).  *See* Motion to Dismiss (Doc. 44); *see also* Exhibit A (Doc. 44-1); *see also* Notice of Errata (Doc. 48).  Each individual DCS Defendant[1] named in this matter and their respective titles are identified below:

1. Dariusz Kot, *former* DCS Specialist Investigations
2. Daniel Nido, *former* DCS Program Supervisor – Investigations
3. Melissa Fuentes, DCS Specialist Investigations
4. Kimberly Egbert, DCS Ongoing Specialist
5. Mildred Jimenez, *former* DCS Program Supervisor – Investigations
6. Mandy Chamberlain, DCS Program Supervisor – Ongoing
7. David Necoechea, DCS Specialist Investigator (After-hours Investigations)
8. Cecilia Rojas-Adnachiel, *former* DCS Program Supervisor (After-hours Investigations)
9. Aiza Huerta, DCS Program Supervisor - Ongoing
10. Pauline Machiche, DCS Program Administrator

Plaintiffs' Opposition asserts the Complaint plausibly alleges claims for violations of Plaintiffs' First and Fourteenth Amendment rights under 42 U.S.C. § 1983 for:

1) judicial deception under Claims One, Three, Eleven, and Thirteen;
2) infringement of free exercise of religion under Claims Eight, Twelve, and Fifteen;
3) retaliation under Claim Nine; and
4) interference with familial association under Claims Four (and judicial deception), Six (and custodial relationship), and Fourteen (and judicial deception).

Opposition (Doc. 54); *see also* Exhibit A (Doc. 54-1).  Also pending before the Court are Defendant Surendran's Motion to Dismiss (Doc. 25) (Claim Five) and Defendants VisionQuest and Miranda Millage's Motion to Dismiss (Doc. 29) (Claim Seven), both addressed under separate R&Rs.

---

[1] Hereinafter, the Court, refers to each individual defendant by their last name or 'defendants' as applicable to each claim or, collectively, as "DCS Defendants."

## II.   BACKGROUND

Plaintiffs seek compensatory and punitive damages under 42 U.S.C. § 1983, alleging DCS Defendants violated their First and Fourteenth Amendment rights to due process and familial association, specifically alleging individual defendants participated in a conspiracy involving judicial deception, infringement of the free exercise of religion, retaliation, and interference with familial association, in a joint effort to remove Plaintiffs' child, A.K., from Plaintiffs' custody and sever familial ties.

A.K. is now approximately eighteen years of age and no longer communicates with Plaintiffs, however, the involvement of DCS Defendants began in October of 2020 with the following significant events:

**October 20, 2020** - DCS Defendants, on October 20, 2020, filed DCS's Dependency Petition & Petition for Child Support [Out-of-Home[2]] ("**Petition I**") (Case No. JD20200657) along with Temporary Orders and Findings, and served Plaintiffs on October 21, 2020.

**April 2, 2021** – Despite a judge's issuance of no dependency on April 2, 2021, the transition of A.K. to Plaintiffs' custody was not successful because A.K. threatened suicide if A.K. was returned to Plaintiffs' custody. As a result, DCS filed an **Application & Declaration for *Ex-Parte* Removal of a Child** ("**CAR**") on the evening of April 2, 2021, which was granted the same day.

**April 8, 2021** – DCS Defendants, on April 8, 2021, filed DCS's Dependency Petition & Petition for Paternity and/or Child Support [Out-of-Home] ("**Petition II**") and Temporary Orders & Findings, *ex parte*, which was granted.

The Court merges and incorporates herein by this reference the "Background" set forth in the R&R addressing Defendant Surendran's Motion to Dismiss (Doc. 25) and the "Supplemental Background" set forth in the R&R addressing Defendant VisionQuest's and Defendant Millage's Motion to Dismiss (Doc. 29), filed concurrently herewith.

---

[2] 9. "Out-of-home placement" means the placing of a child in the custody of an individual or agency other than with the child's parent or legal guardian and includes placement in temporary custody pursuant to § 8-821, voluntary placement pursuant to § 8-806 or placement due to dependency actions.  A.R.S. § 8-501(9).

# I.    JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) and (4).

## II.    42 U.S.C. § 1983

[S]tates and state agencies are not 'persons' within the meaning of 42 U.S.C. § 1983. *Will v. Michigan Department of State Police*, 491 U.S. 58, 70, 109 S.Ct. 2304 (1989); *Hafer v. Melo*, 502 U.S. 21, 31, 112 S.Ct. 358 (1991) (only individual state officials or employees, sued in their personal capacity, qualify as 'persons' within the meaning of § 1983); *Harris v. Arizona Bd. of Regents*, 528 F.Supp. 987, 995 (D. Ariz. 1981).

*Spears v. Arizona Bd. of Regents*, 372 F. Supp. 3d 893, 923 (D. Ariz. 2019). "Compensatory damages against state defendants are not allowed because the Eleventh Amendment 'bars suits for money damages in federal court against a state, its agencies, and state officials acting in their official capacities.'" *Id.* at 923.  Although "punitive damages arising under state law claims are not recoverable against public employees acting within the scope of their public responsibilities[,]" (citation omitted), punitive damages are allowed under § 1983 'when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others.'" *Id.* at 925–26 citing *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (citations omitted). "To state a civil rights claim against a government entity, Plaintiffs must allege the requisite culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the policy or custom as the "moving force" behind the constitutional deprivation). *Id.* at 924 citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–694, 98 S.Ct. 2018 (1978).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.    SUMMARY OF CLAIMS AND FINDINGS

#### Claims One[3] and Three: Barred by Statute of Limitations

The Court finds Plaintiffs' Claims One and Three are barred by the state statute of limitations as applicable to claims for personal injuries, and accrual under federal law.

#### Claims Four and Eight:  Plaintiffs are Granted Leave to Amend

The Court finds it appropriate to dismiss Claims Four and Eight, without prejucide, and grant Plaintiffs leave to amend, limited to Fuentes, Egbert, and Chamberlain.

#### Claims Six, Twelve, Fourteen, and Fifteen:  Plaintiffs Lack Standing

The Court finds Plaintiffs lack standing in Claims Six, Twelve, Fourteen and Fifteen.

#### Claims Nine,[4] Eleven, and Thirteen:  Qualified Immunity Applies

The Court finds qualified immunity bars Plaintiffs' Claims Nine, Eleven, and Thirteen, as DCS Defendants were acting in their official capacities at all relevant times, and the face of the Complaint fails to assert direct evidence (*e.g.* an affidavit) of a false statement material to the issuance of a court's order(s).

#### Claim For Punitive Damages: Dismissed

The Court finds it appropriate to dismiss Plaintiffs' claim for punitive damages, here, as the facts of the Complaint lack the evil motive or intent or reckless or callous indifference to the constitutional rights of others, and as applicable to the two remaining claims, *i.e*., Claim Four and Claim Eight, for which the Court grants leave to amend.

#### Rule 9(b) Pleading Standard

The above Claims involving 'judicial deception' require the Court to apply the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.).  "To support a Sec. 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding . . . ." *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004).

---

[3] *See* Notice of Voluntary Dismissal of Second Claim Only With Prejudice.  (Doc. 36.)
[4] The Court notes, here, that Plaintiffs' Complaint did *not* include a Tenth Claim.

## IV.   CLAIMS ONE AND THREE:  THE STATUTE OF LIMITATIONS

DCS Defendants assert the First and Third Claims are time-barred by a two-year statute of limitation and in support thereof cite to *Wesbrock v. Ledford*, 464 F. Supp. 3d 1094, 1098 (D. Ariz. 2020). (Doc. 44 at 10.)  DCS Defendants assert Kot's investigation began on October 1, 2020, a two-year statute of limitations applies, and Plaintiffs did not file the Complaint (Doc. 1) until October 8[5] [*sic*], 2022.   (Doc. 44 at 10:8-9.)   DCS Defendants assert Plaintiffs 'knew or should have known' of their claims on October 1st of 2020, when Kot's investigation began.

**Claim One – October 8, 2020 – Court-Authorized *Ex Parte* Removal ("CAR")**

**Kot (former DCS Specialist Investigations)**
**Fuentes (DCS Specialist Investigations)**
**Nido (DCS Program Supervisor – Investigations)**

Plaintiffs' Opposition asserts the First Claim of the Complaint sufficiently pleads under the First and Fourteenth Amendments that Plaintiffs' rights to familial association were violated under due process when DCS Defendants sought and obtained an "Order for *Ex-Parte* Removal of Child" ("CAR") drafted by Kot, in collaboration with his superiors, Defendants Jimenez and/or Nido, and granted by the Juvenile Court on October 8, 2020, utilizing material misrepresentations and omissions.  Plaintiffs cite to *Settlemeyer v. Ditsch* and argue that no authority exists for DCS's position that Plaintiffs should have known of their claims on October 1, 2020, with respect to the 'accrual' analysis.  2021 WL 151306 (D. Ariz. May 4, 2021).

---

[5] The Court notes, here, that the Complaint was filed on October 7, 2022.  (Doc. 1.)

**Claim Three – October 20, 2020** – **Filing and Prosecution of Dependency Case**

**Kot (*former* DCS Specialist Investigations)**
**Jimenez (*former* DCS Program Supervisor – Investigations)**
**Nido (DCS Program Supervisor – Investigations)**

Plaintiffs further assert that Claim Three of the Complaint sufficiently pleads 'defendants' violated Plaintiffs' due process rights to familial association under the First and Fourteenth Amendments when Kot, with the knowledge and approval of Jimenez and/or Nido 'verified' an out of home Dependency Petition prepared by an Assistant Arizona Attorney General upon evidence supplied by the defendants which utilized the same material misrepresentations of the CAR and omitted material exculpatory evidence when defendants prepared and obtained Temporary Orders in the underlying Dependency case on October 20, 2020.

**A. Federal Claim Under 42 U.S.C. § 1983 Applies State Law Two-Year SOL**

"Section 1983 provides a federal cause of action, but in several respects relevant here, federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations ("SOL"): It is that which the State provides for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 387, 127 S. Ct. 1091, 1093 (2007) citing *Owens v. Okure,* 488 U.S. 235, 249–250, 109 S.Ct. 573 (1989). "[W]here state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." *Owens*, 488 U.S. at 249–50, 109 S. Ct. at 582. "A.R.S. § 12–542 provides a two-year period for filing personal injury claims." *De Luna v. Farris*, 841 F.2d 312, 313 (9th Cir. 1988) (internal citations omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.  SOL Accrual Under Federal Law**

On the other hand, "[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law."  *Wallace v. Kato*, 549 U.S. 384, 388, 127 S. Ct. 1091, 1095 (2007) (italics added).  Federal law determines when a civil rights claim accrues.  *Maldonado v. Harris*, 370 F.3d 945, 955 (9th Cir. 2004) citing *Knox v. Davis,* 260 F.3d 1009, 1013 (9th Cir.2001).  "Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action."  *Maldonado*, 370 F.3d at 955 citing *Knox*, 260 F.3d at 1013 (quoting *TwoRivers v. Lewis,* 174 F.3d 987, 992 (9th Cir.1999).

**C.  Statute of Limitations Analysis**

The parties agree, the statute of limitations, under Arizona law as applied in 1983 actions, is two (2) years from the date the cause of actions accrues.  (Doc. 44 at 9-10) (Doc. 54 at 15:5-6) (Plaintiffs cite *e.g*., *DeLuna v. Farris*, 841 F.2d 312, 313 (9th Cir. 1988).

Plaintiffs, however, dispute DCS's analysis for the date of accrual.  Plaintiffs argue, the Complaint was filed on October 8, 2022 [*sic*][6], and—that based on the injury described as the assumption of temporary custody of A.K. by Kot, Jimenez, and Nido—Plaintiffs were not notified until the afternoon of October 9, 2020, Plaintiffs' proposed accrual date.  (Doc. 54 at 15:15-16.)

DCS Defendants, on the other hand, submit the date of accrual is October 1, 2020, based on the date Kot began the investigation.  (Doc. 44 at 9-10.)

---

[6] The Complaint was filed on October 7, 2022. (Doc. 1.)

According to the Complaint, "Sgt. Lisa Davila reviewed the report, spoke with a "Patrick," AZDCS worker, and, on October 6th [2020], called and spoke with both parents." (Doc. 1 at 12, ¶ 48.)

The Court finds the date of accrual, under *Maldonado*, *supra*, for purposes of the statute of limitations analysis, is October 6, 2020, when the Plaintiffs were contacted by law enforcement while A.K. was at Palo Verde Behavioral Health (PVBH). Complaint (Doc. 1 at 12, ¶ 48.)

When Plaintiffs were interviewed by law enforcement on October 6, 2020, Plaintiffs were already aware of A.K.'s allegations of "attempting suicide five (5) times before her attempt on September 25th, "hanging, bleeding out, drowning . . ." as revealed by the "telehealth" interview with PVBH the evening of September 25, 2020. (Doc. 1 at 10, ¶ 35.) The next day, September 26, 2020, A.K. was transferred from Tucson Medical Center Emergency to PVBH. As of September 29, 2020, according to a psychosocial assessment of A.K., Plaintiffs were also aware of A.K.'s reports of "sexual abuse that occurred between [the ages of] 7/8-12/13," and, A.K.'s response when asked about concerns with being returned home, *i.e*., that "I want to kill myself when I am home[.]" (Doc. 1 at 10, ¶ 39.)

Plaintiffs' awareness of A.K.'s suicidal ideation (SI) and suicide attempts (SA) combined with A.K.'s reports of past sexual abuse occurring over the course of four years while in Plaintiffs' custody, combined with the transfer of A.K. from TMC to PVBH on September 26, 2020, and the law enforcement interview of Plaintiffs on October 6, 2020; together, provide sufficient support for a finding of accrual on October 6, 2020, under the standard established in *Maldonado, supra*. *Maldonado*, 370 F.3d at 955 citing *Knox*, 260

F.3d at 1013 (quoting *TwoRivers v. Lewis,* 174 F.3d 987, 992 (9th Cir.1999) ("knows or has reason to know of the injury which is the basis of the action").  The injury Plaintiffs suffered, *i.e.*, deprivation of familial association, began, when Plaintiffs became aware that charges may be brought for the perpetration of abuse, or lack of protection from the abuser, while A.K. was in the care, custody, and control of Plaintiffs.

Accordingly, the Court applies the Arizona State statute for personal injuries, *i.e.*, the two-year statute of limitation under A.R.S. § 12-542, and the date of accrual under Federal law, *Maldonado, supra.*  The Court finds the injury for which Plaintiffs base Claim One (October 8, 2020 CAR) and Claim Three (October 20, 2020 Dependency Case), *i.e.*, the deprivation of familial association, began when Plaintiffs became aware on October 6, 2020, that law enforcement was involved in the investigation.  The Court further finds the cause of action accrued on October 6, 2020, and Plaintiffs filed the Complaint on October 7, 2022, after the statute of limitation had lapsed.   "When a motion to dismiss is based on the running of a statute of limitation period, dismissal can be granted "only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Vaughan v. Grijalva*, 927 F.2d 476, 478 (9th Cir. 1991) citing *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980).  Accepting all factual allegations of the complaint as true and drawing all reasonable inferences in favor of the nonmoving party, here, Plaintiffs, the Court finds the facts asserted would not permit the Plaintiffs to prove that the statute was tolled.  Accordingly, the Court finds it appropriate to dismiss, with prejudice, Claims One and Three against Kot, Jimenez, and Nido.

**<u>Fed. R. Civ. P. 9(b) Heightened Pleadings Standard for Fraud</u>**

A party alleging fraud in federal court must meet the heightened pleading standard of Rule 9(b), in pertinent part, "a party must state with particularity the circumstances constituting fraud or mistake."   Fed. R. Civ. P. 9(b).   "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).  "In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim **as a whole** must satisfy the particularity requirement of Rule 9(b)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir 2003) (emphasis added). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged. *Vess*, 317 F.3d at 1106 citing *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir.1997). "[A] plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106.  "To state a claim of fraudulent conduct, which carries substantial reputational costs, plaintiffs must provide each and every defendant with enough information to enable them 'to know what misrepresentations are attributable to them and what fraudulent conduct they are charged with.' " *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1070 (E.D. Cal. 2012).

"When an entire complaint, or an entire claim within a complaint, is **grounded in fraud** and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court **may dismiss** the complaint or claim." *Id.* at 1107. "A plaintiff who provides direct evidence of false statements can allege deliberate fabrication of evidence in violation of constitutional due process guarantees." *Benevidez v. Cnty. of San Diego*, 993 F.3d 1134 (9th Cir. 2021) citing *Cotanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010) (right to be free from judicial deception in child custody proceedings); *see also Greene v. Camreta*, 588 F.3d 1011, 1035 (9th Cir. 2009), vacated in part, 563 U.S. 692, 131 S.Ct. 2020 (2011), 661 F.3d 1201 (9th Cir. 2011) (involving an affidavit and "[t]he alleged misrepresentation was 'material' to the granting of the removal order if the Juvenile Court would have declined to issue the order had [the defendant] been truthful.")

### III.    CLAIMS FOUR AND EIGHT:  LEAVE TO AMEND

**Fuentes (DCS Specialist Investigations);**
**Egbert (DCS Ongoing Specialist); and**
**Chamberlain (DCS Program Supervisor)**

DCS Defendants submit that "[w]hen Plaintiffs' conclusory allegations are omitted from Claims Four and Eight, we are left with the performance of the statutorily prescribed duties of each of the DCS Defendants" and "[t]he doctrine of qualified immunity protects their actions" and cites to *Saucier v. Katz*, 533 U.S. 194, 200 (2009). (Doc. 42 at 20:24-27.)  DCS Defendants assert Chamberlain did not have direct involvement with Plaintiffs, their family, or A.K., and only supervised Fuentes briefly, and there is no *respondeat superior* liability under 42 U.S.C. § 1983 without the showing that a supervisor participated in or directed the alleged violations or, knew of them and failed to act to prevent them.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Claim Four – November 2020 through April 1, 2021** – Plaintiffs' Claim Four asserts under the First and Fourteenth Amendments that Fuentes, Egbert, and Chamberlain, violated Plaintiffs' right to familial association and due process of law by the 'ongoing' creation of false documents and judicial deception.  In support thereof, Plaintiffs, in their Opposition, cite to some specific allegations—gleaned from Section II of the Complaint—related to the general claim of 'judicial deception,' and allege, DCS Defendants:

> "(1) **reject[ed]** parents' submissions of appropriate placement for A.K. . . . and . . . therapies [Complaint ¶¶ 73,[7] 87, 122] (2) **reject[ed]** parents' proposals for . . . services for [A.K.] . . . . [Complaint ¶¶ 86, 107, 108] (3) **falsely document[ed]** that Plaintiffs' submissions for placement and services **promoted** "conversion therapy," [Complaint ¶¶ 71, 73, 107] (4) **falsely assert[ed]** that the child was receiving **appropriate** services, . . . [Complaint ¶¶ 86, 91]; (5) **conceal[ed] from the parents** . . .[¶¶ 85, 92, 219]; (6) facilitat[ed] . . . [¶¶ 70, 87[8]]; (7) as to **Egbert**, additionally, **l[ied]** in response to Plaintiffs' complaint to the AZDCS Ombudsman in which they brought to the department's attention **their concerns** that were **ignored** by the named Defendants [Complaint ¶¶ 122, 124]; (8) as to **Egbert**, **conspir[ed]** with Defendant Millage **to suppress** the knowledge that A.K. had **suffered** . . . ; and **rejected** sound recommendations . . .[Complaint ¶¶ 112-119]."

*See* Opposition (Doc. 54 at 9:5-10:2) (emphasis added).

"In order to prevail on a judicial deception claim, a plaintiff must prove that '(1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused

---

[7] The Court notes, here, the Complaint states "[t]hese were characterized as promoting "conversion therapy" **to A.K. and providers**, though Defendants knew the medical and psychiatric programs Plaintiffs' proposed are based on sound science.  The Defendants had the authority **and discretion** to approve and place A.K. as the parents proposed." *See* Complaint (Doc. 1 at 17, ¶ 73) (emphasis added).

[8] The Court notes, here, the Complaint states '[o]n November 25th, [Plaintiffs] spoke to Fuentes, reaffirmed their Christian beliefs, and requested that the materials be removed and A.K. not practice pagan ceremonies.  **Fuentes agreed, but did not comply**." *See* Complaint (Doc. 1 at 21, ¶ 87) (emphasis added).

the plaintiff's deprivation of liberty.'" *Keates v. Koile*, 883 F.3d 1228, 1240 (9th Cir. 2018) (emphasis added) citing *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). If a state official "submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, ... he cannot be said to have acted in a reasonable manner, **and the shield of qualified immunity is lost**." *Keates*, 883 F.3d at 1240 (emphasis added) citing *Chism v. Washington State*, 661 F.3d 380, 393 (9th Cir. 2011).

Here, the two instances of an 'affidavit' or 'verification' that would preclude qualified immunity are found in paragraphs 52 and 65 of the Complaint, in pertinent part:

> Despite this knowledge, Jimenez and/or Nido approved the submission of the application, **the truth of which Kot swore**, at 8:27 a.m. that day [10/08/20].
>
> * * *
>
> [t]he allegations of the Petition were **sworn to by and verified by Kot**, with the knowledge and approval of Jimenez and/or Nido, and contained the alleged facts that these Defendants had previously prepared and then passed on to the AAG.

*See* Complaint (Doc. 1 at 15, ¶ 65.) Aside from two examples above regarding Kot, however, Plaintiffs' reference to 'the alleged *facts* that these Defendants had *previously* prepared' were *not* in the form of *affidavits* or 'sworn to' under penalty of perjury, at least, as far as reflected in the face of the Complaint. *Keates, supra.* (Italics added). Rather, the specific examples cited to by Plaintiffs in the Opposition referring to the Complaint, include examples of 'rejecting' the Plaintiffs' proposals for placement, services, and therapies, 'falsely' characterizing the Plaintiffs' proposals, and 'concealing' from 'the parents' (not the judiciary), and 'falsely' asserting the 'discretionary' choice of services for A.K. as 'appropriate.' After stripping the qualifiers, and the conclusory language, from the

specific examples, the Court is left with examples of the discretionary function of the DCS Defendants (Fuentes, Egbert, and Chamberlain), performed in their official capacities, and the roles defendants perform in collaborating services for A.K., and other minor children, when the Juvenile Court finds "out-of-home" placement is necessary due to a child alleging a history of abuse, and alleged suicidal ideation, and perhaps alleged suicidal attempts.

Even assuming *arguendo* that a DCS Defendant 'falsely' *characterized* Plaintiffs' suggested therapy provider as utilizing 'conversion therapy'; this does not meet the first element of judicial deception, *i.e.*, the 'deliberate fabrication of evidence'—and at most, may be a mischaracterization.   Plaintiffs' "conversion therapy" example of judicial deception, is a label applied to the ever-changing therapies utilized to address the continuously evolving attempts of young people to explore societies norms, and challenge those norms, while the 'adults,' 'professionals,' and medical treatment providers attempt to keep up.  Whether the therapist Plaintiffs suggested is labeled as "conversion therapy," or some other label, does not change the fact that the Plaintiffs had the opportunity to provide a recommendation, *i.e.*, to be heard on the subject.

The Court merges and incorporates herein by this reference the description of the Child and Family Team ("CFT"), of which this Court took judicial notice under Fed.R.Civ.P., Rule 201, of the URL provided in Defendant Surendran's attached Exhibit A (Doc. 25-1), as follows:

> https://dcs.az.gov/resources/faq/question-what-child-and-family-team-cft ,
> *archived at* http://perma.cc/43T7-THGE

(What is a Child and Family Team (CFT)? Arizona Department of Child Safety, last visited June 21, 2023).

The process, as described in the CFTs, and utilized in developing a service plan, preserves—the dialogue between the various competing interests, Plaintiffs' proposed therapy included, but also preserves—the plenary power, afforded the DCS Defendants to accept, or reject, a proposed therapy, in ultimately developing and implementing a service plan designed for each individual child's needs.

The Court finds Plaintiffs' specific examples do not meet the Rule 9(b) pleading standard for allegations of false documents and judicial deception.  The Court further finds, the facts of the Complaint lack the 'knew to be false' or 'recklessly disregarded the truth' standard, particularly given the 'facts' alleged amounted to a 'mischaracterization'; and therefore, do not preclude the shield of immunity applied to Fuentes, Egbert, and Chamberlain, and as afforded to Kot in execution of the examples of an 'affidavit' and or documents 'sworn to'; and were not material to the court's finding.

**Claim Eight** – **November 2020 through April 1, 2021** – **First Amendment violation of Free Exercise of Religion** – Plaintiffs contend DCS Defendants rejected Plaintiffs' recommendations for placement and treatment of A.K. because DCS mischaracterized the recommendations as 'transphobic' and "promoting 'conversion therapy.'"  Opposition (Doc. 54 at 12) (referring to Complaint, Doc. 1 at 16-17, ¶ 71.) Specifically, Plaintiffs cite to paragraph 107 of the Complaint, which states:

> On **January 20th** [2021], and at other points, Egbert **misled** A.K., AZCA and **the department**, claiming that **one of Plaintiffs' proposals for a therapy provider** "handles **conversion** of people that identify with homosexuality." This and other such **falsehoods** were constantly expressed and reported by Egbert in her efforts to split the Plaintiffs familial association with A.K.

Complaint (Doc. 1 at 26, ¶ 107) (emphasis added).

- 16 -

Even accepting as true, the allegation as set forth above, Egbert claimed that *one* of the therapy providers recommended by Plaintiffs "*handles* conversion."   This is not necessarily a 'falsehood.'



The logic that Plaintiffs ask the Court to follow neglects to consider some overlap in the labels and or 'characterizations' as presented.  It is possible that a therapist could 'handle' a patient with all three competing interests, here, *i.e.*, 'conversion therapy'; 'trans-affirming therapy'; and exploring 'religious beliefs'; all with some overlap.

Even assuming *arguendo* that Egbert 'mischaracterized' one of Plaintiffs' suggested treatment providers as a 'conversion' 'therapist' for having handled one patient utilizing 'conversion therapy' does not mean that Plaintiffs' recommendation was rejected because of this.   Furthermore, even assuming *arguendo* that the recommendation was rejected because of this, does not mean conversion therapy is mutually exclusive with trans-affirming therapy, or that conversion therapy is necessarily associated with religious beliefs.  The allegations of the Complaint are insufficient to find the facts necessary to draw Plaintiffs' suggested inferences, *i.e.*, that Plaintiffs' right to free exercise of religion was infringed by rejection of their proposed therapist because the therapist handles conversion of people that identify with homosexuality, and that this was the actual and proximate cause

of any deprivation to Plaintiffs of their free exercise of religion.  Transaffirming therapy and conversion therapy are not necessarily mutually exclusive, and the specific example fails to support Plaintiffs' proposed reasoning—*i.e.*, that because DCS Defendants rejected the Plaintiffs' proposed therapist because the therapist has utilized conversion therapy, the DCS Defendants *plausibly* rejected Plaintiffs' proposed therapist as an afront on Plaintiffs' freedom of religion—the facts of the Complaint do not support this logic.  And yet, Plaintiffs ask the Court to draw the inference that 'conversion therapy' is associated with 'Christian' beliefs and that because Defendants rejected Plaintiffs' suggestion of a therapist that has performed 'conversion' therapy, then Defendants *necessarily* deprived Plaintiffs' of their freedom of religion.  The premise and suggested leap in logic fail to support the conclusion.

Plaintiffs also cite to paragraph 71 of the Complaint which provides as follows:

These actions, and the subsequent actions by Defendant Egbert, approved and facilitated by Chamberlain, were **motivated** by these Defendants' commitment to the "trans-affirming" philosophy adopted by the department, in its most extreme form, to wit:  that no matter what the mental health condition of the child, the child's exploration of gender change will be enthusiastically endorsed; the child will be exposed only to materials and videos which depict gender transition in a positive light; the child will be shielded from information, literature and professional views which disclose medical and psychological risks and negative outcomes; and health care professionals and **parents who question the decisions made in the child's name will be characterized as "transphobic" and promoting "conversion therapy**[.]

Complaint (Doc. 1 at 16, ¶ 71.)   Plaintiffs have failed to allege a sufficient causal connection between each defendant's actions and the claimed deprivation, here, freedom of religion under Claim Eight.  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

- 18 -

**Claims Four & Eight** - The Court finds the allegations in the Complaint as to Claim **Four,** through April 1, 2021, regarding ongoing judicial deception (extrinsic fraud), and interference with familial association, fail to plead with sufficient particularity under Fed. R. Civ. P. Rule 9(b), the "who, what, when, where, and how" as required for allegations of judicial deception.  The Court finds the allegations in the Complaint as to Claim **Eight** between November 2020 and April 1, 2021, regarding an alleged violation of the free exercise of religion under the First Amendment lack sufficient facts, and or is ambiguous on the face of the Complaint, to support this claim.  The Court finds it appropriate to dismiss, without prejudice, Claims Four and Eight and grant Plaintiffs leave to amend.

## IV.   CLAIMS SIX, TWELVE, FOURTEEN, AND FIFTEEN:  NO STANDING

### Claim Six – Fourteenth Amendment Violation of the Custodial Relationship

**Fuentes, DCS Specialist Investigations**
**Egbert, DCS Ongoing Specialist**
**Chamberlain, DCS Program Supervisor – Ongoing**

DCS Defendants assert Plaintiffs lack standing under Claim Six because the basis for Plaintiffs' argument, as alleged in the Complaint, describes a "special custodial relationship" that exists is between A.K. and defendants, not the Plaintiffs and defendants.

Plaintiffs' Opposition suggests Claim Six "is premised on the same set of facts as the Fourth claim.[9]"  (Doc. 54 at 10:9-10.)  Plaintiffs' Complaint, Claim Six, in pertinent part alleges "[i]n the period November, 2020 through April 1, 2021, Defendants had a

---

[9] The Court notes, however, Plaintiffs' Claim Four is framed as ongoing judicial deception and interference with familial association, and Claim Six, is framed as a violation of the custodial relationship.  (Doc. 54 at 8, 10.)

special custodial relationship with A.K., and, consequently, with Plaintiffs through the residual parental rights they possessed, to assure that their child was cared for appropriately[.]" (Doc. 1 at 46, ¶ 215[10]) (emphasis added).

"[A] parent's right to be heard about a child's medical procedures is not violated when the state actor has reasonable cause to believe that serious bodily harm will befall the child or that the parent is unfit." *Lamorie v. Davis*, 485 F. Supp. 3d 1065, 1070 (D. Ariz. 2020). Generally, courts have recognized a parental "procedural right to a judicial hearing only if 'the State seeks to compel [a] minor child to undergo a medical treatment over [their] parents'] objection." *Lamorie*, 485 F. Supp. 3d at 1070 citing *Mueller v. Auker*, 576 F.3d 979, 995 (9th Cir. 2009); *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000); *see also James v. Rowlands*, 606 F.3d 646, 655 (9th Cir. 2010) (extending this principle to occasions where public officials "encourage and facilitate a transfer of a minor's physical custody"). However, "[i]ndictments for abuse or 'serious allegations of abuse [that] are investigated and corroborated usually give[ ] rise to the reasonable inference of imminent danger sufficient' for state interference." *Lamorie*, 485 F. Supp. 3d at 1070 citing *Ram v. Rubin*, 118 F.3d 1306, 1311 (9th Cir. 1997).

Given the standard set forth above—and the initial grounds alleged by DCS Defendants against Plaintiffs, on October 8, 2020, as the basis for the "Order for *Ex Parte*

---

[10] The Court notes, here, that although Plaintiffs did not characterize Claim Six as a judicial deception claim, facts alleged under Claim Six include references to "actively concealed"; however, the Complaint fails to identify facts identifying 'concealed' from who, when, where, and how, therefore, Claim Six is not analyzed as a judicial deception claim.

Removal of Child" included "(1) Failure to protect a child from abuse or neglect; (2) Mental health issues; and (3) Unfit or unsafe home environment for child[,]" (Doc. 1 at 13, ¶ 52)—the Court finds Plaintiffs' argument unpersuasive.  A parental right to the care of a minor child is not absolute and serious allegations of abuse that are investigated and corroborated give rise to the reasonable inference of imminent danger sufficient to justify the state interference.  *Lamorie, supra, Ram, supra*.

Accordingly, the Court finds DCS Defendants' argument that Plaintiffs lacked standing, has some merit, as any residual rights Plaintiffs retained, while DCS Defendants maintained custody of A.K., were limited, as the allegations of abuse were investigated and corroborated which give rise to the reasonable inference of imminent danger sufficient for state interference.  *Lamorie, supra*.  Here, the period from November, 2020 through April 1, 2021, the DCS Defendants were granted custody of A.K. based on grounds including 'failure to protect a child from abuse or neglect' and 'unfit or unsafe home environment for child'; justifying the state interference with the added requirement of a procedural right to a judicial hearing only if the State sought to compel a minor child to undergo medical treatment over the parents' objection.  *Id.*  Plaintiffs may argue, here, that they objected to A.K.'s use of birth control pills, a prescription allegedly obtain on December 28, 2020. (Doc. 1 at 21, ¶ 91.)  However, there are no facts alleged in the Complaint that the DCS Defendants 'compelled' A.K. to 'undergo a medical treatment'; rather the facts state A.K. 'secured' a prescription.

The Court finds the Plaintiffs lack standing to raise a claim for a Fourteenth Amendment violation based on Claim Six for a custodial relationship when the state's interference was necessary after allegations of abuse were investigated and corroborated.

**Claim Twelve – First and Fourteenth Amendment Violation of Free Exercise 4/2/21**

**Egbert, DCS Ongoing Specialist**
**Necoechea, DCS Specialist Investigator**
(After-hours Investigations Team)
**Rojas-Adnachiel,** *former* **DCS Program Supervisor**
(After-hours Investigations Team)

DCS Defendants allege Plaintiffs lack standing to assert Claim Twelve for a violation of the free exercise of religion because, in essence, Claim Twelve of the Complaint incorrectly asserts "Plaintiffs have a fundamental right to infringe on A.K.'s free exercise[,]" and thus, fails. (Doc. 44 at 12.) In addition, DCS Defendants assert A.K.'s rejection of Plaintiffs' religious beliefs occurred prior to DCS involvement, as stated in the facts of the Complaint, and Plaintiffs have failed to plead "facts to show that making medical decision on behalf of the child is a religious practice[.]" (Doc. 44 at 12.)

Plaintiffs' Opposition alleges that Claim Twelve provides rather, that "Defendants were motivated" [. . .] "by hostility to Plaintiffs' efforts to exercise their right as parents to direct the religious practice of their child . . ." (Doc. 54 at 13:7-10.) Plaintiffs conclude, "[t]he facts which address the actions and motivations have already been set forth in this memorandum, no further elaboration is necessary." *Id.*

The Court merges and incorporates herein by this reference, the discussion regarding Claim Eight, above, as it also addresses a violation of free exercise of religion. Again, here, Claim Twelve, is tenuous, at best. "But the family itself is not beyond

regulation in the public interest, as against a claim of religious liberty" "[a]nd neither rights of religion nor rights of parenthood are beyond limitation." *Prince v. Massachusetts*, 321 U.S. 158, 165-66, 64 S. Ct. 438, 442 (1944). "Acting to guard the general interest in youth's wellbeing, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways." *Id*. at 166. "Its authority is not nullified merely **because the parent grounds his claim to control the child's course of conduct on religion** or conscience." *Id*. (emphasis added). A parental right to the care of a minor child is not absolute and serious allegations of abuse that are investigated and corroborated, as here, give rise to the reasonable inference of imminent danger sufficient to justify the state interference. *Lamorie, supra, Ram, supra*.

Accordingly, the Court finds DCS Defendants' argument that Plaintiffs lacked standing, has some merit, as a parent must be "fit" to have an unrestrained right to family association under *Troxel v. Granville*, 530 U.S. at 68, 120 S.Ct. 2054. Here, on the evening of April 2, 2021, the DCS Defendants were granted custody of A.K. by the court, thus limiting the parents right to the care, custody and control, including the right to the free exercise of religious influence over their child, including decisions regarding their child's religious practices, and any medical decisions made on behalf of the child, short of compelling medical treatment, over their objection. Based on the above, the Court finds Plaintiffs lack standing to assert Claim Twelve for a violation of free exercise of religion regarding DCS Defendants acquiring custody of A.K. on April 2, 2021, as discussed in Claim Eight, any relation to a claim to religious practices, is at best, tenuous. Plaintiffs'

claims that 'Defendants were motivated' 'by hostility' is language more akin to a First Amendment retaliation claim, as alleged in Claim Nine, discussed herein.

**Claim Fourteen – 1ˢᵗ and 14ᵗʰ Amend. Violation of Familial Association Post-4/2/21**

**Machiche, DCS Program Administrator**
**Egbert, DCS Ongoing Specialist**
**Huerta, DCS Program Supervisor - Ongoing**

DCS Defendants assert that under Claim Fourteen, *inter alia*, the actions of the DCS Defendants become protected under the doctrine of qualified immunity because "[w]hen Plaintiffs' conclusory allegations are omitted" "we are left   with" "[t]he statutorily prescribed duties of each" of the defendants. (Doc. 44 at 20:24-27.)  Further asserting:

> The DCS Defendants are entitled to qualified immunity for conducting the child welfare investigation of the Plaintiffs' family, and for their attempts to collaborate with the family to address Plaintiffs' failures to protect their child and to pursue the treatment and health of A.K.  The Plaintiffs' right of family integrity does not include the constitutional right to avoid a child welfare investigation or refuse a meeting with DCS personnel carrying out statutorily prescribed duties.

(Doc. 44 at 21:12-17.)

Plaintiffs oppose this characterization of Claim Fourteen and assert "conduct includ[ed] the suppression of evidence concerning the child's self-harming activities,[11] blocking the parents from critical information and contact with the child, putting psychological pressure on the mentally ill child to renounce [the] family, and falsifying documents in order to" "interfer[e] with the familial association." (Doc. 54 at 33:14-21.)

---

[11] The Court notes, here, that Plaintiffs' allegations of 'self-harming' activities range from 'cutting' to 'tattooing' and 'piercing'.  The Court finds a marked difference between categorizing 'cutting' as 'self-harming' compared with tattooing and piercing.

- 24 -

Here, by Plaintiffs' own recitation, above, the actions summarized do not pertain to the period alleged as "[t]he actions taken by these Defendants, in the period April 2, 2021, through at least the tenure of Egbert as Case Manager . . ." (Doc. 1 at 56, ¶ 266.)  Rather the Complaint alleges "creation of false documentation[,]" "concerns about the treatment of A.K. and the appearance of bias against [Plaintiffs] by AZDCS agents because of their religion[,]" and that "Machiche ratified the past actions and also approved the continuing goal" and "frustrated Plaintiffs' efforts to see that appropriate psychiatric care was provided." (Doc. 1 at 56, ¶¶ 264, 266.). Plaintiffs no longer had custody of A.K. as of April 2, 2021; the rights asserted as to familial association, as discussed herein, *supra*, are limited.  *Troxel, supra*.  Based on the allegations of the Complaint, taken as true, and in the light most favorable to Plaintiffs, Plaintiffs fail to allege sufficient facts for the Court to find they have standing to raise Claim Fourteen, particularly given they no longer had custody of A.K., based on a court's order.

**Claim Fifteen – 1st and 14th Amend. Violation of Free Exercise Religion Post-4/2/21**

**Machiche, DCS Program Administrator**
**Egbert, DCS Ongoing Specialist**
**Huerta, DCS Program Supervisor – Ongoing**

DCS Defendants assert Plaintiffs lack standing to bring Claim Fifteen because Plaintiffs' claim "has nothing to do with Plaintiffs' own religious beliefs and practices, but Plaintiffs are suing because they claim that the DCS Defendants prevented them from forcing their child, A.K., to adhere [to] Plaintiffs' religious beliefs and practices[.]"

Plaintiffs concede standing is proper "only if they claim infringement of their personal religious freedom" and in support cite to *McGowan v. Maryland*, 366 U.S. 420,

429, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961). (Doc. 54 at 27:19-23.)  Plaintiffs cite to *Grove v. Mead School Dist.*, 753 F.2d 1528, 1531 (9th Cir. 1985), as support and provide the following additional citation "[P]arents have a right to direct the religious upbringing of their children and, on that basis, have standing to protect their right."  *Id.*, at *17, quoting *Doe v. Madison School Dist. No.* 321, 177 F.3d 7889, 795 (9th Cir. 1999), and citing *Grove*."  (Doc. 54 at 28:5-17.)

However, the Court finds 1) the citation includes perhaps a clerical error; and 2) the case is distinguishable from the case at bar because the state had custody of A.K. and the cited case(s) are not involving minor children who were removed from their parents' custody based on allegations of abuse and unfit homes.  Addressing the clerical error, first, the citation does not reside at *17, rather *6, and states as follows:

> *6 Doe, **as the parent of a child who is a student** at Heritage has standing to challenge that school's violation of his right to direct the religious upbringing of his child. *See Madison*, 177 F.3d at 795 ("[p]arents have a right to direct the religious upbringing of their children and, on that basis, have standing to protect their right."); *Grove v. Mead School Dist. No. 354*, 753 F.2d 1528, 1532 (9th Cir. 1985) ("Grove has standing as a parent whose right to direct the religious training of her child is allegedly affected."); *Wisconsin v. Yoder*, 406 U.S. 205, 205 (1972); *Schempp*, 374 U.S. at 224 n. 9 (finding that while plaintiffs lacked standing as state taxpayers, they had standing as parents where their children were enrolled in public schools and so were "directly affected" by the challenged laws); *see also Valley Forge*, 454 U.S. at 486 n. 22.

*Doe v. Heritage Acad., Inc.*, No. CV-16-03001-PHX-SPL, 2017 WL 6001481, at *6 (D. Ariz. June 9, 2017) (emphasis added).  Plaintiffs' reference to Grove, in pertinent part:

> Appellants have standing to challenge alleged violations of the establishment clause of the First Amendment **if they are directly affected by use of** *The Learning Tree* in the English curriculum[.] Grove has standing as a parent

whose right to direct the religious training of her child is allegedly affected.

*Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1532 (9th Cir. 1985).

Here, however, Plaintiffs' child, A.K., was removed from their custody, and pursuant to court order, the State was granted custody.  As discussed, herein, *supra*, parents' rights to the care, custody, and control of their children are not absolute and when the state acts as *parens patriae* it may restrict those rights.  *Prince, supra*.  "Its authority is not nullified merely because the parent grounds [the] claim to control the child's course of conduct on religion or conscience."  *Prince, supra*.  The Court finds Plaintiffs Claim Fifteen regarding violation of free exercise of religion in actions post-April 2, 2021, lack sufficient facts to support the Plaintiffs' assertion of care, and control of A.K., *i.e*., to direct the religious training of A.K., when the facts of the Complaint establish that the Plaintiffs no longer had custody, and Plaintiffs therefore lack standing.

## V.   CLAIMS NINE, ELEVEN, AND THIRTEEN:  QUALIFIED IMMUNITY

### Claim Nine - 1st Amend. – Retaliation on April 2, 2021
### Egbert, DCS Ongoing Specialist

DCS Defendants move to dismiss Claim Nine asserting Plaintiffs fail to identify which of the DCS Defendants, if any, were made aware that anyone made criticisms of them.  Specifically, regarding Egbert, and Plaintiffs' assertion that "Egbert's conduct on April 2nd, include[ed] [i]ntentionally bypassing [protocol]; the substance of [notice to A.K.]; misleading [the child]; and subsequent conduct in communications within the agency[,] giving false and misleading information about Plaintiffs[;] retaliate[d] against

them for their protected conduct[,]" (Complaint ¶ 239), is conclusory and without facts to support a plausible claim for retaliation.  (Doc. 44 at 34-35.)

To state a claim under 42 U.S.C. § 1983, Plaintiffs must allege that Plaintiffs suffered the deprivation of a federally protected right and that "the alleged deprivation was committed by a person acting under color of state law." *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1140 (9th Cir. 2020) citing *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250 (1988).

### A.  Qualified Immunity

In § 1983 actions, "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)); *Spears v. Arizona Bd. of Regents*, 372 F. Supp. 3d 893, 908 (D. Ariz. 2019); *Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir. 1997). "Qualified immunity protects governmental defendants from liability, but is also 'an entitlement not to stand trial or face the other burdens of litigation.' [It] is 'an immunity from suit rather than a mere defense.'" *Spears*, 372 F. Supp. 3d at 908 (citation omitted). "[Q]ualified immunity allows for errors in judgment and protects 'all but the plainly incompetent or those who knowingly violate the law ... [I]f officers of reasonable competence could disagree on the issue [whether or not a specific action was constitutional], immunity should be recognized." *Spears*, 372 F. Supp. 3d at 909 citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

1    "To determine whether qualified immunity applies, we ask whether (1) the plaintiff

2    has plausibly alleged a violation of a constitutional right, and (2) the constitutional right

3    was 'clearly established' at the time of the conduct at issue." *Sampson*, 974 F.3d at 1018

4    citing *Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020) (quoting *Pearson*, 555 U.S. at

5    236, 129 S.Ct. 808).  "Lower courts have discretion to address the questions in reverse

6    order[.]" *Sampson*, 974 F.3d at 1018.

7    ### B.  First Amendment Retaliation

8
9        To state a First Amendment retaliation claim, [Plaintiffs] must plausibly
       allege that (1) [Plaintiffs] engaged in a constitutionally protected activity, (2)
10      Defendants' actions would chill a person of ordinary firmness from
       continuing to engage in the protected activity, and (3) the protected activity
11      was a substantial or motivating factor in Defendants' conduct.

12
13   *Sampson*, 974 F.3d at 1019. "To prevail, [Plaintiffs] must establish that Defendants'

14   "retaliatory animus" was the "but-for" cause of [Plaintiffs'] injury, 'meaning that the

15   adverse action against [Plaintiffs] would not have been taken absent the retaliatory

16   motive.'" *Sampson*, 974 F.3d at 1019 citing *Nieves v. Bartlett*, —— U.S. ——, 139 S. Ct.

17   1715, 1722, 204 L.Ed.2d 1 (2019) (first two quoting *Hartman v. Moore*, 547 U.S. 250, 259,

18   260, 126 S.Ct. 1695 (2006)).  "[T]he First Amendment prohibits government officials from

19   subjecting an individual to retaliatory actions, including criminal prosecutions, for

20   speaking out[.]"  *Hartman*, 547 U.S. at 256, 126 S. Ct. at 1701.  "[T]he First Amendment

21   right to criticize official conduct of public officials without being subject to the threat of

22   losing custody was 'clearly established' as of August 2015[.]" *Sampson*, 974 F.3d at 1022

23   citing *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1054 (9th Cir. 2019).

**Claim Nine - 1st Amend. – Retaliation on April 2, 2021 -** Plaintiffs allege that they engaged in constitutionally protected activity when Plaintiffs expressed 'concerns' to Defendants, including Egbert.  (Doc. 54 at 14.) Additionally, on January 7, 2021, Plaintiffs identified concerns in an email to Egbert, and the follow-up submission to Egbert of Instagram posts of A.K. while at VisionQuest.  (Doc. 54 at 14) (Doc. 1 at 24-25, ¶¶ 101, 102, 103 (suppression).)  Plaintiffs brought a complaint to the AZDCS Ombudsman, and the Complaint alleges that Egbert—the subject of the Complaint as the current Case Manager—lied in response and was angered by the Complaint.  (Doc. 54 at 14) (Doc. 1 at 30, ¶¶ 121-125.) Plaintiffs further allege Egbert's involvement in the events of April 2, 2021, as grounds for First Amendment retaliation.  (Doc. 54 at 14) (Doc. 1 at 31-36, ¶¶ 126-157.)

Plaintiffs must show that Defendant Egbert's allegedly false statements, material omissions, and efforts to remove A.K. from Plaintiffs' custody were motivated by Defendant Egbert's desire to retaliate against Plaintiffs for speaking out about Plaintiffs' concerns regarding A.K. in the January 7, 2021 email to Egbert (with Instagram post), and Plaintiffs' official complaint regarding Defendant Egbert to the Ombudsman.

Plaintiffs' complaints about Defendant Egbert to the Ombudsman are clearly constitutionally protected.  *Hartman, supra.*  At the time of Defendant Egbert's alleged conduct, it was clearly established that the First Amendment prohibits public officials from threatening to remove a child from an individual's custody to chill protected speech out of retaliatory animus for such speech. *Sampson*, *supra*, citing *Capp*, *supra*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Ninth Circuit has held that biological parents have a clearly established due process right under the Fourteenth Amendment to be free from the deliberate use of perjured testimony and fabricated evidence during juvenile dependency proceedings.  *See*, *e.g*., *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1116-17 (9th Cir. 2017).  This, however, is not a Fourteenth Amendment claim, rather a First Amendment retaliation claim.  Under *Sampson, supra*, the Ninth Circuit held that—the First Amendment protection against retaliation afforded biological parents as found in *Capp, supra*—the same First Amendment protection against retaliation holds true for a court-appointed legal guardian, as well, *i.e*., that the First Amendment right to criticize official conduct of public officials without being subject to the threat of losing custody was 'clearly established as of August 2015.  *Sampson, supra*, citing *Capp, supra* ("It is well settled that the activity for which [the plaintiff] was allegedly retaliated against—voicing criticism of the Agency's conduct—is constitutionally protected.")  In the context of social workers, a longstanding, clearly established right under the First Amendment includes the right to be free from retaliation in the form of threatened legal sanctions and other similar means of coercion, persuasion, and intimidation.  *Sampson, supra*, *Carr, supra*.  Defendant Egbert was therefore on notice that retaliation for complaints would be a violation of Plaintiffs' constitutional right under the First Amendment as the alleged conduct and or omission occurred between October of 2020 and November of 2021, and the events of April 2, 2021, and the right was established as of August 2015.  *Sampson, supra*, citing *Capp, supra*

Having established the second prong of the qualified immunity test, *i.e*., that the constitutional right was 'clearly established' at the time of the conduct at issue, the Court

turns to the first prong of applying qualified immunity, *i.e.*, to address the question of whether Plaintiffs have plausibly alleged a violation of a constitutional right.  *Wilk, supra.* "Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).

In response to Plaintiffs' 'concerns' and 'objections' regarding A.K., as penned by Levi Kirwin (evident by the language "Sharmila and **I** ask"), and emailed to Defendant Egbert on January 7, 2021, according to the Complaint:

> Egbert brought Plaintiffs' concerns to the attention of Millage, and the two agreed to **suppress the information** and the evidence of **the behaviors** from the department and the juvenile court because disclosure would negatively impact the Defendants' process of splitting A.K. from her family and furthering the goal of A.K.'s gender transition.

Complaint (Doc. 1 at 25, ¶ 103) (emphasis added).

The analysis asks, would a reasonable case worker think that non-disclosure of Plaintiffs' January 7, 2021 email, to the department, or to the juvenile court, would violate the clearly established right to be free from retaliation for criticism of the agency.  The substance of the January 7, 2021 email lists A.K.'s behaviors, that in the eyes of the Plaintiffs, are a result of "recklessly poor oversight."  (Doc. 1 at 24, ¶ 101.)  As DCS Defendants point out, this information was readily available to Plaintiffs had they wished to bring it to the department, or the juvenile court's attention.  In addition, the substance of A.K.'s behaviors, although to Plaintiffs may appear to include "profound and immediate

danger," to others, may appear to be, rather, teenager experimentation and exploration.  In addition, Defendant Egbert sought a second opinion (Millage's), and together they decided against the disclosure, according to the facts of the Complaint, rather than perhaps operating on any individualized personal animus, as Plaintiffs allege against Egbert. According to the Complaint, therefore, the Court finds the January 7, 2021 email cannot be viewed as grounds to preclude the protection afforded a public official under qualified immunity.

Plaintiffs' official complaint to the Ombudsman on January 26, 2021, as worded in the Complaint under scrutiny, here, suggests the January 26th complaint "detailed information about falsehoods and fabrications"; however, only a summary is available for the Court's review.  (Doc. 1 at 30, ¶¶ 122-23.)  The 'summary' provides no specific 'falsehoods' or 'fabrications.' *Id*.  The Complaint proceeds to allege conclusory allegations that Egbert, in response to the January 26, 2021 Ombudsman complaint, "denied, lied and misrepresented the true facts."  (Doc. 1 at 30, ¶ 124.)

Here, again, the Court must consider Fed. R. Civ. P. 9(b), because the allegations against Defendant Egbert include allegations of "lies," "fabrication," and "falsehoods"; however, couched under the auspice of the January 26, 2021 complaint without including the specifics of the who, what, when, where, and how, or why a denial is misleading, or why Plaintiffs assert "[t]he allegations, and court testimony obtained during the contested dependency in February and March 2021, demonstrate 'falsehoods' and 'fabrications.' *Vess, supra* ('the who, what, when, where, and how' and 'what is false or misleading about a statement, and why it is false') ("When an entire complaint, or an entire claim within a

complaint, is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint or claim.")  The Complaint further alleges the elements of a First Amendment retaliation claim in a conclusory manner utilizing the buzz words alleging Egbert was "angry" regarding the January 26, 2021 complaint and "intended to retaliate"; however, without the inclusion of facts establishing the grounds for fraud under Rule 9(b).  (Doc. 1 at 31, ¶ 125.)

Lastly, in support of retaliation, Plaintiffs raise the events of April 2, 2021, and allege Defendant Egbert "manipulated" the situation and "prior to that date" "concealed" A.K.'s "deterioration."  (Doc. 54 at 14:16-19) (Doc. 1 at 31, ¶ 127.)  The Court notes that the "prior to that date" "concealed" "deterioration" lacks dates and the who, what, where, when, necessary under Rule 9(b), in addition to specific facts as to what was meant by A.K.'s "deterioration."  Contrary to Plaintiffs' characterization, the face of the Complaint states "Egbert also returned Plaintiffs' call" and "Egbert . . . called Millage at VisionQuest" which suggest acts of cooperation and despite Plaintiffs' characterization that Egbert "misinformed" A.K., the statement that 'your parents won, they are coming to get you' was based somewhat in fact, and not "misinformation."  (Doc. 1 at 32, ¶ 132.)  In addition, contrary to Plaintiffs assertions of "manipulation" by Egbert of the April 2nd events, it was Millage that called the Crisis Response Team (¶ 134), and Millage that called 911 (Doc. 1 at 33, ¶ 137).  Furthermore, it was Jablonsky of the Crisis Response Team, that called the AZDCS Hotline and made a report (¶ 141).

Regarding any alleged misconduct on behalf of Egbert and the events of April 2, 2021, the Court finds the facts of the Complaint are suggestive of cooperation between

Egbert and various individuals and multiple agencies with everyone attempting to address compliance with a court order effecting the custody of a teenager unwilling to comply, rather than any 'manipulation' by Egbert. (Doc. 1 at 32, ¶ 131.)  A reasonable case worker, in the absence of animus, would have likely conducted themselves similarly.  As stated in the Complaint, A.K., upon hearing the news, tried to 'run into traffic', cut herself, and threatened further self-harm, if returned to Plaintiffs' custody.  (Doc. 1 at 32, ¶ 134.)  The filing of an Application & Declaration for *Ex-Parte* Removal of a Child based on information provided by Egbert, Millage and TPD Officer Muckenthaler, as stated on the face of the Complaint, was reasonable, under the circumstances. (Doc. 1 at 34, ¶ 147.)

> Officials are subject to suit only for actions that they knew or should have known violated the law. *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Law is "clearly established" for the purposes of qualified immunity if "every reasonable official would have understood that what he is doing violates th[e] right" at issue. *Taylor v. Barkes*, 575 U.S. 822, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015) (per curiam) (quotation marks omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances"—i.e., even without a prior case that had "fundamentally similar" or "materially similar" facts. *Hope*, 536 U.S. at 741, 122 S.Ct. 2508.

*Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020).  Here, under the circumstances of April 2, 2021, a reasonable case worker would not have thought that filing of the Application & Declaration for *Ex-Parte* Removal of a Child would violate Plaintiffs' right to be free from retaliation under the First Amendment because other agencies such as law enforcement, the Crisis Response Team, and Sonoran Behavioral Health Center were involved with ensuring A.K.'s safety that day, after instances of self-harming behavior. Although Plaintiffs suggest the Court consider, as well, paragraphs 155 through 157 of the

Complaint, the Court notes these paragraphs involve conduct occurring April 8, 2021 and Plaintiffs' Claim Nine is limited to April 2, 2021.  (Doc. 54 at 14:18-19.)  Based on the above analysis, the Court finds Plaintiffs' Claim Nine against Egbert for an alleged retaliation under the First Amendment, fails to plead facts sufficient under Rule 9(b) for any claims of 'misrepresentations', 'lies', 'falsifications', or 'fabrications' alleged for the January 26, 2021 official complaint to the Ombudsman, and a reasonable case worker, in the absence of animus, would have likely acted, and or made similar omissions under the circumstances of the January 7, 2021 and April 2, 2021 events.  Accordingly, Defendant Egbert is afforded qualified immunity, as all of the acts or omissions alleged were conducted in Egbert's official capacity, there were no allegations of material facts falsely alleged in affidavits or depositions, and Claim Nine should be dismissed with prejudice.

**Claim Eleven – 1st and 14th Amend. Violation Judicial Deception on April 2, 2021**

**Egbert, DCS Ongoing Specialist**
**Necoechea, DCS Specialist Investigator**
(After-hours Investigations Team)
**Rojas-Adnachiel,** *former* **DCS Program Supervisor**
(After-hours Investigations Team)

DCS Defendants move to dismiss Claim Eleven asserting the Complaint lacks sufficient facts for a claim of judicial deception on April 2, 2021, because the particular facts establishing "who, what, or how," Plaintiffs' due process rights were violated are lacking from the Complaint.

Plaintiffs oppose dismissal and ask the Court to compare the allegations of the Complaint to the allegations in *Benevidez v. Cnty. of San Diego*, 993 F.3d 1134 (9th Cir. 2021) under Rule 9(b)'s heightened pleading standard for a judicial deception claim,

alleging the defendants, here, falsified investigative files, and applications, affidavits, and reports and "did so by dramatically deviating from the policies and procedures established by the department."  (Doc. 54 at 24:15-18.)

As to Egbert, the Court merges and incorporates herein by this reference the analysis under Claim Nine regarding claims of 'falsification,' 'fabrication,' 'lies,' and 'misrepresentation' as applied to the events of April 2, 2021.  As stated therein, only claims that a public official knowingly "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known[,]'" strip the protection qualified immunity affords. *Pearson*, 555 U.S. at 231.

Regarding Defendant Necoechea, and the events of April 2, 2021, the Complaint sets forth the following:

> 144. It was Necoechea who was in communication with Muckenthaler, and who **informed** the officer that AZDCS had undertaken to re-establish custody of A.K.;

> 145. No TPD officer, knowing that Plaintiffs were the legal custodians of A.K., nor **Necoechea**, **notified** Plaintiffs that A.K. was not in the ACES facility, but had been taken to the **Midtown Station** and was waiting there[.]

Complaint (Doc. 1 at 34, ¶¶ 144, 145.)

If a state official "submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, ... he cannot be said to have acted in a reasonable manner, and the shield of qualified immunity is lost." *Keates*, 883 F.3d at 1240.

Here, from the facts of the Complaint, it is not clear that Defendant Necoechea was aware that law enforcement had taken A.K. to Midtown Station.  Whomever made the

decision to take A.K. to Midtown Station temporarily, without an arrest, is not clear from the facts of the Complaint, the facts lack an established sequence of events, and does not support the required specificity for an allegation of judicial deception under *Keates*, 883 F.3d at 1240 (quoting *Spence v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

> 146. Necoechea **did contact Levi**, but only to ask the parent if he had the case number. Necoechea knew, when he placed the call, **that he had insufficient information** on the matter and needed to interview the Plaintiffs and collaterals, but he took no such steps. He **concealed** the child's situation from the Plaintiffs[.]

Complaint (Doc. 1 at 34, ¶ 146.)  The allegations of paragraph 146 amount to an omission perhaps, rather than a deliberate falsification of evidence under *Keates*, and this is assuming Necoechea was even aware of the child's situation.  Paragraph 146 fails to identify how any omission caused a deprivation of Plaintiffs' right to familial association, as A.K. was with law enforcement after making allegations with risks of self-harm if returned to Plaintiffs' custody.  Any 'concealing' of information was from Plaintiffs, not judicial deception.

> 147. Based on information provided by Egbert, Millage and Muckenthaler, none of which he vetted for accuracy, **Necoechea** prepared an APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF A CHILD," secured, with full knowledge, the approval of his superior Rojas-Adnachiel, and at 10:33 p.m. on the night of the 2nd of April, submitted the Application and received the Order sought from Maricopa County Judge Tracy Nadzieja at 10:50 p.m.;

Complaint (Doc. 1 at 34, ¶ 147.)  Paragraph 147 alleges no claims of judicial deception, and merely infers Necoechea did not check for accuracy.

> 148. Necoechea then informed Muckenthaler of the Order, and **directed** that A.K. be transported to Sonoran Behavioral Health Center [hereafter, "SBH"], at which location Muckenthaler transferred custody to AZDCS;

> 149. A.K. was never arrested;

* * *

> 152. At 11:24 p.m., Necoechea prepared a Temporary Custody Notice, and notified Plaintiffs by telephone[.]

(Doc. 1 at 35, ¶¶ 148, 152.)   Paragraphs 148 and 152 lack any facts alleging judicial deception.

> 154. Between April 2nd and the 7th, Necoechea and Supervisor Rojas-Adnachiel contacted AAG Nan[s]i Naranjo, and supplied her with alleged facts supporting the department's removal of A.K. Necoechea prepared and submitted a dependency petition worksheet with the allegations. Egbert was consulted and contributed to the allegations[.]

Complaint (Doc. 1 at 35, ¶ 154.)   Paragraph 154 of the Complaint applies after the time-period alleged in Claim Eleven.

The Court finds a material question of fact missing from the allegations of the Complaint and whether Necoechea was aware of A.K.'s temporary physical presence at Midtown.   Accordingly, the Complaint lacks sufficient facts for a claim of judicial deception for the events of April 2, 2021 as against Necoechea as alleged in Claim Eleven.

Regarding Defendant Rojas-Adnachiel, alleged as Egbert's supervisor, and the events of April 2, 2021, regarding Plaintiffs' Claim Eleven for judicial deception, the Complaint suggests Egbert notified Rojas-Adnachiel of Egbert's desire that A.K. be seized (¶ 143) and that Necoechea prepared the Application & Declaration for *Ex-Parte* Removal of Child, "secured, with full knowledge, the approval of his superior Rojas-Adnachiel" (¶ 147).   Whether Defendant Rojas-Adnachiel was Egbert's supervisor or Necoechea's 'superior'; mere approval of an Application does not sufficiently plead facts for a claim of judicial deception, and liability under a theory of *respondeat superior* is precluded.

Accordingly qualified immunity is afforded to Defendant Rojas-Adnachiel, as Plaintiffs have failed to allege facts sufficient for a claim of judicial deception and or fraud under 9(b), and without allegations of false material facts sworn to.

The *Benevidez* case is distinguishable because it involved an unconsented-to medical examination procured by court order. Despite this distinction, Plaintiffs appear to rely on "knowledge, may be pled generally" (*United Healthcare Ins*., 848 F.3d at 1180) and need not allege 'a precise time frame,' 'single specific transaction,' or identify the 'precise method' used to carry out the alleged fraud. *See generally Benevidez, supra*.

The events of April 2, 2021, however, were not an unconsented-to medical examination, as in *Benevidez*, and here, the Court is addressing a court-authorized removal and temporary custody, not medical treatment compelled by the state.

**Claim Thirteen – 1st and 14th Amend. Violation - Judicial Deception in Petition II[12]**

**Egbert, DCS Ongoing Specialist**
**Necoechea, DCS Specialist Investigator**
(After-hours Investigations Team)
**Rojas-Adnachiel,** *former* **DCS Program Supervisor**
(After-hours Investigations Team)

DCS Defendants move to dismiss Claim Thirteen because the "claims regarding the application for the court authorized removal, the reports to the court, and the TDM Summary are barred by prosecutorial immunity because in the context of a dependency proceeding, social workers exercise of discretion is not very different from a criminal

---

[12] Securing the Filing and Prosecution of the Re-opened Dependency Case (JD20200657), Petition II.

prosecutor and in support thereof cite to *Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.*, 812 F.2d 1154, 1156-1159 (9th Cir. 1987) (quasi-prosecutorial/absolute immunity).  (Doc. 44 at 26.) DCS Defendants further argue that Plaintiffs' allegations of decisions made regarding whether and how to pursue a civil dependency case are unsupported because the information is not known to Plaintiffs because of "privileged communications between DCS and its attorney."  (Doc. 44 at 30) (attorney/client privilege). Alternatively, DCS Defendants submit qualified immunity applies because "no reasonable case worker would expect that by consulting in confidence with the Assistant Attorney General to initiate dependency proceedings would violate a clearly established constitutional right."  (Doc. 44 at 29) (qualified immunity).  Specific to Rojas-Adnachiel, DCS Defendants submit "There is no *respondeat superior* liability under section 1983" absent a showing that the supervisor "participated in or directed the violations."  (Doc. 44 at 24) (citing to *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).  Lastly, DCS Defendants submit any alleged 'misrepresentations' related to in the TDM summary and CAR do not plead:

> 1) how the statements identified are false, 2) facts showing that the any of the identified statement(s) are/were false or had any bearing on the issuance on the CAR, 3) whether the DCS Defendants knew the information was false, 4) how Plaintiffs would know this information or have a good faith basis for this claim, 5) whether the documents allegedly containing the false statements were ever provided to AAG Naranjo, the Attorney for DCS, and, 6) whether the alleged misrepresentations had any bearing on the Court's finding of Dependency in the underlying matter wherein the Plaintiffs had not one but two opportunities to contest the CAR and the Dependency Petition and they fully litigated these issues in the underlying matters. Thus, Plaintiffs fail to show that they were denied any due process they claim entitlement to and they have no good faith basis for this claim. *See Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005).

(Doc. 44 at 31.)

- 41 -

In Opposition, Plaintiffs suggest "the allegations of false statements included in the documents, and the material facts omitted, are specifically set out" as well as "[t]he reasons why each statement is false are also set out" and ask the Court to consider the ability of the other defendants, *i.e.*, Defendant Surendran and Defendants VisionQuest and Millage, having had no difficulty with discerning the facts alleged against them, despite DCS Defendants' characterization of the Complaint as a 'puzzle' pleading.  (Doc. 54 at 18-19 n. 4.)  Plaintiffs further allege "the subjective intent" of the defendants is at issue and suggest they deviated from policy.  (Doc. 54 at 25.)  Regarding Rojas-Adnachiel, Plaintiffs submit supervisory liability exists for judicial deception and in support cites to *Maxwell v. Cnty. of San Diego,* 708 F.3d 1075, 1086 (9th Cir. 2013). (Doc. 54 at 25.)

The Court merges and incorporates herein by this reference, Section IV. "Law" of the R&R addressing Defendant Surendran's Motion to Dismiss (Doc. 25), and further supplements below with law relevant to DCS Defendants' Motion to Dismiss.

The Court merges and incorporates herein by this reference, Section IV. "Law" of the R&R addressing Defendant VisionQuest and Defendant Millage's Motion to Dismiss (Doc. 29), and further supplements below with the law relevant to DCS Defendants' Motion to Dismiss.

"Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948 (2009).  "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior."  Id.*

"[S]tate intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394 (1982) *citing Lassiter v. Department of Social Services*, 452 U.S. 18, 37, 101 S.Ct. 2153, 2165 (1981) (first dissenting opinion); *Lassiter*, 452 U.S. at 24-32, 101 S.Ct. at 2158-2162 (opinion of the Court); *Lassiter*, 452 at 59-60, 101 S.Ct. at 2176 (STEVENS, J., dissenting); *see also Little v. Streater*, 452 U.S. 1, 13, 101 S.Ct. 2202, 2209 (1981).

> In *Lassiter*, the Court and three dissenters agreed that the nature of the process due in parental rights termination proceedings turns on a balancing of the "three distinct factors"[:] the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. (citations omitted).
>
> * * *
>
> The "minimum requirements [of procedural due process] being a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action[.]" Moreover, the degree of proof required in a particular type of proceeding "is the kind of question which has traditionally been left to the judiciary to resolve." (citations omitted)

*Santosky*, 455 U.S. at 754–56, 102 S. Ct. at 1395-96.

> This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money[.]' Notwithstanding 'the state's 'civil labels and good intentions[,]' the Court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.'

*Id.* at 756, 102 S. Ct. at 1396.

"Our court[,] has held that parents can challenge under section 1983 a state's severance of a parent-child relationship as interfering with their liberty interests in the companionship and society of their children." *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds* by *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999). "It is well established that a parent has a 'fundamental liberty interest' in 'the companionship and society of his or her child' and that '[t]he state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. § ]1983.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678, 129 S. Ct. at 1949. "[A] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2)." *Id*. at 679. Courts may infer the existence of a subjective state of mind from the fact that the risk of harm is obvious. *Hope*, *supra*. Despite a state-actors participation in constitutionally impermissible conduct, state-actor defendants may still be shielded from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope*, 536 U.S. at 739 citing *Harlow v*, 457 U.S. at 818, 102 S.Ct. 2727.

Under A.R.S. § 8-501, 'out-of-home placement' is defined as follows:

9. "Out-of-home placement" means the placing of a child in the custody of an individual or agency other than with the child's parent or legal guardian and includes placement in temporary custody pursuant to § 8-821, voluntary placement pursuant to § 8-806 or placement due to dependency actions.

A.R.S. § 8-501.

Arizona Revised Statutes (A.R.S.) § 8-201, defines a "dependent child" as follows:

(a) Means a child who is adjudicated to be:
  i.   In need of proper and effective parental care and control and who has no parent or guardian, or one who has no parent or guardian willing to exercise or capable of exercising such care and control.
  ii.  Destitute or who is not provided with the necessities of life, including adequate food, clothing, shelter or medical care.
  iii. A child whose home is unfit by reason of abuse, neglect, cruelty or depravity by a parent, a guardian or any other person having custody or care of the child.
  iv.  Under eight years of age and who is found to have committed an act that would result in adjudication as a delinquent juvenile or incorrigible child if committed by an older juvenile or child.
  v.   Incompetent or not restorable to competency and who is alleged to have committed a serious offense as defined in § 13-706.
(b) Does not include a child who in good faith is being furnished Christian Science treatment by a duly accredited practitioner if none of the circumstances described in subdivision (a) of this paragraph exists.

A.R.S. § 8-201.  Under A.R.S. § 8-821, "[a] child may be taken into temporary custody only pursuant to one of the following:  1) an order of the superior court; [or] 2) Subsection D of this section; or 3) the consent of the child's parent or guardian"; Subsection D provides, "[a] child may be taken into temporary custody without a court order by a peace officer, a child welfare investigator or a child safety worker if temporary custody is clearly necessary to protect the child because exigent circumstances exist"; and Subsection K

provides, "'[e]xigent circumstances' means there is probable cause to believe that the child is likely to suffer serious harm in the time it would take to obtain a court order for removal and either of the following is true:   1) there is no less intrusive alternative to taking temporary custody of the child that would reasonably and sufficiently protect the child's health or safety; [or] 2) [p]robably cause exists to believe that the child is a victim of sexual abuse or abuse involving serious physical injury that can be diagnosed only by a physician who is licensed pursuant to title 32, chapter 13 or 17 or a health care provider who is licensed pursuant to title 32 and who has specific training in evaluations of child abuse." A.R.S. § 8-821.

> [A]n *ex parte* order authorizing temporary custody either expires automatically if no dependency petition is filed, or, if a dependency is initiated, subject to automatic, immediate, and continued review and scrutiny.
> Pursuant to Rule 47.3(D)(4), "[t]he temporary custody authorized by the [*ex parte*] order **will expire after 72 hours excluding Saturdays, Sundays and holidays unless a dependency petition is filed.** Ariz. R.P. Juv. Ct. 47.3(D)(4). Thereafter, "[t]he court with dependency jurisdiction over the child will review continuation of temporary custody as provided in [the Rules]." *Id.* Thus, unlike a criminal warrant, a temporary custody order is subject to continuous review by the juvenile court.

*Dep't of Child Safety v. Stocking-Tate in & for Cnty. of Yuma*, 247 Ariz. 108, 112–13, 446 P.3d 813, 817–18 (Ariz. Ct. App. 2019) (emphasis added).   "Thus, by rule and statute, temporary custody, even if initiated via an *ex parte* order, is reviewed first upon the filing of the dependency petition, a second time within five to seven days after the child is taken into custody at the PPH [Preliminary Protective Hearing], and a third time within twenty-one days after the dependency petition is filed at the IDH [Initial Dependency Hearing]. The need for continued out-of-home care is then reviewed at least once every six months

- 46 -

until the dependency is resolved. Recurring review of a child's placement ensures that the court's orders **remain in his best interests** — a consideration that "permeates dependency and severance proceedings." *Dep't of Child Safety v. Stocking-Tate in & for Cnty. of Yuma*, 247 Ariz. 108, 113–14, 446 P.3d 813, 818–19 (Ariz. Ct. App. 2019) (emphasis added) citing *DCS v. Beene*, 235 Ariz. 300, 304, ¶ 9, 332 P.3d 47, 51 (App. 2014) (collecting authority).

According to the Complaint,

154. Between April 2nd and the 7th, **Necoechea** and Supervisor **Rojas-Adnachiel** contacted AAG Nan[s]i Naranjo, and supplied her with alleged facts supporting the department's removal of A.K. **Necoechea** prepared and submitted a dependency petition worksheet with the allegations. **Egbert** was consulted and contributed to the allegations;

155. Relying on the sufficiency of the allegations, Naranjo prepared and filed with the juvenile Court DCS' DEPENDENCY PETITION AND PETITION FOR PATERNITY AND/OR CHILD SUPPORT [OUT-OF-HOME] [hereafter, "**Petition II**"]. Naranjo also prepared and submitted proposed TEMPORARY ORDERS AND FINDINGS [hereafter "Temporary Orders II], which the juvenile judge executed on April 8, 2021, *ex parte*, and which confirmed the department's seizure[.]

Complaint (Doc. 1 at 35, ¶¶ 154, 155) (emphasis added).

The Court finds regarding Claim Thirteen for violation of the First and Fourteenth Amendments against Egbert, Necoechea, and Rojas-Adnachiel for judicial deception in the prosecution and filing of Petition II, the allegations of paragraph 154 of the Complaint fall under attorney/client privilege as submitted by DCS Defendants.  The Court further finds to the extent that the allegations of judicial deception rely on previously alleged 'false' facts or 'misrepresentions' alleged in other Claims, herein, involving judicial deception, the Court merges and incorporates herein by this reference the law and analysis (*e.g*

Claims One, Three, Four, Six, Eleven and Fourteen).  Indeed, "[w]hen an entire complaint, or an entire claim within a complaint, is **grounded in fraud** and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court **may dismiss** the complaint or claim." *Vess*, 317 F.3d at 1107 (emphasis added).

## VI.    PUNITIVE DAMAGES

Plaintiffs seek punitive damages.  DCS Defendants cite to A.R.S. § 12-820.04[13] for the position that Plaintiffs are precluded from punitive damages because the DCS Defendants were "acting within the scope of [their] employment at all times under A.R.S. § 12-820.04."  DCS Defendants, in their reply, further cite to *Smith v. Wade*, to clarify that "Plaintiffs may only obtain punitive damages from Defendants in their individual capacity if their 'conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others'" and here, no showing of evil motive or intent appears in the facts of the Complaint.  Plaintiffs' claim that 'Defendants were  motivated' 'by hostility', even taken as true, fail to reach the threshold of 'evil' intent because in the absence of 'motivation' 'by hostility', A.K.'s undisputed threats of self-harm if returned to Plaintiffs' custody and the 'failure to protect' for previous abuse were sufficient for DCS Defendants to proceed with the dependency, acting within the scope of their employment.

---

[13] A.R.S. § 12-820.04 provides, "Neither a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages."

# VII.   CONCLUSION

**Claims One[14] and Three** - The Court finds the statute of limitations bars Claims One and Three and hereby dismisses Claims One and Three, with prejudice.

**Claims Four and Eight** – The Court finds Claim **Four** fails to plead with sufficient particularity under Fed. R. Civ. P. Rule 9(b) for a claim of ongoing judicial deception (extrinsic fraud) under the First and Fourteenth Amendments for interference with familial association.  The Court finds Claim **Eight** fails to plead a claim for interference with the free exercise of religion between Nov. 2020 and April 2, 2021 in violation of the First Amendment.  The Court further finds it appropriate to dismiss, without prejudice, and grant Plaintiffs leave to amend Claims Four and Eight, to address what Plaintiffs allege was deceptive.

**Claims Six, Twelve, Fourteen, and Fifteen** – As discussed herein, *supra*, the Court finds Plaintiffs lack standing to raise Claims Six, Twelve, Fourteen, and Fifteen, and finds it appropriate to dismiss Claims Six, Twelve, Fourteen, and Fifteen, with prejudice.

**Claims Nine,[15] Eleven, and Thirteen** – The Court finds DCS Defendants are afforded absolute/quasi-judicial/qualified immunity in their roles as pled in Claims Nine, Eleven, and Thirteen, and finds it appropriate to dismiss Claims Nine, Eleven, and Thirteen, with prejudice.

# V.   CLAIMS FOUR AND EIGHT:  LEAVE TO AMEND

"[W]hen dismissing with leave to amend, a court is to provide reasons for the dismissal so a plaintiff can make an intelligent decision whether to file an amended complaint."  *Spears*, 372 F. Supp. 3d at 908 citing *e.g.*, *Bonanno v. Thomas*, 309 F.2d 320 (9th Cir. 1962); *Eldridge v. Block*, 832 F.2d 1132 (9th Cir. 1987).

Within 30 days, Plaintiffs may submit a first amended complaint, as to **Claim Four** and **Claim Eight**, *only*, to cure the deficiencies outlined above.  Plaintiffs must clearly

---

[14] Claim Two – The Court notes Plaintiffs voluntarily dismissed Claim Two.  *See* Notice of Voluntary Dismissal of Second Claim Only With Prejudice (Doc. 36).

[15] Plaintiffs did not include a Claim Ten in the Complaint. (Doc. 1).

designate on the face of the document that it is the "First Amended Complaint." The first amended complaint must be retyped or rewritten in its entirety and may not incorporate any part of the original complaint by reference. Plaintiffs may include only one constitutional violation per claim and the facts in support of each claim shall be included with the appropriate claim. Plaintiffs first amended complaint shall be limited to the causes of action, time frames, and defendants, as first pled in Claims Four and Eight as follows:

> **Fourth Claim:  Fuentes, Egbert, and Chamberlain – 1st and 14th Amend. – Ongoing Judicial Deception and Interference with Familial Association Through April 1, 2021**

> **Eighth Claim:  Fuentes, Egbert, and Chamberlain – 1st Amend. – Violation of Free Exercise of religion Between November, 2020 and April 2, 2021**

The Court notes, here, that DCS Defendants raised the issue regarding a "Ryan" and Plaintiffs' reference in the Opposition to "the actions taken by Defendants Fuentes and Ryan, taken from November through December, 2020 [¶ 70], and more fully details those specific actions in Paragraphs 73 through 93." *See* Reply (Doc. 58 at 8:15-18); *see also* Opposition (Doc. 54 at 8:22-27). The Court notes the Complaint includes reference to "Ryan" in paragraphs 76 and 77, as a "Nicole Ryan, an AZDCS Case Aide assigned to work with PVBH." (Doc. 1 at 17-18, ¶¶ 76, 77.) Leave to amend the Complaint is limited to the three defendants previously identified in Claims Four and Eight, *i.e.*, Fuentes, Egbert, and Chamberlain.

## VIII.    RECOMMENDATION

For the reasons delineated above, the Magistrate Judge recommends that the District Judge, after its independent review, **grant** DCS Defendants' Motion to Dismiss (Doc. 44), and dismiss, with prejudice, Claims **One**, **Three**, **Six**, **Nine**, **Eleven**, **Twelve**, **Thirteen**, **Fourteen**, and **Fifteen**; and as to Claims **Four** and **Eight**, dismiss, without prejudice, and grant Plaintiffs leave to amend.

The Magistrate Judge further recommends the District Judge dismiss Plaintiffs' claim for punitive damages, herein, and as Plaintiffs' leave to amend Claims **Four** and **Eight**.

Pursuant to Federal Rules of Civil Procedure, Rule 72(b)(2), any party may serve and file written objections within fourteen (14) days of being served with a copy of the Report and Recommendation.  A party may respond to the other party's objections within fourteen (14) days.  No reply brief shall be filed on objections unless leave is granted by the District Court.  If objections are filed, the parties should use the following case number:

**CV-22-00471-TUC-RCC**

If objections are not timely filed, they may be deemed waived.

Dated this 25th day of July, 2023.

Honorable Bruce G. Macdonald
United States Magistrate Judge
