**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sharmila Kirwin, *et al*., | No. CV-22-00471-TUC-RCC-BGM |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | **RE:  Defendant Surendran's** |
| Dariusz Kot, *et al*. | **Motion to Dismiss (Doc. 25)** |
| Defendant. | |

Pending before the Court is Defendant Sandheep Surendran's Motion to Dismiss Complaint, Associated Request for Judicial Notice, and Supporting Memorandum of Authorities ("Motion to Dismiss") (Doc. 25).  Plaintiffs filed a Memorandum of Plaintiffs' In Opposition to Defendant Sandheep Surendran's Motion to Dismiss ("Opposition") (Doc. 32), and Defendant Surendran replied (Doc. 34).  This matter was referred to Magistrate Judge Bruce G. Macdonald for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72, and 72.2 of the Rules of Practice of the United States District Court for the District of Arizona.  (Doc. 26.)  A motion(s) hearing was held before Magistrate Judge Macdonald on May 31, 2023.  ME 5/31/23 (Doc. 59).  The Magistrate Judge recommends that the District Court, after its independent review, **grant** Surendran's Motion to Dismiss, and dismiss, with prejudice, Claim Five (V) (Doc. 25).

## I.    INTRODUCTION

Defendant Surendran ("Surendran") moves to dismiss Claim Five (V) of the Complaint under Rule 12(b)(6), Federal Rules of Civil Procedure (Fed.R.Civ.P.), for failure to state a claim on the grounds that Plaintiffs' allegations of a 'conspiracy' lack sufficient facts in the Complaint to overcome the presumption that Surendran, in his individual capacity, is a private citizen—and not a state actor, under Section 1983. Defendant Surendran further submits, that even if Plaintiffs are able to satisfy the 'joint-action test'—a countervailing factor precludes liability—namely, Surendran's First Amendment right of free speech.

Plaintiffs seek compensatory and punitive damages under 42 U.S.C. § 1983. Plaintiffs' Fifth Claim of the Complaint, specific to Defendant Surendran, alleges Defendant Surendran colluded with the State and private entity defendants[1] in a joint effort to sever Plaintiffs' familial association with their child ("A.K.") in violation of due process and Plaintiffs' First and Fourteenth Amendment rights.

## II.    BACKGROUND

In July of 2020, during A.K.'s summer of ninth grade, at approximately fourteen or fifteen years of age, one of A.K.'s counselors described A.K. as presenting with "anxiety, panic attacks, social anxiety, depression, gender dysphoria ("GD"), hallucinations, self-harm, suicidal ideations, and conflicted relationship with family." At this age, Plaintiffs 'allowed' A.K. to determine A.K.'s own clothing and hairstyle. On July 16, 2020, Plaintiffs and A.K., at A.K.'s insistence, placed a Zoom call to A.K.'s maternal grandmother. A.K.'s maternal grandmother invited Defendant Surendran—Plaintiff Sharmila Kirwin's brother (A.K.'s maternal uncle), and his then girlfriend—to join the call, without Plaintiffs' knowledge.

---

[1] Also pending before the Court is Defendant VisionQuest's and Miranda Millage's Motion to Dismiss Complaint (Doc. 29), addressed under separate report and recommendation.

Surendran continued contact with A.K. through August and September of 2020, encouraging A.K.'s online activities, posts, and videos.

On or about September 25, 2020, Plaintiffs transported A.K. to the hospital, after A.K. allegedly consumed more than the prescribed amount of medication—normally administered by, and kept in the possession of, A.K.'s parents. Despite receiving confirmation that the amount of medication consumed by A.K. was insufficient to cause illness or death, the Plaintiffs decided to take A.K. to Tucson Medical Center ("TMC"), in-patient care. While in TMC's care, A.K. made additional allegations of previous 'suicide attempts' which resulted in the transfer of A.K.—with parental consent—from TMC to Palo Verde Behavioral Health (PVBH).

During A.K.'s first ten days at PVBH, Plaintiffs communicated with A.K., daily. Surendran also communicated, unmonitored, with A.K., daily. Communications by Surendran with A.K. included promoting the 'trans affirmation' agenda and disparaging Plaintiffs and the family's religious beliefs. (Complaint Doc. 1 at 19, ¶ 81.) While at PVBH, A.K. made further allegations of 'past abuse' to professionals and threatened suicide if returned home. A.K. participated in a psychiatric evaluation and psycho-social assessment. The acting therapist, upon hearing the allegations of 'past abuse,' made a hotline report to Arizona Department of Child Services ("AZDCS"), on or about **September 29, 2020**. During A.K.'s stay at PVBH, Defendant Surendran provided A.K. books and materials.

On **October 2, 2020**, in response to a report from PVBH, Tucson Police Department ("TPD") called AZDCS regarding A.K.'s report of 'past abuse' and went to PVBH and interviewed A.K. On **October 6, 2020**, TPD spoke with both parents, and communicated the same to AZDCS. On October 8, 2020, AZDCS filed an Application and Declaration for *Ex-Parte* Removal of Child, and the Application was approved, and granted AZDCS temporary custody of A.K. On October 11, 2020—following a Zoom call, initiated by Plaintiffs after learning the department had taken custody of A.K.—Defendant Surendran cut off all communication with Plaintiffs.

Plaintiffs assert DCS Defendants worked in conjunction with Surendran, "to turn A.K. against" Plaintiffs, and allege that Surendran subscribed to the same 'philosophy' as the AZDCS Defendants and allege "that Surendran was in communication with various DCS Defendants and came to a meeting of the minds that Surendran would advocate the department philosophy to A.K., and would continue to use his influence in securing A.K.'s repudiation of [A.K.'s] parents' religion and values." Complaint (Doc. 1 at 16, ¶ 70; 17, ¶ 72.)

On October 21, 2020, Plaintiffs were served with DCS's Dependency Petition & Petition for Child Support [Out-of-Home[2]] ("**First Dependency Petition**"), filed **October 20, 2020**, and Temporary Orders & Findings, which affirmed the custody of A.K. to the department.  According to the Complaint, the legal grounds for seizure of A.K. included (1) Failure to protect a child from abuse or neglect; (2) Mental health issues; and (3) Unfit or unsafe home environment for [A.K.]. (Doc. 1 at 13:8-10.)

On **November 10, 2020**, A.K. was discharged from PVBH and transferred to Defendant VisionQuest, Madalyn House.  On the evening of November 11, 2020, Plaintiffs had a phone call with A.K. that ended abruptly.  Beginning in November 2020—while in custody of DCS—A.K. met with a therapist employed by Arizona Children's Association (AZCA), and when released from PVBH, changed primary care physicians from Dr. Lorenz with Desert Spring Family Care to El Rio Community Health.  While A.K. was at VisionQuest, Madalyn House, Surendran provided A.K. with books, materials, a cellphone, and a laptop computer.  Defendant Surendran, while in communication with A.K.—with the knowledge and approval of various DCS Defendants—allegedly promoted the DCS Defendants' 'philosophy' or 'agenda' and at the same time attacked and disparaged Plaintiffs' and the family's religious 'beliefs.'  Surendran's communications with A.K. included—*inter alia*, encouraging online communications, encouraging allegations against Plaintiffs, and encouraging A.K. to threaten suicide if returned to the parents' home—all characterized by Plaintiffs as part of a 'strategy' to achieve gender-change through hormone and surgical procedures.  Defendant Surendran's communications with A.K. were known to, supported by, and approved by, the AZDCS Defendants—allegedly, as part of the 'concerted plan' to achieve severance of the familial association bonds between parents and child.

On or about January 4, 2021 Surendran, in an email to Plaintiffs, indicated "my concern for [A.K.] compels me to **intervene** . . . [.]" (Doc. 1 at 24, ¶ 100.)  On January 26, 2021, Plaintiffs submitted a formal complaint to the AZDCS Office of the Ombudsman.

On February 25, 2021, Stephen Levine, M.D., presented his psychiatric evaluation of A.K., identifying his impression that A.K. experiences 'depersonalization, derealization, has a poor time sense, and has

---

[2] 9. "Out-of-home placement" means the placing of a child in the custody of an individual or agency other than with the child's parent or legal guardian and includes placement in temporary custody pursuant to § 8-821, voluntary placement pursuant to § 8-806 or placement due to dependency actions.  A.R.S. § 8-501(9).

shown dramatic changes in her behaviors from kind, compassionate, and gentle to cruelly hostile, mean, and uncaring with a ten-year history of visual and auditory hallucinations,' and identified A.K. as experiencing 'Dissociative Identity Disorder' [a.k.a. Multiple Personality Disorder] and 'Depersonalization/Derealization Disorder.'   Dr. Levine's psychiatric evaluation and addenda of A.K. was provided to DCS Defendants.

On March 1, 2021, following an emergency Child and Family Team ("CFT") Session—from which Plaintiffs were excluded—DCS Defendants began the process for securing an appropriate placement with Home Care Training to Home Care Client ("HCTC") (a.k.a. Therapeutic Foster Care).

On **April 2, 2021**, in Pima County Juvenile Court case number **JD20200657**, an order issued, finding there was no dependency, and ordered A.K. to be returned to the Plaintiffs' custody.  Despite the court ordered legal transfer of custody from DCS—to Plaintiffs—physical transfer of A.K. from VisionQuest to Plaintiffs' vehicle was unsuccessful.  The attempted transfer involved, *inter alia*, Plaintiffs' private investigator, a mobile Crisis Response Team,[3] Tucson Police Department ("TPD"), Tucson Fire Department, A.K.'s alleged attempts of self-harm, and A.K.'s alleged threats to kill the Plaintiffs if returned to their custody, Plaintiffs' unsuccessful attempt to secure placement of A.K. at PVBH, and TPD's plan to transport A.K. to Alternative Community Engagement Services ("ACES"), 'where [A.K.] would be allowed a 'cool down' period, and may be held overnight.'  During these events, the head of the mobile Crisis Response Team placed a call to the AZDCS Hotline and made a report.  TPD reported that ACES intake refused to accept A.K. and called AZDCS.  AZDCS conferred and informed TPD of the intent to re-establish custody of A.K.  A.K. was transported to Midtown Station unbeknownst to Plaintiffs.  AZDCS contacted Plaintiffs requesting the case number and prepared an "Application and Declaration for *Ex-Parte* Removal of a Child" and received the Order sought at 10:50 p.m. on April 2, 2021.   AZDCS informed TPD of the Order and directed that A.K. be transported to Sonoran Behavioral Health Center ("SBH") and TPD transferred custody of A.K. to AZDCS without arrests.  Upon admittance at SBH, A.K. was evaluated and the admitting diagnoses were, Major Depressive Disorder, recurrent, severe, with psychotic features; Cannabis use disorder; Alcohol disorder; and Gender Dysphoria.  AZDCS prepared a Temporary Custody Notice and notified Plaintiffs by telephone at 11:24 p.m. on April 2, 2021.

---

[3] The Court notes that the mobile Crisis Response Team *is an entity separate and distinct from* the Child and Family Team (CFT) of AZDCS.

Between April 2, 2021, and April 7, 2021, DCS Defendants prepared and filed with the Juvenile Court "DCS' Dependency Petition & Petition for Paternity and/or Child Support [Out-of-Home] ("**Second Dependency Petition**") and "Temporary Orders & Findings" affirmed and executed on April 8, 2021, *ex parte*.

Beginning on April 29, 2021, over the objection of the Plaintiffs, DCS Defendant(s) encouraged and authorized Surendran to participate in CFT meetings.  Complaint (Doc. 1 at 36, ¶ 158.)  "This was done, in part, to give Surendran access to HIPAA-protected SBH records and information and so he could (1) recommend a plan of treatment for A.K. which was directed at having A.K. placed in a "trans affirming" facility; and (2) continue his "trans affirming" goals he shared with the AZDCS Defendants." Complaint (Doc. 1 at 36, ¶ 158.)  "Surendran, to further these goals, and without any authority, began contacting placements and having discussions about placing A.K. in one of these facilities, information he then shared with Egbert, and the CFT." Complaint (Doc. 1 at 36, ¶ 158.)  While hospitalized at SBH, through approximately June 15, 2021, DCS Defendant(s) facilitated A.K.'s communication with Surendran.  DCS Defendant and Surendran continued to disparage Plaintiffs to A.K.  All of these cooperative actions were taken by DCS Defendant [Egbert], and Surendran, for the purpose of continuing the process of severing any familial association between parents and child.

On July 22, 2021, A.K. was released from SBH and transferred to Outback Therapeutic Expeditions (Outback).  On October 27, 2021, A.K. was released from Outback and transferred to "Angel House," a facility in Tucson.  Plaintiffs, and their insurer, paid for A.K.'s stay and treatment at Outback.  Subsequently, with encouragement and facilitation of AZDCS, A.K. announced the intent to sever all ties with Plaintiffs and directed A.K.'s lawyer in the dependency case to accomplish that goal.

## III.   JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) and (4).

## IV.   PARTIES' POSITIONS

Defendant Surendran requests that the Court analogize Surendran's role as 'intervenor' in A.K.'s custody proceeding—under Rule 113 of the *Arizona Rules of Procedure for the Juvenile Court* ("Ariz. R. P. Juv. Ct.")—to that of a 'guardian *ad litem*'

and cites to *Kirtley v. Rainey*, 326 F.3d 1088, 1096 (9th Cir. 2003).  Surendran suggests the role as 'intervenor' 'insulates' him from liability under Section 1983, despite acknowledging "intervenors like Surendran have no official [r]ole" to "investigate and report factual information to the court" nor "wield" "governmental power."  (Doc. 25 at 6).

In response, Plaintiffs assert that under either the 'state compulsion' or 'joint action' tests, the Complaint sufficiently alleges that Surendran engaged in action 'under color of law'; and meets at least these two of the four tests employed by the Ninth Circuit in determining state action by a private party.  (Doc. 32 at 13.)  Plaintiffs contend that although proof of a 'conspiracy' meets the joint action test, a 'conspiracy' is not required and the joint action test may otherwise be met by a showing that the private party was 'a willful participant in joint action with the state or its agents' and cites to *Tsao v. Desert Palace*, 698 F. 3d 1128 (9th Cir. 2012).  Plaintiffs further assert, the Complaint "plausibly allege[s] that the AZDCS Defendants recruited Surendran, a willing participant, in their campaign to turn [A.K.] away from [A.K.'s] parents and [r]eligion."  (Doc. 32 at 15.)  And lastly, "that Surendran enthusiastically participated in this covert action over a period of months, a strategy that proved ultimately successful" while asserting "Surendran and the AZDCS Defendants were interdependent in their goal, and in the strategy used to achieve it."  (Doc. 32 at 15.)  Plaintiffs concede Surendran's actions did not fall within protected First Amendment protections.  (Doc. 32 at 15.)  Plaintiffs' response further notes that "[t]he Complaint does not allege facts that Surendran's liability is grounded on his participation in the dependency case, nor in the CFT's."  (Doc. 32 at 16:11-13.)

Defendant Surendran's reply suggests the Court to apply the standards, stringently,

to "[preserve] an area of individual freedom by limiting the reach of federal law" and cites to *Lugar v. Edmondson Oil Co., Inc*., 457 U.S. 922, 936 (1982).   Surendran further contends that under the 'willful participant' portion of the joint action test, as argued by Plaintiffs, Plaintiffs fail to consider the deeper analysis which requires the state to have "so far insinuated itself into a position of interdependence with the private entity that [the two] must be recognized as joint participant[s] in the challenged activity" citing to *Kirtley*, 326 F.3d at 1093.

## V.   LAW

The **First Amendment** of the United States Constitution provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. CONST. amend. I.   "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1258 (10th Cir. 2009) citing *Employment Div., Dep't of Human Res. of Ore. v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595 (1990) *superseded by statute in Ramirez v. Collier*, 142 S.Ct. 1264, 212 L.Ed.2d 262 (2022) (Congress enacted RLUIPA [Religious Land Use and Institutionalized Persons Act], and its sister statute the Religious Freedom Restoration Act of 1993 to ensure "greater protection for religious exercise than is available under the First Amendment"); *see also Holt v. Hobbs*, 574 U.S. 352, 357, 135 S.Ct. 853 (2015) (discussing this history).

"The rights of children to exercise their religion, and of parents to give them religious training and to encourage them in the practice of religious belief, as against preponderant sentiment and assertion of state power voicing it, have had recognition here, [i]n *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178 (1943)." *Prince v. Massachusetts*, 321 U.S. 158, 165–66, 64 S. Ct. 438, 442 (1944). "But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty" "[a]nd neither rights of religion nor rights of parenthood are beyond limitation." *Prince*, 321 U.S. at 166, 64 S. Ct. 442 *citing Reynolds v. United States*, 98 U.S. 145 (1878). "Acting to guard the general interest in youth's wellbeing, the state as **parens patriae** may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways." *Id.* (emphasis added). "Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience." *Prince*, 321 U.S. at 166, 64 S. Ct. at 442.

> Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*. (citations omitted). In this respect, **the juvenile's liberty interest** may, in appropriate circumstances, be subordinated to the State's '*parens patriae* interest in preserving and promoting the welfare of the child.'

*Schall v. Martin*, 467 U.S. 253, 265, 104 S. Ct. 2403, 2410 (1984). "The doctrine of *parens patriae* recognizes both the power and the duty of the courts to act for the child's best interests." *Stewart v. Superior Ct. In And For Cnty. of Maricopa*, 163 Ariz. 227, 230, 787 P.2d 126, 129 (Ariz. Ct. App. 1989) citing *See* Note, *Arizona's Presumption Favoring Parental Rights—A Variable Standard?,* 23 ARIZ.L.REV. 470, 471 (1981); Note,

*Developments in the Law—The Constitution and the Family,* 93 HARV.L.REV. 1156, 1221 (1980).  *"Parens patriae* means literally 'parent of the country.'" *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 600, 102 S. Ct. 3260, 3265 (1982).  "At a fairly early date, American courts recognized this common-law concept, but now in the form of a legislative prerogative: "This prerogative of *parens patriae* is inherent in the supreme power of every State, whether that power is lodged in a royal person or in the legislature [and] is a most beneficent function ... often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves." *Id.* at 600, 102 S. Ct. at 3265.

"The fundamental concept of liberty embodied in [the Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment." *Cantwell v. State of Connecticut,* 310 U.S. 296, 303, 60 S. Ct. 900, 903 (1940).  "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws." *Id.* at 303, 60 S. Ct. at 903.

The **Fourteenth Amendment** of the United States Constitution provides in part that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1.[4]

> Since the decision of this Court in the *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18 (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment

---

[4] The "powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."  U.S. CONST. amend. X.

is only such action as may fairly be said to be that of the States. That Amendment **erects no shield against merely private conduct, however discriminatory or wrongful**.

*Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S. Ct. 836, 842 (1948) (emphasis added).

We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.' *(*citation omitted). The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' (citations omitted).

*Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059–60 (2000) (plurality opinion); *see generally Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 101 S.Ct. 2153 (1981); *see also Roberts v. U.S. Jaycees*, 468 U.S. 69, 104 S.Ct. 3244 (1984) (Supreme Court has long recognized parental constitutional rights to the care, custody, and control of minor children). "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65, 120 S. Ct. at 2060.

'The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment[,] the Equal Protection Clause of the Fourteenth Amendment[,] and the Ninth Amendment[.]

*Morrison v. Jones*, 607 F.2d 1269, 1276 (9th Cir. 1979) (internal citations omitted).

42 U.S.C. § 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State[,] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254–55 (1988). "Section § 1983's 'under color of law' requirement is treated 'as the same thing' as the 'state action' requirement under the Constitution." *Doe v. Rosenberg*, 996 F. Supp. 343, 348 (S.D.N.Y. 1998), *aff'd*, 166 F.3d 507 (2d Cir. 1999). "Our court[,] has held that parents can challenge under section 1983 a state's severance of a parent-child relationship as interfering with their liberty interests in the companionship and society of their children." *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds* by *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999). "A section 1983 claim based upon procedural due process thus has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). "Both the Fourteenth Amendment and Article 2, Section 4 of Arizona's Constitution provide that no person may be deprived of life, liberty, or property "without due process of law." *Coleman v. City of Mesa*, 230 Ariz. 352, 361, 284 P.3d 863, 872 (2012)

"[E]ven a private entity can, in certain circumstances be subject to liability under section 1983." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012). Under the joint action test which asks, "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights" a private party can be held to be a state actor either 'by proving the existence of a conspiracy or by showing that the private

party was 'a willful participant in joint action with the State or its agents.'" *Tsao*, 698 F.3d at 1140.

> [O]ur precedents indicate that a State normally can be held responsible for a private decision only when it has exercised **coercive power** or has provided such **significant encouragement**, either overt or covert, **that the choice must in law be deemed to be that of the State**. (citations omitted). Mere **approval** of or **acquiescence** in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment. (citations omitted).

*Blum v. Yaretsky*, 457 U.S. 991, 1004–05, 102 S. Ct. 2777, 2786 (1982) (emphasis added).

"It is well established that a parent has a 'fundamental liberty interest' in 'the companionship and society of his or her child' and that '[t]he state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. § ]1983.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (internal citations omitted). Generally, "[t]he only elements which need to be present in order to establish a claim for damages under the Civil Rights Act[5] are that the conduct complained of was engaged in under color of state law, and that such conduct subjected the plaintiff to the deprivation of rights, privileges, or immunities secured by the Constitution of the United States." *Marshall v. Sawyer*, 301 F.2d 639, 646 (9th Cir. 1962).

> To hold the [Children's Defendants] liable **as private parties** under § 1983, Plaintiffs must allege that they were engaged in state action—*i.e.*, that 'the

---

[5] Regarding the bill which became the Civil Rights Act of 1871, "[o]n March 28, 1871, Representative Shellabarger, acting for a House select committee, reported H.R. 320, a bill 'to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes.' H.R. 320 contained four sections. Section 1, [is] now codified as 42 U.S.C. § 1983[.]" *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 665, 98 S. Ct. 2018, 2023 (1978).

conduct allegedly causing the deprivation of a federal right [was] fairly attributable to the [s]tate.'

*Grae-El v. City of Seattle*, 618 F. Supp. 3d 1080, 1087 (W.D. Wash. 2022).

'The Supreme Court has articulated four tests for determining whether a private [party's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test.'

*Grae-El,* 618 F. Supp. 3d at 1087 *citing Tsao*, 698 F.3d at 1139.

**The Public Function Test -** "[T]he public function test is satisfied if the private party performs a function that is 'traditionally the exclusive prerogative of the State.'" *Doe v. Rosenberg*, 996 F. Supp. 343, 349 (S.D.N.Y. 1998), *aff'd*, 166 F.3d 507 (2d Cir. 1999) citing *Blum v. Yaretsky*, 457 U.S. at 1005.

**The Governmental Nexus Test –** "Generally, the governmental nexus test requires evidence that the private actor is 'entwined with governmental policies, or ... [the] government is entwined in [the private actor's] management or control.' (citation omitted). A showing of mere 'significant links is insufficient to demonstrate a governmental nexus between the state and a private entity without further evidence of "substantial interconnection." *Webber v. First Student, Inc.*, 928 F. Supp. 2d 1244, 1260 (D. Or. 2013). "Although the governmental nexus test is the most vague of the four state action tests, the Ninth Circuit has articulated four factors to consider when determining whether entwinement exists: (1) whether the organization is primarily made up of state institutions; (2) whether state officials control the organization's decision making; (3) whether state institutions largely generate the organization's funds; and (4) whether the organization is acting in place of a traditional state actor." *Webber*, 928 F. Supp. 2d at 1260 citing *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 955 (9th Cir. 2008). The Ninth Circuit has often treated the 'nexus' test and 'joint action' test in one analysis. *See e.g., Jensen v. Lane Cnty.*, 222 F.3d 570 (9th Cir. 2000).

**The Joint Action Test –** "The joint action test asks 'whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) *citing Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002). "[Joint action] can be satisfied either 'by proving the **existence of a conspiracy** or by showing that the private party was 'a **willful**

**participant** in joint action with the State or its agents.'" *Tsao*, 698 F.3d at 1140, *citing Franklin*, 312 F.3d at 445 (quoting *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir.1989)). "To establish liability for **a conspiracy** in a § 1983 case, a plaintiff must "demonstrate the existence of **an agreement** or **meeting of the minds**" to violate constitutional rights. *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) citing *Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1301 (9th Cir.1999). "Such an agreement need not be overt and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Mendocino*, 192 F.3d at 1301. A "common objective" is insufficient; the common objective must also intend a violation of constitutional rights. *Crowe*, 608 F.3d at 440–41. Joint action of a '**willful participant**' was shown in *Rawson*, "when medical professionals who leased property connected to the State's psychiatric hospital involuntarily confined the plaintiff after his arrest, in part based on the prosecutor's 'heav[y] involve[ment] in the decisionmaking process.'" *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020). The court in *Rawson* held that "the State had 'undertaken a complex and deeply intertwined process [with private actors] of evaluating and detaining individuals' for long-term commitments, and therefore, 'the state ha[d] so deeply insinuated itself into this process' that '[the private actors'] conduct constituted state action.'" *Rawson*, 975 F.3d at 753 citing *Jensen v. Lane County*, 222 F.3d 570, 575 (9th Cir. 2000). "The close nexus and joint action tests may be satisfied where the court finds 'a sufficiently close nexus between the state and the private actor 'so that the action of the latter may be fairly treated as that of the State itself,' or where the State has 'so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise.'" *Rawson*, 975 F.3d at 748 citing *Jensen*, 222 F.3d at 575–58.

**The State Compulsion Test -** Governmental compulsion or coercion may exist where the State "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Rawson*, 975 F.3d at 748 citing *Blum*, 457 U.S. at 1004.

Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists. *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002). "[T]hese different tests [may not] actually [be] different in operation [but rather] different ways of characterizing the necessarily fact-bound inquiry that confronts the Court[.]" *Lugar*, 457

U.S. at 939, 102 S. Ct. at 2755. "The plaintiffs bear the burden of establishing by a preponderance of the evidence that the [Defendant] is a State actor for Fourteenth Amendment purposes. *Lee*, 276 F.3d at 553–54. "Th[e] two-part approach to this question of 'fair attribution' [f]irst, [requires] the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible [and] [s]econd, the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar*, 457 U.S. at 937, 102 S. Ct. at 2754.

## A. Relevant Arizona State Law (Intervention)

The Court notes the Arizona Supreme Court promulgated on December 8, 2021, effective July 1, 2022, under the Arizona Rules of Procedure for the Juvenile Court (Ariz.R.P.Juv.Ct.), Rule 113, addressing 'Intervention' set forth, in full, as follows:

(a) **Generally.**
    (1) *Of Right.* The court **must** permit a person to intervene in any proceeding under Part III [Dependency], Part IV [Adoptions], or Part V [Emancipation] of these rules if the person has a right to intervene under ICWA or other law.
    (2) *Permissive.* The court **may** permit a person to intervene in any proceeding under Part III, Part IV, or Part V of these rules after considering the factors in section (b).
(b) **Factors.** The court must determine **whether intervention would be in the child's best interests**. In making that determination, the court should consider the following factors:
    (1) the nature and extent of **the person's interest**, and whether **the person's interest** or position **is adequately represented** by existing parties;
    (2) whether the person is a child's relative as defined in A.R.S. § 8-501, or is **another member of the child's extended family** or person who has a significant relationship with a child under A.R.S. § 8-514(B);
    (3) **whether the person has requested DCS to be the placement** for the child, and if so, the status of the request;

**(4)** whether the person seeks to file a motion for change of physical custody **to that person**;

**(5)** the timeliness of the motion;

**(6)** whether intervention will unduly prolong or delay the case;

**(7)** whether the parties seeking intervention **will significantly contribute to full development of the underlying factual issues** in the proceeding and to the just and equitable adjudication of the legal questions presented; and

**(8)** any other factors the court deems appropriate.

**(c) Scope of Intervention.** The court *may* grant intervention for a limited purpose, and it *may* limit the scope and duration of intervention. ***Unless the court expressly limits intervention, an order granting intervention permits the intervenor to participate on all issues <u>as a party</u>***.

**(d) Procedure.**

**(1)** *Requirements of a Motion.* The person who requests to intervene must file a motion that specifies facts supporting the motion. The person moving to intervene must serve the motion on all parties.

**(2)** *Motion for a Change of Physical Custody.* If intervention is for purposes of filing a motion for change of physical custody, the intervenor must file and serve the motion no later than 10 days after entry of the order granting the motion to intervene.

Ariz.R.P.Juv.Ct., Rule 113 (added Dec. 8, 2021, eff. July 1, 2022) (emphasis added).

Regarding the application of Ariz. R. P. Juv. Ct., Rule 113, "[t]he July 1, 2022 amendments apply in all cases *filed on or after that date* except when this application would be infeasible or work an injustice, th[e]n the former rule will apply." *See* "Application" after Ariz.R.P.Juv.Ct. 113 (emphasis added). In addition, regarding Arizona Supreme Court Order No. R-20-0044, which abrogated the former Arizona Rules of Procedure for the Juvenile Court, and adopted a revised and reorganized the version in its place, Dec. 8, 2021, effective July 1, 2022, the "Application" of Rule 113 provides, in pertinent part:

"IT IS FURTHER ORDERED that the newly adopted rules (and associated comments) and the rule amendments shown in Attachments A, B, C, and D shall apply: (1) in all cases filed on or after July 1, 2022; and (2) *in all other cases pending* on July 1, 2022, except to the extent that the court in an affected action determines that applying the rule or amendment would be

infeasible or work an injustice, in which event the former rule or procedure applies."

*See* Arizona Supreme Court Order Amending the Rules of Procedure for the Juvenile Court and Related Rules Number R-20-0044 at 2 (italics added).  Prior to the enactment of Rule 113, Ariz.R.P.Juv.Ct., effective July 1, 2022, the courts, and case law, interpreted 'intervention' pursuant to Arizona Rules of Civil Procedure ("Ariz.R.Civ.P."), Rule 24, which provides as follows:

> **(a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:
>     **(1)** has an unconditional right to intervene under a statute; or
>     **(2)** claims an interest relating to the subject of the action, and is so situated that disposing of the action in the person's absence may as a practical matter impair or impede the person's ability to protect that interest, unless existing parties adequately represent that interest.
> **(b) Permissive Intervention.**
>     **(1)** *Generally*. On timely motion, the court may permit anyone to intervene who:
>         **A.** has a conditional right to intervene under a statute; or
>         **B.** has a claim or defense that shares with the main action a common question of law or fact.
>     **(2)** *By a Government Officer or Agency*. On timely motion, the court may permit a state governmental officer or agency to intervene if a party's claim or defense is based on:
>         A. a statute administered by the officer or agency; or
>         B. any regulation, order, requirement, or agreement issued or made under a statute administered by the officer or agency.
>     **(3)** *Delay or Prejudice*. In exercising its discretion over permissive intervention, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.
> **(c) Procedure.**
>     **(1)** *Requirements of Motion*. Anyone moving to intervene must:
>         **A.** serve the motion on the parties as provided in Rule 5(c); and
>         **B.** attach as an exhibit to the motion a copy of the proposed pleading in intervention that sets out the claim or defense for which intervention is sought.

**(2)** *Filing and Serving Pleading in Intervention.* Unless the court orders otherwise, an intervenor must file and serve the pleading in intervention within 10 days after entry of the order granting the motion to intervene.

**(3)** *Response to Pleading in Intervention.* If the pleading in intervention is one to which a party must respond, that party must plead in response to the pleading in intervention within 20 days after it is served. If the pleading in intervention does not require a party to file a responsive pleading, that party may plead in response to the pleading in intervention within 20 days after it is served.

Ariz.R Civ.P., Rule 24 (added Sept. 2, 2016, effective Jan. 1, 2017.)  Case law interpreting Rule 24 provides, in pertinent part:

> Rule 24 is remedial and should be construed liberally in order to assist parties seeking to obtain justice in protecting their rights. (citation omitted). However, a prospective intervenor must have such an interest in the case that the judgment would have a direct legal effect upon his or her rights and not merely a possible or contingent effect. (citation omitted).

*Dowling v. Stapley*, 221 Ariz. 251, 270, 211 P.3d 1235, 1254 (Ariz. Ct. App. 2009).

Here, the Court applies Ariz.R.P.Juv.Ct., Rule 113—to the case at bar—and not Ariz.R.Civ.P., Rule 24, as the Court finds applying Ariz.R.P.Juv.Ct., Rule 113 to this case, would not be infeasible and or would not work an injustice.

### B.  Defendant Surendran's Request for Judicial Notice of CFT's Description

As a preliminary matter, Surendran requests that the Court take judicial notice of Exhibit A (Doc. 25-1) attached to Surendran's Motion to Dismiss (Doc. 25) regarding an official Arizona Department of Child Safety ("AZDCS") webpage, which explains what a Child and Family Team ("CFT") is.

The Court may take judicial notice under Fed. R. Evid. Rule 201, as follows:

**(a)** Scope. This rule governs judicial notice of an adjudicative fact only, not a legislative fact.

- 19 -

(**b**) Kinds of Facts That May Be Judicially Noticed. The court may judicially notice a fact that is not subject to reasonable dispute because it:

(1) is generally known within the trial court's territorial jurisdiction; or

(2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

(**c**) Taking Notice. The court:

(1) may take judicial notice on its own; or

(2) must take judicial notice if a party requests it and the court is supplied with the necessary information.

(**d**) Timing. The court may take judicial notice at any stage of the proceeding.

(**e**) Opportunity to Be Heard. On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard.

(**f**) Instructing the Jury. In a civil case, the court must instruct the jury to accept the noticed fact as conclusive. In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.

Fed. R. Evid. 201.  "[C]ourts may take judicial notice of any fact which is 'capable of such instant and unquestionable demonstration, if desired, that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary." IX J. WIGMORE, EVIDENCE s 2571, at 548 (1940)."  *United States v. Gould*, 536 F.2d 216, 219 (8th Cir. 1976).

The Court hereby takes judicial notice of Ariz.R.P.Juv.Ct., Rule 113, and Ariz.R.Civ.P., Rule 24, as well as the Arizona Revised Statutes as identified herein.  In addition, the Court, hereby takes judicial notice of the URL provided in Surendran's attached Exhibit A (Doc. 25-1), as follows:

https://dcs.az.gov/resources/faq/question-what-child-and-family-team-cft ,
*archived at* http://perma.cc/43T7-THGE

(What is a Child and Family Team (CFT)? Arizona Department of Child Safety, last visited June 21, 2023).  The Court is permitted to consider documents that were not physically attached to the complaint where the documents' authenticity is not contested, and the

plaintiff's complaint necessarily relies on them. *Sams v. Yahoo! Inc.*, 713 F.3d 1175 (2013) citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). Plaintiffs rely on references to CFT meetings in paragraphs 158 and 159 of the Complaint. (Doc. 1 at 36.) Despite Plaintiffs' contention that "[t]he Complaint does not allege facts that Surendran's liability is grounded on his participation in the dependency case, or in the CFT's" (Opposition, Doc. 32 at 16:10-13), according to the face of the Complaint, Plaintiffs allege:

> [E]gbert encouraged and authorized Surendran to participate in CFT meetings, **beginning on April 29, 2021**, over the objection of the Plaintiffs. This was done, in part, to give Surendran access to HIPAA-protected SBH records and information and so he could (1) recommend a plan of treatment for A.K. which was **directed** at having A.K. placed in a "trans affirming" facility; and (2) continue his encouragement of the "trans affirming" goals he shared with the AZDCS Defendants.

(Doc. 1 at 36, ¶ 158) (emphasis added).

> Surendran, to further these goals, and **without any authority**, began contacting placements and having discussions about placing A.K. in one of these facilities, information he then shared with Egbert, and the CFT[.]

(Doc. 1 at 36, ¶ 159) (emphasis added). As archived herein, the CFT is described as:

> The Child and Family Team (CFT) is a defined group of people which may include the child, DCS Specialist and his/her caregiver, a behavioral health representative and any individuals important in the child's life identified and invited to participate by the child and family. This may include, for example, teachers, extended family members, friends, family support partners, health care providers, coaches, community resource providers, representatives from religious affiliations. It can also include representatives from other service systems like Juvenile Probation or Division of Developmental Disabilities (DDD). **The size, scope and intensity of involvement of the team members are determined by the goal established for the child**, the needs of the family in providing for the child and the resources needed to develop an effective service plan. **People can join or leave the CFT as needed to make sure the child gets the best care**.

*See* Motion to Dismiss (Doc. 25), Exhibit A (Doc. 25-1) (emphasis added).

- 21 -

1  Plaintiffs' Complaint necessarily relies on the reference to "CFTs," and by the Court

2  taking judicial notice of the AZDCS webpage, and the description of the CFTs, as archived

3  herein, the document's authenticity is preserved.  Accordingly, the Court takes judicial

4  notice of Defendant Surendran's Exhibit A (Doc. 25-1), as archived herein, and in so doing,

5  Defendant Surendran's Motion to Dismiss is *not* converted into one for summary judgment.

6

7  Rule 12(d), Fed.R.Civ.P.; *see also Sams, supra.*

8

9  To survive a motion to dismiss, a complaint must contain sufficient factual matter,

10 accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

11 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) *citing Bell Atlantic Corp. v. Twombly*,

12 550 U.S. 544, 127 S.Ct. 1955 (2007).  Accepting all of the allegations in the Complaint as

13 true, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows

14 the court to draw the reasonable inference that the defendant is liable for the misconduct

15

16 alleged." *Ashcroft*, 556 U.S. at 678, 129 S. Ct. at 1949.  "But where the well-pleaded facts

17 do not permit the court to infer more than the mere possibility of misconduct, the complaint

18 has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule

19

20 Civ. Proc. 8(a)(2)." *Ashcroft*, 556 U.S. at 679, 129 S. Ct. at 1950.  "If, on a motion under

21 Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by

22 the court, the motion must be treated as one for summary judgment under Rule 56."  Rule

23

24 12(d), Fed.R.Civ.P.

25

26 "In ruling on a 12(b)(6) motion, a court may generally consider only allegations

27 contained in the pleadings, exhibits attached to the complaint, and matters properly subject

28 to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) citing

*Jacobson v. Schwarzenegger,* 357 F.Supp.2d 1198, 1204 (C.D.Cal.2004).  A court may take judicial notice of an adjudicative fact that "is not subject to reasonable dispute" because it is "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201.  "Federal Rule of Evidence 201 allows the court to take judicial notice of certain items without converting the motion to dismiss into one for summary judgment." *Rex v. Chase Home Fin. LLC*, 905 F. Supp. 2d 1111, 1124 (C.D. Cal. 2012) citing *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994).

The Court finds judicial notice of the Arizona Department of Child Safety's "What is a CFT" is not subject to reasonable dispute, has been archived, as set forth herein, and is generally known within the trial court's territorial jurisdiction, and therefore, by this action, it is *not* necessary to convert Defendant Surendran's Motion to Dismiss into one for summary judgment under Rule 12(d), Fed.R.Civ.P.

## VI.   ANALYSIS

Surendran moves to dismiss Claim Five (V) of the Complaint, as to Surendran, pursuant to Fed. R. Civ. P. Rule 12(b)(6) because, according to Surendran, the Plaintiffs have failed to plead that Surendran acted 'under the color of [state] law' as required to bring a claim under 42 U.S.C. § 1983.  (Doc. 25 at 5.)  According to Surendran, dismissal is appropriate because Section 1983 requires state action, and reasons that Surendran, as an 'intervenor,' should be afforded the same 'insulation' afforded to that of a guardian *ad litem*, under the proposed analysis in the Ninth Circuit case, *Kirtley*; that Plaintiffs have not adequately alleged conspiracy (joint action test), and that even if state action is found,

Surendran's free speech rights are a countervailing factor, cutting against state action. Surendran also asserts "the parties have been unable to agree the pleading is curable by permissible amendment." (Doc. 25 at 5 n.1.)

Plaintiffs' Opposition submits at least two of the four tests are met for determining whether Surendrant, a private actor, acted 'under color of law'; 'the joint action test' and the 'state compulsion test.'  Plaintiffs assert further "[t]he Complaint does not allege facts that Surendran's liability is grounded in his participation in the dependency case, nor in the CFTs" (Doc. 32 at 17:11-13).  Plaintiffs assert claims against Surendran in his individual capacity, and in his capacity as a state actor. (Doc. 1 at 5, ¶ 5.)  Specifically, Plaintiffs assert Surendran:  1) collaborated with DCS Defendants to violate the constitutional rights of Plaintiffs; and 2) intervened at the behest of the DCS Defendants in the Dependency case JD20200657, Juvenile Court, Pima County, Arizona.

Surendran's involvement this case, and the State's involvement are relevant to the Court's analysis.  The Court, for demonstrative purposes only, includes significant events for A.K., beginning the summer of 2020 (A.K.'s 9th grade), the 2020/2021 School Year (A.K.'s 10th grade), and the first half of the 2021/2022 School Year (A.K.'s 11th grade).

| 2020 | | | | | 2021 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| July/Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | July | Aug/Sept | Oct | Nov |
| | TMC/ PBVH | PBVH / TPD / AZDCS / | PBVH / VisionQuest, Madalyn House | | Plaintiffs' Complaint to AZDCS Ombudsman | Stephen Levine, MD Psychiatric Eval. | **Emergency CFT** - *Plaintiffs Excluded* | Juvenile Court Case JD20206567 Court Order **"No dependency"** VisionQuest /SBH | SBH | SBH | SBH / Outback | Outback | Outback / Angel House | Angel House |
| | | | | | | | | **04/02/21** | | | | | | |
| | | **TPD 10/02/20** | | | | | | **CFT meetings** | | | | | | |
| | | | | | | | | **04/29/21** | | | | | | |
| | | **1st Dependency** | | | | | | **2nd Dependency** | | | | | | |
| | | **10/02/2020** | | | | | 03/01/21 | **04/07/21** | | | | | | |
| Individual capacity prior to 10/02/20 | | | | | As part of a 'team' after 04/29/21 | | | | | | | | | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.  A.K. *before* Defendant Surendran's involvement

The face of Plaintiff's Complaint asserts A.K.'s mental health and behavioral health baseline—prior to Surendran's significant involvement in A.K.'s life—included experiencing hallucinations, self-harm, suicidal ideations, conflicted relationship with family, and gender dysphoria ["GD"]. (Doc. 1 at 7, ¶ 20.) "Gender Dysphoria" is no longer considered a 'disorder' but rather focuses on the distress the individual experiences, described in pertinent part:

> [Gender Dysphoria] ["GD"] [formerly classified as gender identity disorder] is defined in the latest edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM–V") as a "marked incongruence between one's experienced/expressed gender and assigned gender," as manifested by at least two of the following: (i) a "marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics..."; (ii) a "strong desire to be rid of one's primary and/or secondary sex characteristics..."; (iii) "a strong desire for the primary and/or secondary sex characteristics of the other gender"; (iv) a "strong desire to be of the other gender..."; (v) a "strong desire to be treated as the other gender..."; and (vi) a "strong conviction that one has the typical feelings and reactions of the other gender...". The DSM–V further specifies that GD is 'associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.'

*Cruz v. Zucker*, 116 F. Supp. 3d 334, 337–38 (S.D.N.Y. 2015) (citations omitted).  As identified on the face of the Complaint, "GD" was just one of A.K.'s conditions—as identified by A.K.'s then-counselor—experienced *prior to* Surendran's involvement.

Plaintiff's Complaint asserts Surendran, in his capacity as a state actor and in his individual capacity, "[e]ngaged in intentional acts within Arizona[,] including, but not limited to, collaborating with [DCS] Defendants to violate the constitutional rights of Plaintiffs, and interven[e] in the juvenile Dependency case JD20200657 filed in Pima

County, Arizona, by the Arizona Attorney General at the behest of certain of the [DCS] Defendants[.]"  (Doc. 1 at 5, ¶ 5.)  Specifically, Plaintiff's Fifth Claim asserts First and Fourteenth Amendment violations of familial association and due process of law asserting Surendran "collaborat[ed] with Defendants Fuentes, Egbert and Chamberlain" to effectuate the shared "strategy of severing the familial association between parents and child." (Doc. 1 at 45-6.)  Plaintiff asserts the means utilized to assert Surendran's 'influence' included "(1) direct communications via Zoom, text, email, and telephone, and (2) providing [A.K.] with electronic devices [that] enable[ed] [A.K.] to bypass limitations on access to harmful materials online." (Doc. 1 at 46, ¶ 211.)  Plaintiffs further assert "[a]s a direct and proximate result, Defendants succeeded in prolonging the separation of parents and child," "convincing [A.K.] to repudiate [A.K.'s] familial associations; Plaintiffs suffered and continue to suffer intangible damages, including, [h]umiliation and loss of self-esteem," "incurred legal and medical and hospital expense and other costs; and will suffer further injuries and damages in the future."  (Doc. 1 at 46, ¶ 212.)

**B.  Surendran's involvement in his 'individual capacity' prior to October 2nd**

According to the Complaint, AZDCS did not become involved with A.K., until **October 2, 2020**, when TPD responded to a report from PVBH, and called AZDCS.  Prior October 2, 2020, any allegations against Surendran are limited to conduct in his individual capacity, as the State was not involved, and the Complaint does not allege Surendran was clothed with authority under state law.  To wit:  Plaintiffs' Complaint alleges Surendran:

1) **collaborated** with AZDCS Defendants to violate the constitutional rights of Plaintiffs; and

- 26 -

2) **Intervened** in the juvenile Dependence case **JD20200657** filed in Pima County, Arizona, by the Arizona Attorney General **at the behest** of certain of the [DCS] Defendants

(Doc. 1 at 5, ¶ 5) (emphasis added).  Accordingly, any conduct attributed to Surendran in the Complaint—prior to October 2, 2020—was performed in his individual capacity, and the Complaint lacks facts to support he was operating as if clothed with authority under state law.  In fact, the Complaint states that it was maternal grandmother that invited A.K.'s Uncle, Surendran, to the Zoom call on July 16, 2020.  The Complaint alleges that while A.K. was at PVBH, Surendran may have communicated with A.K., however, any acts prior to October 2, 2020, were prior to AZDCS's involvement and therefore, Surendran's actions were performed in his individual capacity and any claim of state action fails under 42 U.S.C. § 1983.

**C. Surendran's involvement *after* TPD contacted AZDCS on October 2, 2020**

To maintain an action against a private actor under 42 U.S.C. § 1983, the analysis asks:  Is the alleged infringement of federal rights fairly attributable to the government; *i.e.*, first, was the deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible; and second, is the party charged with the deprivation fairly be said to be a state actor. *Lugar*, 457 U.S. at 937.

**1. *Joint Action Test***

***Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012)** - Plaintiffs rely on *Tsao* in support of their request that Court find that the 'joint action test' <u>is</u> met by the 'willful participant' analysis.  As a matter of first impression, the Ninth Circuit Court in *Tsao*

considered whether the case of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018 (1978), applies to suits against private entities under § 1983.

*Kirtley v. Rainey***, 326 F.3d 1088 (9th Cir. 2003)** - Defendant Surendran relies on *Kirtley* in support of Surendran's position that the 'joint action test' is <u>not</u> met.

The Court finds the joint action test is <u>not</u> met, however, finds the reasoning of *Kirtley* inapplicable to the case at bar, for the reasons that follow.

*Kirtley* cites to *Polk County v. Dodson*, for the premise that a 'public defender' does not act under color of state law when performing 'pure advocacy functions.' 454 U.S. 312, 325, 102 S.Ct. 445 (1981). The opinion in *Kirtley* reasons further, that the Tenth Circuit has relied on the analogy between public defenders and guardians to hold explicitly that guardians do not act under color of state law for § 1983 purposes. The holding relies on two aspects of the guardian's role, *i.e.*, the guardian's 'independence' *as an advocate* on behalf of the child and the difficulty the court had in seeing 'how any unconstitutional act by the guardian would benefit the state.' *Kirtley v. Rainey*, 326 F.3d 1088 (9th Cir. 2003).

### a. Color of state law

The joint action test asks 'whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights' and this requirement can be satisfied by either proving 'the existence of a conspiracy' or by showing that the private party was a 'willful participant in joint action with the State or its agents.' *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002); *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989). Ultimately, joint action exists when the state has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint

participant in the challenged activity.  *Gorenc v. Salt River Project Agric. Improvement & Power Dist.*, 869 F.2d 503, 507 (9th Cir. 1989).  Relevant here is the maxim that 'if the state knowingly accepts the benefits derived from unconstitutional behavior,' … then the conduct can be treated as state action.  *Gorenc*, 869 F.2d at 507 quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192, 109 S.Ct. 454 (1988).

> In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action. This may occur if the State creates the legal framework governing the conduct, (citation omitted); **if it delegates its authority to the private actor**, *e.g., West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); or sometimes if it knowingly accepts the benefits derived from unconstitutional behavior, (citation omitted). Thus, in the usual case we ask whether the State provided **a mantle of authority** that enhanced the power of the harm-causing individual actor.

*Tarkanian*, 488 U.S. at 192, 109 S. Ct. at 462 (emphasis added).

The Arizona Department of Child Safety is unquestionably a state actor.  When it decides to take custody of a child, or sever parental rights, it must comply with the terms of the Due Process Clause of the Fourteenth Amendment to the Federal Constitution.  When DCS served Plaintiffs with the Dependency Petition(s), it acted under color of state law within the meaning of 42 U.S.C. § 1983.  It was DCS, the state entity—authorized by the court—that removed A.K. from the custody of Plaintiffs through the dependency action(s).  The question is whether the Complaint alleges plausible facts, identifying whether, and to what extent, DCS was influenced by Surendran, the private party.  Thus, the question is not whether DCS participated to a critical extent in Surendran's activities, but whether DCS's actions—upon the recommendations of Surendran—turned

Surendran's conduct into state action.  *Tarkanian, supra*.

> The face of the Complaint alleges, as follows:

> [DCS Defendant] [Egbert] **encouraged** and **authorized** Surendran to participate in CFT meetings, **beginning on April 29, 2021**, over the objection of the Plaintiffs.  This was done, in part, to give Surendran access to HIPAA-protected SBH records and information and **so he could** (1) *recommend* **a plan** of treatment for A.K. which was directed at having A.K. placed in a "trans affirming" facility; and (2) continue his encouragement of the "trans affirming" goals he shared with the AZDCS Defendants.

> Surendran, to further these goals, and without any authority, began contacting placements and having discussions about placing A.K. in one of these facilities, **information he then shared** with Egbert, and the CFT.

(Doc. 1 at 36, ¶¶ 158, 159) (emphasis added).  The Court notes, here, regarding the initiation of Surendran's involvement in CFTs, according to the Complaint—fails to allege a specific date until paragraphs 158 and 159—*i.e.*, the *Second* Dependency action.

Contrary to the allegations set forth in paragraphs 158 and 159 of the Complaint, above, Surendran asserts "[i]ndeed, the Complaint does not allege any other right Surendran has by virtue of his intervenor status."  (Doc. 25 at 13:1-2.)  And yet, Surendran's Motion to Dismiss, also states, "Surendran had access to A.K.'s health information by virtue of his intervenor status and membership in A.K.'s Child and Family Team ("CFT")."  (Doc. 25 at 16:11-12.)

Significantly, whether analyzing Plaintiffs' allegation of state action with respect to Surendran, or Defendant Surendran's 'insulate' argument proposed based on the analogy of a guardian *ad litem* to an intervenor, it appears from the Complaint that Surendran participated in CFTs *after* Plaintiffs were excluded in March of 2021, *i.e.*, as a part of the *Second* Dependency action, not as a part of the *First* Dependency action.  Accordingly,

from October 2, 2020 to approximately March 1, 2021—prior to when AZDCS held an Emergency CFT wherein Plaintiffs were excluded—Surendran's state-action analysis does not involve CFTs, and his 'influence' or coordinated efforts with the state are limited, as the Complaint states DCS Defendant(s) encouraged and authorized Surendran to participate in CFT meetings beginning April 29, 2021. (Doc. 1 at 36, ¶ 158.)   Mere encouragement is insufficient, as under the State compulsion test, 'significant' encouragement is required.  *Rawson, supra.*

First, it is necessary to examine the relationship between DCS and Surendran regarding Surendran's conduct.  Even when DCS permitted Surendran to 'intervene,' no official authority was conferred on Surendran, according to the Complaint (¶ 158).  *West, supra* ("if it delegates its authority to the private actor").

State action nonetheless might lie if DCS—by embracing Surendran's opinions and recommendations—*e.g.* 'plan of treatment' or 'placement facility' for A.K., transforms those recommendations into state-held 'plan(s)' or 'placement(s)' and Surendran into a state actor.

DCS engaged in state action if, and when, it adopted Surendran's recommendations to govern its own behavior—without conducting its own independent professional analysis—but that would be true even if DCS had taken no part in developing Surendran's opinions and recommendations.

DCS's *implementation* of Surendran's recommendation for a 'plan' or 'placement facility' would be DCS's state action; however, the resources or means by which Surendran arrived at a recommendation for a 'plan' or 'placement' would not be DCS's state action,

*i.e.*, the sources Surendran consulted with, or relied upon to develop his opinions and recommendations would not be considered DCS's state action.

The question remains, did DCS retain 'plenary power' to reexamine those recommendations and, if necessary, to reject them and promulgate its own?

Here, DCS retained the authority to exclude Surendran as an 'intervenor', as well as, retaining the ongoing authority to revoke Surendran's participation in the CFTs. DCS could, alternatively, make other arrangements for A.K.'s plan and placement, without relying on Surendran's recommendations and influence. Even if DCS adopted Surendran's recommendations for A.K.'s plan for services or placement—DCS retained plenary power to decide otherwise—and therefore, *neither* DCS's decision to allow Surendran to 'intervene', *nor* DCS's decision to allow Surendran to participate in CFTs and make recommendations regarding A.K.'s plan for services or placement is a sufficient reason for concluding that Defendant Surendran was acting under color of Arizona law when he made recommendations for A.K.'s plan for services or placement, as DCS retained plenary power to decide otherwise, and reject Surendran's recommendations, if it chose to do so.

At the motion to dismiss stage, the Court is not in a position to determine whether Surendran enjoyed the power to subpoena witnesses, or documents, when conducting research into 'placement' or 'service plans' for A.K.; however, the Court notes, here, that as an 'intervenor'—according to Rule 113(c), "unless the court expressly limits intervention, an order granting intervention permits the intervenor to participate on all issues as a *party*." Rule 113(c), Ariz.R.P.Juv.Ct. At this stage of the proceedings, we do not know whether the Juvenile Court limited Surendran's 'intervenor'-status. Defendant

Surendran's ability to participate in CFT meetings, and make recommendations, did not constitute state action on the theory that they resulted from a delegation of power by DCS, because: DCS delegated no power to Surendran to take specific action against A.K. or A.K.'s parents; DCS and Surendran acted as 'joint participants'—not adversaries. Surendran, however, was granted 'intervenor' status by the court which did allow Surendran to obtain HIPAA-related documents. Surendran did not-indeed, could not-directly deprive Plaintiffs of their familial association with A.K., but could only exert influence on A.K. and influence on DCS Defendants, and perhaps the court, if they did not follow Surendran's recommended 'services' and or recommended 'placement.' .

Significant, here, under the Joint Action test, and the "two-part approach to this question of "fair attribution[,]" [f]irst, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S. Ct. 2744, 2753 (1982).

First, the Court finds the 'rule of conduct' relevant to the case at bar is—Rule 113, Ariz.R.P.Juv.Ct., which allows a '*permissive*' "intervenor" to participate in a dependency action—and whether Rule 113 "clearly indicates that the intended benefits 'flow directly to' the child," and whether the 'permissive' intervenor was admitted based on the interest of the child; as opposed to some other interest, *e.g.*, the intervenor's interest (as potential placement), or the State's interest (welfare of the child), or the court's interest (fact-finder). *Kirtley v. Rainey*, 326 F.3d 1088 (2003); *see also Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1486 (9th Cir. 1995).

Under Rule 113(c), Ariz.R.P.Juv.Ct, "[u]nless the court **expressly limits** intervention, [a]n order granting intervention permits the intervenor to participate on all issues *as a party*." Rule 113(c), Ariz.R.P.Juv.Ct. (emphasis added).

In addition, Rule 302, Ariz.R.P.Juv.Ct. "Definitions," include, in pertinent part:

> **(b) "<u>Party</u>"** means a child, parent, guardian, DCS, any petitioner, and **<u>any person</u>**, Indian tribe, or entity **<u>that the court has allowed to intervene</u>**.
> **(c) "Participant"** includes any person permitted by the court or authorized by law to participate in the proceedings. Participants must be notified of all applicable proceedings as required by law or court order. A participant is <u>not</u> a party.

Ariz.R.P.Juv.Ct., Rule 302 (emphasis added). And under the adoption section, Rule 402, Ariz.R.P.Juv.Ct., "Meanings," in pertinent part, provides:

> (4) *"Parties"* include the prospective adoptive parent, the person to be adopted, the parents of the person to be adopted, any person or entity whose consent is required to effectuate an adoption, **and any other person** or entity **who has been permitted by the court to intervene in the proceedings pursuant to Rule 113** or ICWA.

Ariz.R.P.Juv.Ct., Rule 402 (emphasis added).

Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. *Lugar*, 457 U.S. at 937, 102 S. Ct. at 2754. Here, at the motion to dismiss stage, the Court does not have a copy of Surendran's motion to intervene, the scope of intervention granted to Surendran by the Juvenile Court, or whether Surendran filed a motion for a change of physical custody, under Ariz. R. P. Juv. Ct., Rule 113. It is also not clear from the Complaint whether Surendran participated in the *First* and or *Second* dependency action as an 'intervenor,' *as a party*, or whether the 'scope of intervention,' *was limited in some way*, by the Juvenile Court. In addition, the facts of the Complaint

- 34 -

lack identification of the specific date Surendran became an 'intervenor' in the underlying dependency action.

Accordingly, the Court finds fair attribution to the State would require Surendran to operate under a 'rule of conduct' created by the State.  Here, the only 'rule of conduct' Surendran could perhaps operate under was Rule 113, as an intervenor.  Surendran's status as an intervenor, lacks identification of dates in the Complaint and whether Surendran enjoyed this status during both the *First* and *Second* Dependency actions, or just the *Second*.  In addition, from the facts of the Complaint it appears Surendran's participation in CFTs was limited to the *Second* Dependency action.  Under the second prong of *Lugar*, Surendran cannot be said to be a state actor for any recommendations for services or placement of A.K., because AZDCS maintained 'plenary' power during the CFT meetings.  The plenary power exercised by AZDCS during the CFT meetings, distinguishes a guardian *ad litem* under Washington law, from an intervenor under Arizona law.  *Kirtley, supra.*

A distinction exists between that of a guardian *ad litem* under Washington law—appointed by the court to represent the 'best interest' of the child—and that of an 'intervenor' under Arizona law—either as a matter 'of right'; or as *discretionarily permitted* by the court, *i.e.*, '*permissive*' based on the court's analysis of several factors under Rule 113.  Ariz.R.P.Juv.Ct., Rule 113.  The factors under the rule's '*permissive*' prong, perhaps applicable here, include in pertinent part: (1) "the nature and extent **of the person's interest**, and whether the person's interest or position is adequately represented by the existing parties."  Ariz.R.P.Juv.Ct., Rule 113(b)(1) (emphasis added).  Additional

factors for the court to consider before considering whether to 'permit' a proposed intervenor include:  (2) whether the person is a child's relative as defined in A.R.S. § 8-501, or is another member of the child's extended family or person who has a significant relationship with a child under A.R.S. § 8-514(b); (3) **whether the person has requested DCS to be the placement** for the child, and if so, the status of the request; (4) **whether the person seeks to file a motion for change of physical custody to that person** . . .; (5) . . .; (6) . . .; and (7) whether the parties seeking intervention will significantly contribute to full development of the underlying **factual issues** in the proceeding and to the just and equitable adjudication of **the legal questions presented**; and (8) . . . ."  Ariz.R.P.Juv.Ct., Rule 113(b) (emphasis added).

Contrasting an 'intervenor' with a guardian *ad litem* ("GAL"), the Court notes, in Arizona, a GAL, prior to appointment by the court, must fulfill professional requirements, including minimum education, training in advocacy, as well as, continuing education requirements, not required of intervenors. *See e.g.*, Rule 309, Ariz.R.P.Juv.Ct.  The Court, further notes, that according to the Complaint, in pertinent part, "[t]he agency began cooperating with the Guardian *ad litem*, attorney [T.G.], and the child's lawyers, to continue the dependency case, and custody in the agency, and subsequently collaborated to secure orders to that effect."  (Doc. 1 at 56, ¶ 265.)

The Court finds Rule 113, Ariz.R.P.Juv.Ct., does <u>not</u> clearly indicate that the intended benefits of allowing a permissive intervenor to participate in a dependency action 'flow directly to' the child because the court's decision to allow a 'permissive' intervenor may include development of the facts (the court's interest), the intervenor's interest (as

potential placement for the child, as well as other interests), and or the state's interest (the welfare of the child and potential placement).  Rule 113 allows the court to "limit the scope and duration of intervention" and "unless the court expressly limits intervention, an order granting intervention permits the intervenor to participate on all issues as a party." Ariz.R.P.Juv.Ct., Rule 113(c).

The Court finds there remains a question of fact and law regarding the scope of Defendant Surendran's status as intervenor in the dependency action.  At the motion to dismiss stage of the proceedings, the record is void of the order granting Surendran's '*permissive*' intervenor status.

Defendant Surendran cites to a Washington State case, *Kirtley v. Rainey,* as support for preclusion of state action attributable to Defendant Surendran.  326 F.3d 1088 (9th Cir. 2003)  The Washington State case, *Kirtley*, involved a guardian *ad litem*, and Defendant Surendran suggests the independence enjoyed by the role of a guardian *ad litem*, and the independence enjoyed by the role of an 'intervenor,' are sufficiently similar to suggest that the Court in this matter, should find, that Defendant Surendran, in his role as 'intervenor' in this case, is not a state actor.  However, by the language of the *Kirtley* case, itself, *i.e.*, "[i]t is conceivable that a more expansive type of guardianship role could satisfy the nexus test, *see Thomas S. v. Morrow,* 781 F.2d 367, 377–78 (4th Cir.1986) (state-appointed guardian was state actor where guardian had custody of ward and guardian acted together with or obtained significant aid from state officials) (emphasis added), the actions of the guardian at issue here do not appear to be 'fairly attributable to the state.'"  *Kirtley v. Rainey*, 326 F.3d 1088, 1095 (9th Cir. 2003).

- 37 -

An additional distinction between the role of a guardian *ad litem* and that of an intervenor, as stated in *Meeker v. Kercher*, "it is the requirement that the guardian *ad litem* must exercise independent, **professional judgment** that is crucial to the determination of whether a guardian *ad litem* acts under color of state law and is therefore a person liable under Sec. 1983."  782 F.2d 153 (10th Cir. 1986) (emphasis added) cited by *Kirtley v. Rainey*, 326 F.3d 1088 (9th Cir. 2003) (analogizing the guardian ad litem role to that of a public defender, as both roles are professionals trained in advocacy).  Unlike a guardian *ad litem* or a public defender, the role of an intervenor may be filled by someone who is not a 'professional' trained in advocacy, and may be permitted to intervene in order to advocate for a variety of interests or positions, otherwise not adequately represented in the proceeding, and the court may, or may not, consider the position advocated for by the intervenor in the court's ultimate determination of the child's best interest.  In *Kirtley*, the role of a guardian under Washington state law, as provided in Wash. Rev. Code § 26.12.175 (1996), "clearly" indicates the "role is to investigate and report factual information to the court concerning parenting arrangements for the child, and to represent the child's best interests[.]"  *Kirtley*, 326 F.3d at 1092-93.  Here, the role of an 'intervenor'—as declared in the rule of this case, *i.e.*, Ariz.R.P.Juv.Ct., Rule 113—is not as "clearly" defined and allows for discretionary measures on behalf of the court to address a variety of interests.

The Court finds the facts of the *Kirtley* case, and the facts of the case at bar, are too attenuated—to analogize the role of a guardian *ad litem* appointed in a custody dispute under a Washington State rule in Family Court, to the role of an intervenor permitted in a dependency action under an Arizona State rule in Juvenile Court—to utilize *Kirtley* in

determining whether Defendant Surendran, as an intervenor, or otherwise, is a state actor under 42 U.S.C. § 1983.

Defendant Surendran asserts "allegations of an inferred conspiracy are <u>in</u>sufficient where there are" "more likely explanations for the parallel conduct" described in the Complaint and cites to *Grae-El v. City of Seattle*, in support thereof. (Doc. 25 at 14:22-28.)

Plaintiffs' Opposition asserts the Complaint alleges multiple actions by Surendran intended to aid the AZDCS Defendants in their objective. (Doc. 32 at 15.)  For example, paragraph 157 provides DCS Defendant continued "past conduct of facilitating A.K's communication with Surendran, and [a]ccess to unmonitored online social media, videos and websites.  (Doc. 1 at 36, ¶ 157.)  Plaintiffs' theory of liability as to Surendran is that he conspired with the DCS Defendants and is thus liable for unconstitutional acts committed by other defendants.

[**Joint action**] can be satisfied either "by proving the existence of a conspiracy or by showing that the private party was 'a willful participant in joint action with the State or its agents.'" *Tsao*, 698 F.3d at 1140, *citing Franklin*, 312 F.3d at 445 (quoting *Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir.1989)).

### 1.  Existence of a Conspiracy

> Establishing liability for a conspiracy between a private actor and a state actor is no different from establishing liability for a conspiracy between two state actors. The plaintiff must show "an agreement or **meeting of the minds** to violate constitutional rights," and "[t]o be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least **share the common objective** of the conspiracy.

*Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (emphasis added).

- 39 -

        **a.**      **Meeting of the minds -**Defendant Surendran asserts "[t]he Complaint offers no supporting facts to indicate that there was an agreement beyond alleging that Surendran and AZDCS were in communication."  (Doc. 25 at 15:7-8.)  Surendran further asserts, "[t]he Plaintiffs do not allege specific statements constituting the alleged agreement, nor do they identify a date or a conversation where the alleged agreement occurred (nor could they)."  (Doc. 25 at 15:9-11.)

        The Complaint asserts, in pertinent part:

> In communications with Surendran, as previously alleged, Plaintiffs learned that he subscribed to the same extreme 'trans affirmation' philosophy as the AZDCS Defendants.  On information and belief, Plaintiffs allege that Surendran **was in communication** with, first Fuentes, and subsequently, Egbert, in which these Defendants came to a **meeting of the minds** that Surendran would advocate the department philosophy to A.K., and would continue to use his influence in securing A.K.'s repudiation of her parents' religion and values.

(Doc. 1 at 17, ¶ 72) (emphasis added). The Complaint further alleges:

> [E]gbert **encouraged** and **authorized** Surendran to participate in CFT meetings, **beginning on April 29, 2021**, over the objection of the Plaintiffs. This was done, in part, to give Surendran access to HIPAA-protected SBH records and information and **so he could** (1) recommend **a plan** of treatment for A.K. which was directed at having A.K. placed in a "trans affirming" facility; and (2) continue his encouragement of the "trans affirming" goals he shared with the AZDCS Defendants.

(Doc. 1 at 36, ¶ 158) (emphasis added).  According to Ninth Circuit case law,

> A **meeting of the minds** can be inferred from circumstantial evidence, and Blum's **involvement in the interrogations**, particularly **in formulating and directing the tactical plan**, is sufficient for a reasonable factfinder to conclude it was 'unlikely to have been undertaken without an agreement,' of some kind between the defendants. *Mendocino Envtl. Ctr.,* 192 F.3d at 1301.

*Crowe*, 608 F.3d at 440.

According to the face of the Complaint, Surendran and DCS Defendants perhaps shared the same philosophy.  Here, however, there is a distinction between "directing" a plan versus "recommending" a plan, as the facts are for Surendran, and distinct from being "involved in the interrogations" or interviews, and "formulating and directing [a plan]" as the case was in *Crowe, supra*.  Although the Complaint attempts to allege DCS Defendants encouraged Surendran to participate in CFTs "so he could recommend a plan of treatment for A.K. which was **directed** at having A.K. placed . . ." (¶ 158), the facts fail to allege Surendran, himself, directed the plan.  A reasonable factfinder may conclude Surendran's actions in "recommending" a plan would have likely occurred in the absence of an agreement or meeting of the minds, *i.e.*, because Surendran was *not* involved in interviews or directing a plan, but rather made recommendations perhaps based on his own research and knowledge of the minor child, *i.e.*, a recommendation that the DCS Defendants could accept or reject.  The Complaint fails to allege facts that Surendran was making decisions on behalf of the government.

### b.  Common Objective

Defendant Surendran asserts that any shared philosophy between Surendran and DCS Defendants, "rather than prove conspiracy, the existence of this shared philosophy provides a more plausible explanation for any parallel conduct that occurred—namely that AZDCS and Surendran **both believed** supporting A.K.'s gender identity was in the child's best interest."  (Doc. 25 at 16:5-9) (emphasis added).

Plaintiffs assert, one specific example of the alleged 'cooperative efforts' between Surendran and DCS Defendants—to influence A.K. to repudiate her familial relationship

with Plaintiffs—occurred when Plaintiffs advocated for a psychiatric evaluation of A.K., by a doctor of the Plaintiffs' choosing.  (Doc. 32 at 9) (Doc. 1 at 22, ¶ 96).  When A.K. learned of the Plaintiffs' request and discussed it with Surendran, Surendran told A.K. of the option to refuse—the same sentiment mirrored by a DCS Defendant to A.K.  (Doc. 1 at 22, ¶ 96.)  Resolution of the matter required a court order for the psychiatric evaluation to go forward. (Doc. 1 at 22-23, ¶ 96.)  Although a common objective may be found, the Court finds the facts insufficient to find a conspiracy.  A common objective, or parallel conduct is insufficient for finding a conspiracy. *Bell Atl. Corp.*, 550 U.S. at 556-57.

The Court provides the following 'combined' paragraphs in order to 'link' up Plaintiffs' suggested events demonstrating an alleged conspiracy:

> On January 4, 2021, A.K.'s then therapist, attempted to set up a call with Plaintiffs, however, unsuccessfully.  Before refusing any further contact with Plaintiffs, A.K. authored an email on January 6, 2021, to Plaintiffs and copied Defendant Surendran, that contained elements and language later 'echoed' by Defendant Surendran, in a separate email to Plaintiffs, indicating "my concern for [A.K.] compels me to **intervene** . . . [.]"

(Doc. 1 at 24, ¶¶ 99, 100) (emphasis added).  The Court notes Plaintiffs' paragraphs are not in chronological order and dates are missing from some paragraphs making it difficult to know if subsequent paragraphs are subsequent in time, or on about the same time as the previous paragraph(s).  Here, however, the language of Surendran's email suggests Surendran's decision to intervene was on his own accord, as this occurred approximately January 6, 2021, and the CFT meetings did not commence for Surendran, according to the Complaint, until April 29, 2021.

On or about January 7, 2021, DCS Defendant:

> Egbert communicated with Surendran, learned of the psychological pressure [Defendant Surendran] was exerting on A.K. and [the DCS Defendant] '**agreed with** and facilitated **those actions** thereafter.'

(Doc. 1 at 26, ¶¶ 104, 105.)  The piecemeal approach of Plaintiffs' allegations, with dates not included in specific paragraphs and the paragraphs not placed in chronological order lacks the plausibility standard of the Complaint necessary for defendants to know the claims against that which they must defend.  The allegations, here, if intended to establish an agreement, or meeting of the minds, or a common objective, under the Joint Action test, the facts of the Complaint are lacking, even for an inference of 'conspiracy.'  Plaintiffs are asking the Court to infer 'psychological pressure' as state action, and the facts fail.

Similarly, here, Plaintiffs' Complaint alleges:

> Shortly after A.K.'s transfer to VisionQuest, Surendran had been permitted to supply A.K. with a cellphone and laptop computer with unrestricted access to [Surendran] and to social media.  [Surendran] was also approved by the [DCS] Defendants to have unmonitored communications with A.K. in addition to those he had had while [A.K.] was inpatient at PVBH.  Defendant Millage, with full knowledge of Surendran's **intent**, approved this as well.  Upon information and belief, Plaintiffs allege that while A.K. was at PVBH, and continuing during [A.K.'s] commitment to VisionQuest, **Surendran** was, with the **knowledge** and **approval** of first, Ryan and Fuentes, then, subsequently, Egbert, constantly promoting the "trans affirmation" agenda and at the same time attacking and disparaging Plaintiffs and the family's religious beliefs.  Surendran **encouraged** A.K. to continue [A.K.'s] online communications with trans-affirming advocates, and encouraged [A.K.] to accelerate [A.K.'s] allegations against Plaintiffs and threaten suicide if returned to the home as a strategy for achieving ultimate change in gender through hormone and surgical procedures.  This strategy paid off, as A.K., in the few insights Plaintiffs had to [A.K.'s] state of mind, became increasingly hostile to them and [A.K.'s] position against being reunited with [A.K.'s] family solidified.

(Doc. 1 at 19, ¶ 81) (emphasis added).

Surendran's activities were known to, supported by, and **approved**, by the

- 43 -

> [DCS] Defendants as part of the concerted plan **to achieve severance of the familial association bonds between parents and child**.

Complaint (Doc. 1 at 19, ¶ 82.)

The Supreme Court has held, however, that, "[m]ere **approval** of or **acquiescence** in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum*, 457 U.S. at 1004–05 (emphasis added). "The defendants must have, 'by some concerted action, intend[ed] to accomplish some **unlawful** objective **for the purpose of harming another which results in damage**.'" *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (emphasis added) citing *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir.1999) (quoting *Vieux v. East Bay Reg'l Park Dist.,* 906 F.2d 1330, 1343 (9th Cir.1990)). However, here, the unlawful objective is missing.

Plaintiffs' Complaint asserts that the "concerted plan" was "to achieve severance of the familial association bonds between parents and child." Complaint (Doc. 1 at 19, ¶ 82.) The Complaint further alleges:

> [E]gbert **encouraged** and **authorized** Surendran to participate in CFT meetings, beginning on April 29, 2021, over the objection of the Plaintiffs. This was done, in part, to give Surendran access to HIPAA-protected SBH records and information and **so he could** (1) recommend a plan of treatment for A.K. which was directed at having A.K. placed in a "trans affirming" facility; and (2) continue his encouragement of the "trans affirming" goals he shared with the AZDCS Defendants.

> Surendran, to further these goals, and **without any authority**, began contacting placements and having discussions about placing A.K. in one of these facilities, information he then shared with Egbert, and the CFT[.]

Complaint (Doc. 1 at 36, ¶¶ 158, 159.)

- 44 -

However, if the common objective held by two participants, or parties, is the 'best interest' of the minor child—and 'severance', a lawful objective, would serve the best interest of the child, *i.e.*, severance is appropriate and if conducted properly under due process—it is neither an unlawful objective, nor is it necessarily intended to harm [the parents] but rather to serve the best interest of the child. *See generally Mendocino, supra*. The focus, here, is on the best interest of the minor child.

Arizona Revised Statutes (A.R.S.) § 8-201, defines a "dependent child" as follows:

> **(a)** Means a child who is adjudicated to be:
>   **i.**   In need of proper and effective parental care and control and who has no parent or guardian, or one who has no parent or guardian willing to exercise or capable of exercising such care and control.
>   **ii.**  Destitute or who is not provided with the necessities of life, including adequate food, clothing, shelter or medical care.
>   **iii.** A child whose home is unfit by reason of abuse, neglect, cruelty or depravity by a parent, a guardian or any other person having custody or care of the child.
>   **iv.**  Under eight years of age and who is found to have committed an act that would result in adjudication as a delinquent juvenile or incorrigible child if committed by an older juvenile or child.
>   **v.**   Incompetent or not restorable to competency and who is alleged to have committed a serious offense as defined in § 13-706.
> **(b)** Does not include a child who in good faith is being furnished Christian Science treatment by a duly accredited practitioner if none of the circumstances described in subdivision (a) of this paragraph exists.

A.R.S. § 8-201. Under A.R.S. § 8-821, "[a] child may be taken into temporary custody only pursuant to one of the following: 1) an order of the superior court; [or] 2) Subsection D of this section; or 3) the consent of the child's parent or guardian"; Subsection D provides, "[a] child may be taken into temporary custody without a court order by a peace officer, a child welfare investigator or a child safety worker if temporary custody is clearly

necessary to protect the child because **exigent circumstances** exist"; and Subsection K

provides, "'[e]xigent circumstances' means there is **probable cause**[6] to believe that the

child is likely to suffer serious harm in the time it would take to obtain a court order for

removal and either of the following is true:  1) there is no less intrusive alternative to taking

temporary custody of the child that would reasonably and sufficiently protect the child's

health or safety; [or] 2) [p]robably cause exists to believe that the child is a victim of sexual

abuse or abuse involving serious physical injury that can be diagnosed only by a physician

who is licensed pursuant to title 32, chapter 13 or 17 or a health care provider who is

licensed pursuant to title 32 and who has specific training in evaluations of child abuse."

A.R.S. § 8-821 (emphasis added).

> [A]n *ex parte* order authorizing temporary custody either expires
> automatically if no dependency petition is filed, or, if a dependency is
> initiated, subject to automatic, immediate, and continued review and
> scrutiny.
> Pursuant to Rule 47.3(D)(4), "[t]he temporary custody authorized by the [*ex
> parte*] order **will expire after 72 hours excluding Saturdays, Sundays and
> holidays unless a dependency petition is filed.** Ariz. R.P. Juv. Ct.
> 47.3(D)(4). Thereafter, "[t]he court with dependency jurisdiction over the
> child will review continuation of temporary custody as provided in [the
> Rules]." *Id.* Thus, unlike a criminal warrant, a temporary custody order is
> subject to continuous review by the juvenile court.

*Dep't of Child Safety v. Stocking-Tate in & for Cnty. of Yuma*, 247 Ariz. 108, 112–13, 446

P.3d 813, 817–18 (Ariz. Ct. App. 2019) (emphasis added).  "Thus, by rule and statute,

temporary custody, even if initiated via an *ex parte* order, is reviewed first upon the filing

---

[6] According to Arizona Administrative Code R21-1-501 (13), "Probable Cause" means
some credible evidence that abuse or neglect occurred.

of the dependency petition, a second time within five to seven days after the child is taken

into custody at the PPH [Preliminary Protective Hearing], and a third time within twenty-

one days after the dependency petition is filed at the IDH [Initial Dependency Hearing].

The need for continued out-of-home care is then reviewed at least once every six months

until the dependency is resolved. Recurring review of a child's placement ensures that the

court's orders **remain in his best interests** — a consideration that "permeates dependency

and severance proceedings." *Dep't of Child Safety v. Stocking-Tate in & for Cnty. of Yuma*,

247 Ariz. 108, 113–14, 446 P.3d 813, 818–19 (Ariz. Ct. App. 2019) (emphasis added).

In the seminal case of *Bell Atl. Corp. v. Twombly*, the court instructed:

> We hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] **to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.**
>
> * * *
>
> Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts **adequate to show illegality**.
>
> * * *
>
> [The facts] must be placed in a context that raises **a suggestion of a preceding agreement**, not merely parallel conduct that could just as well be independent action.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57, 127 S. Ct. 1955, 1965-66 (2007). Even

"conscious parallelism," a common reaction of "firms in a concentrated market [that]

recogniz[e] their shared economic interests and their interdependence with respect to price

and output decisions" is "not in itself unlawful." 550 U.S. at 553–54, 127 S. Ct. at 1964.

The Court finds that *even if* Surendran and DCS Defendants shared perhaps the same philosophy, and were aware of each other's shared views, *i.e.*, "conscious parallelism"; the Complaint lacks facts tending to exclude the possibility of independent action.  Plaintiffs' reference to a 'meeting of the minds' is vague, does not include dates, and does not include evidence tending to exclude the possibility of independent action.  Plaintiffs merely state, "[f]irst Fuentes, and subsequently, Egbert, in which these Defendants came to a **meeting of the minds** that Surendran would advocate the department philosophy to A.K., and would continue to use his influence in securing A.K.'s repudiation of her parents' religion and values." (Doc. 1 at 17, ¶ 72.)

### 2.  Willful Participant

In addition to proving joint action by the existence of a conspiracy, one can also demonstrate joint action by demonstrating the private actor was a 'willful' participant. *Taos, supra.*  "[T]he joint action inquiry focuses on whether the state has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity....(citation omitted) Joint action therefore requires a substantial degree of cooperative action." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989)

Although Surendran's Motion to Dismiss does not address the 'willful participant' prong that is also sufficient to meet the joint action test; in the reply, Surendran asserts "*Kirtley* controls the 'willful participant' inquiry."  (Doc. 34 at 9.)

Plaintiffs, on the other hand, assert "[t]he allegations detailed in the Complaint[,] plausibly allege that the AZDCS Defendants **recruited** Surendran, **a willing participant**,

in their **campaign to manipulate the desires and intentions** of a mentally-ill adolescent **to turn her away from her parents** and **her religion**." (Doc. 32 at 15.)  Plaintiffs further contend "[t]he Complaint alleges multiple actions by Surendran intended to aid the AZDCS Defendants in their objective."  *Id*.  And lastly, Plaintiffs submit the Complaint "alleges that Surendran enthusiastically participated in this covert action over a period of months, a strategy that proved ultimately successful" and "Surendran and the AZDCS Defendants were interdependent in their goal, and in the strategy used to achieve it."  *Id*.

The Court finds Surendran was involved with A.K. before the DCS Defendants' involvement and Surendran demonstrated, according to the facts of the Complaint, he was acting on his own accord in encouraging and supporting A.K., and therefore, not a state actor under the willful participant analysis.

**First Amendment Claim**

Under Plaintiffs' Claim Five (V), despite the reference to a First Amendment violation, no specific reference is made to religion in the paragraphs that follow.  Plaintiffs merely allege that Surendran—as a joint participant with the named Defendants—developed a strategy to sever familial bonds that depended upon Surendran's continuing influence on A.K. through 1) direct communications via Zoom, text, email, and telephone (Doc. 1 at 46, ¶ 211); and 2) providing the child with electronic devices enabling her to bypass limitations on access to harmful materials online." (Doc. 1 at 46, ¶ 211.)  Rather, Plaintiffs' reference to religion—as it pertains to Surendran—is found in Plaintiffs' recitation of facts, as follows, "Surendran was in communication with various DCS Defendants and came to a meeting of the minds that Surendran would advocate the

department philosophy to A.K., and would continue to **use his influence** in securing A.K.'s

repudiation of [A.K.'s] **parents' religion** and values."  Complaint (Doc. 1 at 17, ¶ 72.)

The United States Supreme Court explained a distinction between 'beliefs' and

'conduct' in *Cantwell*, as follows:

> The constitutional inhibition of legislation on the subject of religion has a
> double aspect. On the one hand, **it forestalls compulsion** by law of the
> acceptance of any creed or the practice of any form of worship. Freedom of
> conscience and freedom to adhere to such religious organization or form of
> worship as the individual may choose cannot be restricted by law. On the
> other hand, **it safeguards the free exercise of the chosen form of religion**.
> Thus the Amendment embraces two concepts,—**freedom to believe** and
> **freedom to act**. **The first is absolute but, in the nature of things, the
> second cannot be**. *Conduct* **remains subject to regulation for the
> protection of society.**

*Cantwell v. State of Connecticut*, 310 U.S. 296, 303–04, 60 S. Ct. 900, 903 (1940).  A

"private entity is not ordinarily constrained by the First Amendment." *Informed Consent

Action Network v. YouTube LLC*, 582 F. Supp. 3d 712, 718 (N.D. Cal. 2022).

> When the government provides a forum for speech (known as a public
> forum), the government may be constrained by the First Amendment,
> meaning that the government ordinarily may not exclude speech or speakers
> from the forum on the basis of viewpoint, or sometimes even on the basis of
> content. (citations omitted) (private theater leased to the city); (sidewalks);
> (streets and parks).
> **By contrast, when a private entity provides a forum for speech**, the
> private entity is not ordinarily constrained by the First Amendment because
> the private entity **is not a state acto**r. The **private entity** may thus exercise
> **editorial discretion** over the speech and speakers in the forum.

*Manhattan Cmty. Access Corp. v. Halleck*, 204 L. Ed. 2d 405, 139 S. Ct. 1921, 1930

(2019) (emphasis added).

> If the private actor is merely claiming power derived from the State with no
> actual delegation or abdication by the State, the private actor's mere attempts
> to perform traditional public functions do not suffice to make the private

actor a state actor. In *Lee,* the State delegated the power to control a public forum to the private actor, whereas in *Villegas* the city specifically declined to delegate its authority, leading to the conclusion that the festival organizer was not a state actor.

*Perez-Morciglio v. Las Vegas Metro. Police Dep't*, 820 F. Supp. 2d 1100, 1107 (D. Nev. 2011). "As the Court said in *Hudgens*, to hold that private property owners providing a forum for speech are constrained by the First Amendment would be 'to create a court-made law wholly disregarding the constitutional basis on which private ownership of property rests in this country." (internal quotation marks omitted). The Constitution does not disable private property owners and private lessees from exercising editorial discretion over speech and speakers on their property. *Manhattan Cmty. Access Corp. v. Halleck*, 204 L. Ed. 2d 405, 139 S. Ct. 1921, 1931 (2019) citing *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029 (1976).

**(1) direct communications via Zoom, text, email, and telephone** (Doc. 1 at 46, ¶ 211.)

Plaintiffs suggest in support of a free exercise claim, an email dated **January 6, 2021**, from A.K. addressed to Plaintiff Sharmila—with Surendran copied—stating that the contents of the "email parroted the false attacks that Surendran had previously voiced about Levi [Plaintiff Levi Kirwin]" inferring from the contents of the email that "[t]he words and thoughts had been successfully promoted by Surendran in previous communications with A.K." Complaint (Doc. 1 at 24, ¶ 99.)

At the time of the January 6, 2021 email, A.K. was in the custody of AZDCS at VisionQuest, however, Surendran did not hold a status as an intervenor, and only alluded to the notion when, sometime in January, he expressed "my concern for [A.K.] compels

me to intervene[.]" (Doc. 1 at 24, ¶100.)  In addition, it does not appear from the face of the Complaint that Surendran was participating in CFT meetings until approximately April 29, 2021.  (Doc. 1 at 36, ¶ 158) ("Beginning on April 29, 2021, over the objection of the Plaintiffs, DCS Defendant(s) encouraged and authorized Defendant Surendran to participate in CFT meetings.")  Accordingly, Surendran was acting in his individual capacity on January 6, 2021, when A.K. sent this email.

The Court finds the language inferred, here, *i.e.*, "parroted the false attacks that Surendran had previously voiced about Levi" is supportive of Surendran's intentions to act in accordance with his own personal convictions, and perhaps in the interest of A.K.  The Complaint lacks additional facts to foreclose this possibility.  Plaintiffs contend, "[i]mportantly, evidence that the actions were 'unlikely to have been undertaken without an agreement of some kind between the defendants requires the Court submit the decision to the factfinder" and cites to *Crowe, supra*, at 441.  (Doc. 32 at 14.)  However, the procedural posture of the *Crowe* case was at the summary judgment stage, and here, we are operating under a Rule 8 standard (and perhaps Rule 9(b)), and whether the Complaint includes "a short and plain statement of the claim showing that the pleader is entitled to relief."  Based on this standard as set forth in *Bell*, "[The facts] must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bell Atl. Corp.*, 550 U.S. at 556-57, 127 S. Ct. at 1965-66.  Given the date, January 6, 2021, and the substance of the email, the Court finds the facts of the Complaint insufficient to raise the inference of a preceding agreement, and Surendran's involvement could just as well be independent action.

1

2
3      Regarding Zoom calls, Plaintiffs allege in the Complaint:

On July 16, 2020, A.K. and Plaintiffs, at A.K's insistence, placed a zoom call
4      to the maternal grandmother to discuss A.K.'s decision.  **The grandmother
invited onto the call Defendant Surendran** and his then-girlfriend, without
5      prior notice to Plaintiffs.  Surendran is Plaintiff Sharmila Kirwin's brother
who, up to that time, had engaged the Plaintiffs' children only sporadically
6      throughout their lives[.]  Complaint (Doc. 1 at 7, ¶ 22) (emphasis added).

7      Following the zoom call, during which Surendran expressed his approval of
A.K.'s transitioning to a male, Surendran began for the first time
8      communicating on a regular basis with A.K. To the Plaintiffs, he expressed
effusive praise of A.K.'s transition, stating that he was "so proud of him" and
9      that he "respects his decision."  In a follow up call, with the maternal
grandmother present, Surendran insisted that Plaintiffs call A.K. by the
10     child's preferred male name and address the child with only masculine
pronouns[.]  Complaint (Doc. 1 at 7-8, ¶ 23.)
11

12

13     Plaintiffs' Opposition further submits, "[S]urendran learned of the hospitalization, and was

14     granted access to A.K., communicating daily thereafter with [A.K.].   The [DCS]

15
Defendants concealed this avenue of communication from the parents. ¶¶43, 44."  (Doc.
16
32 at 4-5.)  The Complaint states, "[w]hen Surendran learned of A.K.'s hospitalization, he
17
18     was granted permission to communicate with [A.K.].  Thereafter, he communicated daily

19     with A.K.  This avenue of communication was concealed from Plaintiffs by Defendants

20     Fuentes, and later, Egbert." (Doc. 1 at 11, ¶ 44.)  Plaintiffs further allege in the Complaint,

21     "[a]lso upon information and belief, Surendran reiterated to A.K. that [A.K.'s] "trans"

22
status would be affirmed if she was out of custody of Plaintiffs[.]" (Doc. 1 at 11-12, ¶ 46.)
23

24

25             The facts of the Complaint do not tend to rule out the possibility that Surendran

26     was operating independently—despite the alleged common objective(s)—particularly

27
given that it was A.K.'s maternal grandmother who invited Surendran to participate in
28

- 53 -

Zoom calls with the family, according to the facts of the Complaint. (Doc. 1 at 7, ¶ 22.) Given the date of the Zoom call, July 16, 2020 (well before DCS involvement), and the call was placed at A.K.'s insistence, and it was maternal grandmother who invited Surendran, the Court finds the facts of the Complaint insufficient to raise the suggestion of a preceding agreement with the DCS Defendants, or that Surendran acted under color of state law, for a claim under the First Amendment. Surendran's status as a private citizen precludes a finding of 'state action' and any alleged infringement of Plaintiffs' First Amendment rights of freedom to believe, and or freedom to act, fails.

**(2) providing the child with electronic devices enabling her to bypass limitations on access to harmful materials online."** (Doc. 1 at 46, ¶ 211.)

According to the Complaint, "[t]hrough approximately June 15, 2021, while A.K. was hospitalized at SBH [Sonoran Behavioral Health], Egbert continued her past conduct of facilitating A.K.'s communication with Surendran, and [a]ccess to unmonitored on line social media, videos and websites[.]"   (Doc. 1 at 36, ¶ 157.) Whether attributed to Surendran, in his individual capacity, prior to TPD contacting AZDCS, or thereafter, either when AZDCS became involved, or when Surendran was granted permissive intervention, or after he was granted the ability to participate in CFTs—facilitation of access to online materials using electronic devices does not provide the Court with facts precluding the possibility that Surendran was acting of his own volition and encouraged A.K.'s actions based on Surendran's independent belief that facilitating research was in A.K.'s interest.

**State Compulsion Test**

Defendant Surendran submits "[a]n intervenor's independence [b]ars a finding of

state action under the [state] compulsion and nexus tests" and cites in support thereof to

"*Kirtley*, 326 F.3d at 1094 (explaining that the compulsion test only applies where the state

coerces private parties into doing its bidding); 1092 (rejecting the nexus test[)]."  (Doc. 25

at 13-14.)

Plaintiffs allege "[t]hrough **August and September, 2020** A.K.'s behavior was

erratic, however, vacillating between expressions of love and remorse, and hostility and

anger towards her parents."  (Doc. 1 at 8, ¶ 26) (emphasis added).  Plaintiffs further allege

the following, specific to Surendran:

> On information and belief, **during that period**, A.K., **with the support of
> Surendran**, was accessing online posts and videos directed at adolescents
> which advocated sex change and educated viewers in how to compel parents
> to give in to the child's demands.  These advocates offered education in how
> a child could free himself or herself of parental restraints by making
> accusations of emotional or physical abuse by one or more of the parents,
> reporting to children's services authorities, and creating a crisis in the family
> by claiming to be suicidal, or claiming to have attempted suicide[.]

 (Doc. 1 at 8-9, ¶ 27) (emphasis added).

Defendant Surendran asserts the time frame, *i.e.*, August and September 2020, is

*before* AZDCS was even contacted, and therefore, Surendran was not "compelled" by the

state to interfere with the Plaintiffs' parent-child bond; he was allegedly already doing that.

(Doc. 34 at 5-6.)  The Court agrees that the dates of the DCS involvement are supportive

of Surendran operating in his individual capacity, on his own accord, not as a state actor.

**COUNTERVAILING FACTOR**

Defendant Surendran submits, "Surendran's free speech rights are a countervailing

factor, cutting against state action."  Defendant Surendran "disputes attempting to turn

A.K. away [from Plaintiffs],” but argues even if he did hold this position, a position that he alleges is common in custody disputes, it is protected by the First Amendment, which protects having a viewpoint and voicing it.  Surendran further submits a finding of state action would impose a viewpoint-based restriction on Surendran's speech and in support thereof cites to *Resenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-29 (1995).  Defendant Surendran's Reply asserts, Surendran's role in the alleged 'conspiracy' was to “advocate the department philosophy to A.K.” and such advocacy is unequivocally speech, alleging “speech on private matters is just as protected as speech on matters of public concern” and cites to *Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967).

Plaintiffs, on the other hand, counter, Surendran is not alleged to have engaged in any form of protected viewpoint advocacy, rather, Surendran is alleged to have “collaborated with AZDCS Defendants in a covert strategy of manipulation of the mind of [a] severely impaired child in order to violate the Plaintiffs' constitutional right to parent th[e] child under the First and Fourteenth Amendments.  (Doc. 32 at 15-16.)  Plaintiffs dispute Surendran's characterization of communications as benign advocacy.  *Id.* at 16.

At the motion to dismiss stage, because the Court finds that Plaintiffs' Complaint fails to reach the threshold state actor element of a claim under 42 U.S.C. § 1983—due to the plenary power the State retained over any influence Surendran may have had on the development of A.K.'s 'services plan' or 'placement,' Surendran may have had, either in his individual capacity, or in his capacity as an intervenor (or possibly as a party), as well as his participation in CFT meetings, in the dependency action(s)—the Court finds it unnecessary to conduct a countervailing interest analysis.

## VII.    CONCLUSION

"In adjudicating a Rule 12(b)(6) motion to dismiss[,] a court does not resolve factual disputes between the parties on an undeveloped record.  Instead, the issue is whether the pleading states a sufficient claim to warrant allowing the [Plaintiffs] to attempt to prove their case." *Coleman v. City of Mesa*, 230 Ariz. 352, 363, 284 P.3d 863, 874 (2012). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2)." *Ashcroft*, 556 U.S. at 679.

> We have [h]eld that a challenged activity may be state action when it results from the State's exercise of 'coercive power,' [w]hen the State provides 'significant encouragement, either overt or covert[,]' or when a private actor operates as a 'willful participant in joint activity with the State or its agents[.]'  We have treated a nominally private entity as a state actor when it is controlled by an 'agency of the State,' [w]hen it has been delegated a public function by the State, [w]hen it is 'entwined with governmental policies," or when government is entwined in [its] management or control[.]

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296, 121 S. Ct. 924, 930 (2001) (internal citations omitted).

Here, however, the Complaint fails to identify facts, that foreclose the possibility that Surendran and DCS Defendants merely hold similar viewpoints as a matter of coincidence, rather than as a result of coercion by DCS Defendants.  Nor does the Complaint, identify facts demonstrating the DCS Defendants managed or controlled Defendant Surendran's conduct or actions.  Even when referring to 'encouragement' the Complaint merely suggests that Surendran encouraged A.K., not that the DCS Defendants 'significantly' encouraged Surendran.  And Surendran may have made "recommendations"

for services or placement of A.K., however, Surendran did not direct the plan, and DCS Defendants retained plenary power to reject Surendran's recommendations.   Having established the Complaint fails to meet the threshold state actor requirement of a claim under 42 U.S.C. § 1983, the Court need not address any procedural due process deficiencies, as Surendran is a private individual. Plaintiffs have failed to meet their burden by a preponderance of the evidence that [Surendran] is a State actor for First and or Fourteenth Amendment purposes, *Lee, supra*, *Flagg, supra*.   Plaintiffs have failed to demonstrate Surendran's actions were the result of 'coercive power' and or 'significant encouragement,' either overt or covert, for this Court to find that "the choice must in law be deemed to be that of the State."   *Rawson*, 975 F.3d at 748.   The Court finds the Complaint fails to identify facts placed 'in a context that raises a suggestion of a preceding agreement' and at the pleading stage the allegations must 'plausibly sugges[t] (not merely [be] consistent with) agreement'; this is 'the threshold requirement of Rule 8(a)((2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.' *Bell Atl. Corp., supra*.  Plaintiffs' fail to reach a showing of plausibility of 'entitlement to relief' by failing to demonstrate that any parallelism asserted was the product of collusion rather than coincidence.  *Bell Atl. Corp., supra*.  The Complaint lacks sufficient facts to suggest any parallel conduct was intended to 'unlawfully' deprive Plaintiffs of their familial association.  The Court finds Surendran acted in his individual capacity prior to October 2, 2020, as there was no state involvement; and 2) *after* October 2, 2020, and the subsequent filing of the *First* Dependency Petition, on October 20, 2020, with service on October 21, 2020, Surendran became part of a team, of which, the state retained plenary power.

## VIII.   RECOMMENDATION

For the reasons delineated above, the Magistrate Judge recommends that the District Judge, after its independent review, GRANT Defendant Surendran's Motion to Dismiss (Doc. 25), and dismiss, with prejudice, Claim Five (V) of the Complaint, as to Defendant Sandheep Surendran.

Pursuant to Federal Rules of Civil Procedure, Rule 72(b)(2), any party may serve and file written objections within fourteen (14) days of being served with a copy of the Report and Recommendation.  A party may respond to the other party's objections within fourteen (14) days.  No reply brief shall be filed on objections unless leave is granted by the District Court.  If objections are filed, the parties should use the following case number:

**CV-22-00471-TUC-RCC**

If objections are not timely filed, they may be deemed waived.


Dated this 25th day of July, 2023.



Honorable Bruce G. Macdonald
United States Magistrate Judge