1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7               **FOR THE DISTRICT OF ARIZONA**

8    Sharmila Kirwin, *et al*.,                    No. CV-22-00471-TUC-RCC-BGM

9                         Plaintiff,         **REPORT AND RECOMMENDATION**
                                             **RE:  Defendant VisionQuest National, Ltd.**
10   v.                                      **and Miranda Millage's Motion to Dismiss**
     Dariusz Kot, *et al*.,                  **(Doc. 29)**
11                        Defendant.

12         Pending before the Court is Defendant VisionQuest National, Ltd. ("Defendant

13   VisionQuest") and Miranda Millage ("Defendant Millage") (jointly referred to as

14

15   "Defendants VQ&MM") Motion to Dismiss Complaint and Supporting Memorandum of

16   Authorities ("Motion to Dismiss") (Doc. 29).  Plaintiffs filed Plaintiffs' Memorandum In

17
     Opposition ("Opposition") (Doc. 33), and Defendants VQ&MM replied (Doc. 38).  This
18

19   matter  was  referred  to  Magistrate  Judge  Bruce  G.  Macdonald  for  Report  and

20   Recommendation pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72, and 72.2 of the

21
     Rules of Practice of the United States District Court for the District of Arizona.  (Doc. 26.)
22

23   A motion(s) hearing was held before Magistrate Judge Macdonald on May 31, 2023.  ME

24   5/31/23 (Doc. 59).  The Magistrate Judge recommends that the District Court, after its

25
     independent  review,  **grant**  Defendants  VQ&MMs'  Motion  to  Dismiss  (Doc. 29),  and
26

27   dismiss, with prejudice, Claim Seven (VII), as to Defendant VisionQuest and Defendant

28   Miranda Millage.

## I.    INTRODUCTION

Pursuant to Claim Seven (VII) of Plaintiffs' Complaint, Defendant VisionQuest, a private corporation, maintains a contract with Arizona Department of Child Services (AZDCS) to provide "youth services."  Despite the private status of Defendant VisionQuest and Defendant Millage—an employee of VisionQuest, and a private citizen—Plaintiffs allege Defendants VN&MM colluded with AZDCS, and under 42 U.S.C. § 1983, should therefore be considered state actors, and liable for acts and omissions pursuant to written and unwritten policies at VisionQuest related to the care of A.K., Plaintiffs' minor child.  Complaint (Doc. 1 at 4-5, ¶ 4, 48, Section IX.)  Plaintiffs allege Defendants VN&MM, as 'state actors,' violated Plaintiffs' First and Fourteenth Amendment rights by interfering with familial association and omitting information from reports. [1]

## II.    SUPPLEMENTAL BACKGROUND

The Court merges and incorporates herein by this reference the "Background" set forth in the Report and Recommendation (R&R) addressing Defendant Surendran's Motion to Dismiss (Doc. 25), and further supplements with the following background relevant to Defendants VisionQuest and Millage.

* * *

On November 10, 2020—after AZDCS sought and obtained legal custody of Plaintiffs' minor child, A.K., by court order—AZDCS physically placed A.K with Defendant VisionQuest, in their group home, the Madalyn House.  As an employee of VisionQuest, Defendant Millage was the manager of the Madalyn House, and the case manager for A.K.

Defendant Millage—upon A.K. being placed at Madalyn House (through VisionQuest)—met with [Defendants Ryan][2] and Fuentes, learned

---

[1] Also pending before the Court are Defendant Surendran's Motion to Dismiss (Doc. 25) and DCS Defendants' Motion to Dismiss (Doc. 44), each addressed under separate R&R.

[2] Plaintiffs did not include as a defendant, a Defendant Ryan.  The Court merges and incorporates herein by this reference the Court's discussion of "Ryan" as set forth in the

of their goal to "affirm" A.K.'s gender transition, and came to a meeting of the minds that VisionQuest would cooperate with the department in securing that transition despite the parents' religious and moral objections. (Doc. 1 at 19, ¶ 79.)

Defendant Millage was required to submit regular reports to the department regarding A.K., and allegedly concealed the nature and extent of A.K.'s self-destructive behaviors while at Madalyn House from the case manager employed by AZCA [Arizona Children's Association] and others.[3]

One example of an omission from department reports occurred on December 23, 2020, when A.K. was transported from the Madalyn House to the Crisis Response Center, based on experiencing hallucinations, and returned to Madalyn House after reporting no suicidal ideation.

January 4, 2021, Millage was aware of a planned telephone between A.K. and Plaintiffs, a call set up by A.K.'s then-therapist, however, Millage intentionally frustrated the planned call.

On January 7, 2021, Plaintiffs emailed Defendant Egbert regarding concerns with A.K.'s placement at Madalyn House and Defendant Egbert brought the concerns to Defendant Millage, "and the two **agreed** to suppress the information and the evidence of the behaviors from the department and the juvenile court because disclosure would negatively impact the Defendants' process of splitting A.K. from her family and further the goal of A.K.'s gender transition" and "approved Millage's continued false reports of A.K.'s condition and behaviors in VisionQuest (Doc. 1 at 24-26, ¶¶ 101-05.)

Omission of A.K.'s 'behavior' in Millage's reports continued when a new therapist was assigned January 21, 2021, and thereafter.

On April 2, 2021, when the Juvenile Court order concluded "no dependency" Defendant Egbert called Defendant Millage requesting A.K. be put on the telephone and informed A.K. of the Juvenile Court's order at approximately noon, by stating "your parents won, they are coming to get you." At 1:43 p.m. on April 2nd, A.K.'s then-therapist called Defendant Millage and asked to speak with A.K., A.K. reported A.K. already knew about the court order, had tried to "run into traffic," had cut herself in an attempt to 'bleed out,'" and would continue self-harming if returned to her

---

R&R addressing DCS Defendants Motion to Dismiss (Doc. 44).

[3] According to the Complaint, Arizona Children's Association is a contractor providing "wrap around services." (Doc. 1 at 18, ¶ 77.)

parents and would probably return to the "the psycho ward." Defendant Millage informed A.K.'s therapist that she had called a Crisis Mobile Team, and expressed hope that the team would arrive before the parents. Around 1:50 p.m. when Sharmila Kirwin arrived at VisionQuest [Madalyn House], at the same time as the Crisis Mobile Team and Defendant Millage had already placed 911 calls to Tucson Police Department and Tucson Fire Department, and units of both agencies arrived around the same time. Based on information provided by Egbert, Defendant Millage and Muckenthaler, Necoechea prepared an Application and Declaration for *Ex-parte* Removal of Child and received an order at 10:50 p.m. on April 2, 2021.

## III.   JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(3) and (4).

## IV.   PARTIES' POSITIONS

Defendant VisionQuest and Defendant Millage move to dismiss Claim Seven (VII) under Rule 12(b)(6) for failure to state a claim, alleging Plaintiffs have failed to meet the state-actor element of a 42 U.S.C. § 1983 claim based on Plaintiffs' alleged failure to plausibly infer Defendants VQ&MM conspired with [DCS] Defendants.

In opposition, Plaintiffs counter Defendant Millage, as an employee of VisionQuest, in his individual capacity, "willingly participated" in the AZDCS Defendants' covert scheme to sever Plaintiffs' familial association by, among other acts, manipulating their severely mentally-ill child in Defendant Millage's care and facilitating obstruction of Plaintiffs' efforts to secure the care necessary, while concealing the child's 'deterioration.'

## V.   LAW

The Court merges and incorporates herein by this reference, Section V. "Law" of the R&R addressing Surendran's Motion to Dismiss (Doc. 25), and further supplements below with law relevant to Defendant VQ&MMs' Motion to Dismiss (Doc. 29).

- 4 -

"While generally not applicable to private parties, a § 1983 action can lie against a private party when 'he is a willful participate in joint action with the State or its agents.'" *Kirtley v. Rainer*, 326 F.3d 1088, 1092 (2003) citing *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183 (1980).  "Only in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes." *Doe v. Rosenberg*, 996 F. Supp. 343, 348 (S.D.N.Y. 1998), *aff'd,* 166 F.3d 507 (2d Cir. 1999) citing *Harvey v. Harvey,* 949 F.2d 1127, 1130 (11th Cir.1992).

> To hold the [Children's Defendants] liable **as private parties** under § 1983, Plaintiffs must allege that they were engaged in state action—*i.e*., that 'the conduct allegedly causing the deprivation of a federal right [was] **fairly attributable to the [s]tate.'**

*Grae-El v. City of Seattle*, 618 F. Supp. 3d 1080, 1087 (W.D. Wash. 2022) (emphasis added) citing *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S. Ct. 2744 (1982)).

> 'The Supreme Court has articulated four tests for determining whether a private [party's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test.'

*Grae-El,* 618 F. Supp. 3d at 1087 *citing Tsao*, 698 F.3d at 1139.

Under the Joint Action Test, a private party may be deemed to be a state actor by "either '[p]roving the existence of a conspiracy or by showing that the private party was 'a willful participant in joint action with the State or its agents.'" *Tsao*, 698 F.3d at 1140, *citing Franklin*, 312 F.3d at 445 (quoting *Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir.1989)). "To establish liability for a conspiracy in a § 1983 case, a plaintiff must "demonstrate the existence of an agreement or meeting of the minds" to violate

constitutional rights. *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) citing

*Mendocino Env'tl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1301 (9th Cir.1999).  "Such

an agreement need not be overt and may be inferred on the basis of circumstantial evidence

such as the actions of the defendants."   *Mendocino*, 192 F.3d at 1301.   A "common

objective" is insufficient; the common objective must also intend a violation of

constitutional rights.  *Crowe*, 608 F.3d at 440–41.

Whether an unlawful conspiracy exists is "generally" an issue for the jury, "so long

as . . . the jury can infer from the circumstances that the alleged conspirators had a meeting

of the minds and thus reached an understanding to achieve the conspiracy's objective."

*Mendocino Env'tl Ctr.*, 192 F.3d at 1301-02 (internal marks and citation omitted).  A jury

can infer an agreement if "alleged conspirators have committed acts that 'are unlikely to

have been undertaken without an agreement.'"  *Id.*

Under a 'conspiracy' theory of state action, to confer liability on a private actor, at

the motion to dismiss stage, the question is whether the well-pleaded facts of the Complaint

show the pleader is entitled to relief and permit the Court to *infer more than the mere*

*possibility of misconduct*, rather sufficient facts to plausibly infer that the particular

parallelism asserted was the product of collusion rather than coincidence.  *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 553, 127 S. Ct. 1955, 1963 (2007).

> Ultimately, Plaintiffs' theory that the contested findings were the result of a
> deficient process—including the participation of "misinformed and/or
> undertrained professionals" (*see id.* at 45)—offers the "**more likely**
> **explanation[ ]" and is, accordingly, the inference the court must draw**.
> *See Iqbal*, 556 U.S. at 681, 129 S.Ct. 1937 (finding allegations "consistent
> with" **unlawful** conduct insufficient to state a claim "given more likely
> explanations"); *see also Mendocino Env't Ctr.*, 192 F.3d at 1301-02 (finding

allegations "that the alleged conspirators have committed acts that 'are unlikely to have been undertaken without an agreement'" sufficient to support an inference that a conspiracy was formed).

*Grae-El v. City of Seattle*, 618 F. Supp. 3d 1080, 1088 (W.D. Wash. 2022). "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum v. Yaretsky*, 457 U.S. 991, 1004-05, 102 S. Ct. 2777, 2786 (1982).

At the motion to dismiss stage, the well-pleaded facts of parallel conduct, accepted as true, must plausibly suggest an unlawful agreement.  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Ashcroft*, 556 U.S. at 678, 129 S. Ct. at 1949.

## VI.   ANALYSIS

Defendants VQ&MMs' motion to dismiss asserts "allegations of an inferred conspiracy are <u>in</u>sufficient where there are" "more likely explanations for the parallel conduct" described in the Complaint and cites to *Grae-El v. City of Seattle*, in support thereof. (Doc. 25 at 14:22-28) (emphasis added).

Plaintiffs' Opposition asserts the standard found in *Mendocino* applies, and quotes the following "[w]hether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, 'so long as there is a *possibility* that the

jury can' infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives[,]" and cites to *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999) (citations omitted, emphasis added). (Doc. 33 at 6-7.)

The Court notes, here, that the standard Plaintiffs cite to in the Ninth Circuit case of *Mendocino*, decided in 1999, refers to a standard applied at the summary judgment stage of the proceedings, and the subject case, here, is addressing the sufficiency of the Complaint at the motion to dismiss stage.  More recently, in 2007, in the seminal case of *Bell Atlantic Corp. v. Twombly*, the United State Supreme Court addressed the pleading standard construing Fed.R.Civ.P., Rule 8, when testing the sufficiency of a complaint for a Rule 12(b)(6) motion to dismiss for failure to state a claim for relief.  550 U.S. 544, 127 S.Ct. 1955 (2007).  In *Bell Atlantic Corp.*, the United States Supreme Court dispensed with the previous "no set of facts" pleading standard set forth in *Conley* because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the *possibility* that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  550 U.S. at 561, 127 S.Ct. at 1968 *abrogating Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99 (1957).  "*Conley*[,] described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id*. Accordingly, the Court, applies the general standard set forth in *Bell Atlantic*, as follows:

> The inadequacy of showing parallel conduct or interdependence, **without more**, mirrors the ambiguity of the behavior: consistent with conspiracy, but

**just as much in line with a wide swath of rational** and competitive business **strategy unilaterally prompted by common perceptions** of the market.

\* \* \*

Accordingly, we have previously **hedged against false inferences from identical behavior** at a number of points in the trial sequence.

\* \* \*

[A] conspiracy plaintiff with evidence **showing nothing beyond parallel conduct** is not entitled to a directed verdict[,] proof of a [conspiracy] **must** include evidence **tending to exclude** the possibility of independent action[,] and at the summary judgment stage a [plaintiff's] offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently[.]

*Bell Atlantic Corp*., 550 U.S. at 554, 127 S. Ct. at 1964 citing *Matsushita Elec. Indust. Co. v. Zenith Radio Corp*., 475 U.S. 574, 106 S.Ct. 1348 (1986). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp*, 550 U.S. at 555, 127 S. Ct. at 1965. Even "conscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful." *Bell Atl. Corp.*, 550 U.S. at 553–54, 127 S. Ct. at 1964. The holding in *Bell Atl. Corp*., in pertinent part, "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made" while "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to **raise a reasonable expectation that discovery** will reveal evidence of **illegal agreement**." 550 U.S. at 556, 127 S.Ct. at 1965 (emphasis added).

**A. Written Agreement by Contract**

The federal Child Welfare Act ("CWA" or "the Act") establishes a cooperative federal-state program that assists states in meeting the costs of providing foster care to children. Pursuant to this federal spending clause

1
2
3
4
5

> legislation, the federal government and the state governments share the cost of providing funds for **licensed** third parties (e.g., **group homes**) that care for these children. The CWA and related federal regulations require states receiving federal aid to provide foster care for a child when a court has determined that it is necessary under applicable law that the child be removed from his or her home and placed in **out-of-home care**. *See, e.g.,* 42 U.S.C. §§ 670–79b.

6
7
8

*California All. of Child & Fam. Servs. v. Wagner*, No. C 09-4398 MHP, 2009 WL 3920364, at *1 (N.D. Cal. Nov. 18, 2009), *aff'd,* 425 F. App'x 660 (9th Cir. 2011) (emphasis added).

9
10
11
12
13
14
15

> The CWA requires that states participating in the cooperative program provide "foster care maintenance payments" on behalf of eligible children to child-care institutions, including **group homes**. 42 U.S.C. §§ 671(a)(1), 672(b)(2); 45 C.F.R. § 1356.21(a). "The term 'foster care maintenance payments' means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." 42 U.S.C. § 675(4)(a).

16

*Id.* (emphasis added).

17
18
19
20

> Pursuant to the CWA, a state must designate **a state agency** to administer or supervise the administration of the approved state plan. 42 U.S.C. § 671(a)(2). The state must also amend its approved plan by appropriate submission to the Secretary whenever necessary to comply with alterations to the CWA or federal regulations or policies. 45 C.F.R. § 1356.20(e)(1).

21

*Id.* at *2.

22
23
24
25

The Department of Child Safety was established pursuant to A.R.S. § 8-451. Pursuant to Arizona Administrative Code R21-1-301 Definitions, 14. "Department" or "DCS" means the Arizona Department of Child Safety.[4]

26
27
28

---

[4] Arizona Division of Child Safety and Family Services (CSFS) was formerly known as Child Protective Services (CPS) a division of the Arizona Department of Economic Security (ADES). Effective May 29, 2014, the Arizona legislature repealed the statutory

1    Pursuant to Executive Order 2014-01, Governor Jan Brewer implemented orders
2
3    which abolished the Division of Children, Youth and Families, and established the Division
4    of Child Safety and Family Service (CSFS).  In doing so, the Governor also ordered the
5    Office of Child Welfare Investigations to report to the Director of CSFS, and the Director
6
7    of CSFS to report directly to the Governor "on all administrative and policy matters
8    involving child welfare, including Child Protective Services (CPS), foster care, adoption,
9    and the Comprehensive Medical and Dental Program.  In addition, the Director of CSFS
10   was ordered to "administer the budgets of the state child welfare program and the Office
11
12   of the Child Welfare Investigations separate and distinct from one another."  And, the
13   Director of CSFS was tasked with collaborating in the development of a "permanent,
14   separate agency – autonomous from the Department of Economic Security – for state child
15   welfare programs and services."
16
17   According to Arizona Administrative Code R21-1-501(15) "PSRT" means the
18   Department's Protective Services Review Team, that administers the process described in
19   A.R.S. § 8-811 for review and appeal of proposed substantiated findings of child abuse or
20   neglect.
21
22   In Arizona, under A.R.S. § 36-1201, a 'Group home' means:
23
24   [A] residential facility that is licensed to serve more than four minors at any
     one time, **that is licensed** by the department of health services pursuant to
25   chapter 4 of this title[2] or § 36-591, subsection A or **by the department of**

26   authorization for creation of CPS and for ADES's administration of child welfare and
27   placement services under title 8, and the powers, duties, and purposes from those entities
     were transferred to the newly established DCS. *See* 2014 Ariz. Sess. Laws 2d Spec. Sess.,
28   ch. 1 §§ 6, 20, 54.  For simplicity, our references to DCS in this opinion encompass both
     ADES and the former CPS, as appropriate.

**child safety** pursuant to title 8, chapter 4, article 4[3] **and that provides services pursuant to a contract** for minors **determined to be dependent** as defined in § 8-201 or delinquent or incorrigible pursuant to § 8-341, or for minors with developmental disabilities, mental health or substance abuse needs.

A.R.S. § 36-1201(F)(3)(a) (*eff.* Sept. 29, 2021) (emphasis added). A 'Group home' "does not include hospitals, nursing homes, child crisis and domestic violence shelters, adult homes, foster homes, facilities subject to any transient occupancy tax or behavioral health service agencies that provide twenty-four hour or continuous physician availability."

A.R.S. § 36-1201(F)(3)(b). The 'contract' provisions regarding 'Group homes' under A.R.S. § 36-1201, in pertinent part, include:

> **A. State agencies** that contract directly **with group homes** or regional behavioral health authorities that, as part of their contracts with the department of health services, subcontract with group homes **shall require in each contract awarded, renewed or amended the following minimum provisions**:
>
> **1.** The group home shall provide a safe, clean and humane environment for the residents.
> **2.** The group home is **responsible for supervising the residents** while in the group home environment or while residents are engaged in any off-site activities organized or sponsored by and under the direct supervision and control of the group home or affiliated with the group home.
> **3.** All group home contractors **shall be licensed** by either the department of health services, the department of child safety or the department of economic security.
> **4.** The award of a group home contract from an appropriate contracting authority is not a guarantee that children will be placed at the group home.
> **5.** A licensing violation by the group home that is not corrected pursuant to this section may also be considered a contract violation.
> **6.** State agencies and regional behavioral health authorities may share information regarding group home contractors. The shared information shall not include information that personally identifies residents of group homes.
>
> * * *

- 12 -

A.R.S. § 36-1201 (emphasis added).  "As the Supreme Court recently explained, the fact that the government "licenses [or] contracts with" a private entity, "does not convert the entity into a state actor." *Polk v. Yee*, 481 F. Supp. 3d 1060, 1068 (E.D. Cal. 2020), *aff'd,* 36 F.4th 939 (9th Cir. 2022) citing *Manhattan Community Access Corp. v. Halleck*, ⸺ U.S. ⸺, 139 S. Ct. 1921, 1931, 204 L.Ed.2d 405 (2019).

**B. Unwritten Agreement (inferred 'conspiracy')**

**1. Defendant Millage's Alleged Omissions**

**December 23, 2020** - One example of an **omission** from department reports occurred on December 23, 2020, when A.K. was transported from the Madalyn House to the Crisis Response Center, based on experiencing hallucinations, and returned to Madalyn House after reporting no suicidal ideation.

According to the Complaint, A.K. experienced 'hallucinations' as early as May, June, or July of 2020, while still in the care, custody, and control of Plaintiffs.  (Doc. 1 at 7, ¶ 20.)  Also noted in the Complaint, is A.K.'s use of alcohol and marijuana while housed at Madalyn House.  (Doc. 1 at 20, ¶ 85.)  Plaintiffs' allegation that Defendant Millage's omission in any required reports of A.K.'s December 23, 2020 visit to the Crisis Response Center for A.K.'s 'hallucinations'—as a fact for the Court to infer is part of a larger 'conspiracy'—fails to address the more likely explanation that Defendant Millage's omission was instead perhaps self-serving, as substance use and experimentation, although fairly common among teenagers, would not reflect well on the group home.  It is possible that Defendant Millage omitted the December 23, 2020 event for some other reason, such as, A.K. may have ingested hallucinogens.  According to the Complaint, A.K. allegedly began experimenting with substances such as alcohol and marijuana while living at

Madalyn House—combined with A.K.'s past alleged attempt to overdose on prescription medication—suggests substance use and experimentation, or abuse.   The self-serving explanation for Defendant Millage's omission from the reports to preserve the reputation of the group home, is just as plausible as applying any alleged 'conspiracy' to explain the omission; if not, more persuasive.   Accordingly, the Court finds the December 23, 2020, omission from any reports is conduct by Defendant Millage that is just as likely to occur— in the absence of an agreement or 'conspiracy.'

> **January 21, 2021** - **Omission** of A.K.'s behavior in Millage's reports continued when a new therapist was assigned January 21, 2021, and thereafter.

Similar to the December 23, 2020, alleged omission from the reports, the January 21, 2021, omission also involved 'dangerous behaviors'; a vague characterization that may, just as well, refer to substance use, experimentation, and or abuse.   Again, a plausible explanation, other than 'conspiracy,' for any alleged omission in report(s) might be better supported by the self-serving explanation of preserving the reputation of the group home as a respectable facility—conduct that is just as likely to occur in the absence of a 'conspiracy.'

### C. Alleged Obstruction of Familial Association

> **January 4, 2021**, Millage was aware of a planned telephone call between A.K. and Plaintiffs, a call set up by A.K.'s then-therapist, however, Millage intentionally frustrated the planned call.

The arrangement for the January 4, 2021 telephone call between A.K. and A.K.'s parents was allegedly 'set up' by A.K.'s then-therapist, allegedly with the agreement of A.K.  However, logistically, the Complaint alleges that "no one at VisionQuest picked up

the phone." (Doc. 1 at 26, ¶ 106.)  Taken as true, the fact that 'no one' answered the phone,

supports the ambiguity of who was responsible for picking up the phone and negates

attribution of the omission to Defendant Millage, and serves as an alternate explanation.

The potential reasons why no one picked up the phone abound, and therefore, these facts

as alleged in the Complaint do not function as a fact for which the finder can draw an

inference of 'conspiracy' as the conduct, or here, rather the omission, is likely to have

occurred in the absence of an agreement or alleged 'conspiracy.'  The Court finds that the

January 4, 2021, allegation fails to allege sufficient facts to infer plausibly a 'conspiracy'

to obstruct familial association.

## D.  Alleged 'Agreement'

> On January 7, 2021, Plaintiffs emailed Defendant Egbert regarding concerns
> with A.K.'s placement at Madalyn House and Defendant Egbert brought the
> concerns to Defendant Millage, "and the two **agreed** to suppress the
> information and the evidence of **the behaviors** from the department and the
> juvenile court because disclosure would negatively impact the Defendants'
> process of splitting A.K. from her family and further the goal of A.K.'s
> gender transition" and "approved Millage's continued false reports of A.K.'s
> condition and behaviors in VisionQuest. (Doc. 1 at 24-26, ¶¶ 101-05.)

By January of 2021, A.K. had been residing at the group home since November of

2020.  Any agreement identified in January of 2021, fails to explain Defendant Millage's

alleged December 23, 2020 omission, and as previously discussed, the more likely

explanation of any omission of A.K.'s 'behaviors,' generally; is a vague characterization

alluding to perhaps substance use, experimentation, or abuse; and the omission(s), are

better explained as perhaps Defendant Millage's self-serving attempt to maintain the

reputation of the group home as a respectable facility, and the omission(s) would have

- 15 -

likely occurred in the absence of any agreement or 'conspiracy.'  Furthermore, assuming the facts alleged in the Complaint are true, as the Court is obliged to do at the motion to dismiss stage, "and the two agreed to suppress the information," under *Blum, supra*, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment."  *Blum*, 457 U.S. at 1004-05, 102 S. Ct. at 2786.

## VII.    CONCLUSION

Under 42 U.S.C. § 1983, as a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that "most rights secured by the Constitution are protected only against infringement by governments."  *Lugar*, 457 U.S. at 936 citing *Flagg*, 436 U.S. at 156.  To fairly attribute a deprivation to the State, the deprivation must be caused by some right or privilege created by the State, and second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.  Just because the state, here, DCS Defendants, have a contract with a group home, a private entity, does not necessarily mean the group home is a state actor. "As the Supreme Court recently explained, the fact that the government 'licenses [or] contracts with' a private entity, 'does not convert the entity into a state actor—unless the private entity is performing a traditional, exclusive public function.'" *Polk*, 481 F. Supp. 3d at 1068.  The conduct of Defendant Millage as alleged in the Complaint, is just as likely to have been performed in the absence of an agreement with the DCS Defendants, and the Complaint lacks facts that 'hedge against false inferences' from any alleged 'parallel conduct.' *Bell Atl. Corp., supra; Mendocino Env't Ctr.*, *supra*.

The Court finds Defendant VisionQuest, a private corporation, and Defendant Millage, a private citizen—are inappropriate parties to be held as state actors, based on the allegations of the Complaint, for alleged unconstitutional violations under the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983.

## VIII.     RECOMMENDATION

For the reasons delineated above, the Magistrate Judge recommends that the District Judge, after its independent review, **grant** Defendant VisionQuest and Defendant Millage's Motion to Dismiss (Doc. 29), and dismiss, with prejudice, Claim Seven (VII).

Pursuant to Federal Rules of Civil Procedure, Rule 72(b)(2), any party may serve and file written objections within fourteen (14) days of being served with a copy of the Report and Recommendation.  A party may respond to the other party's objections within fourteen (14) days.  No reply brief shall be filed on objections unless leave is granted by the District Court.  If objections are filed, the parties should use the following case number:

**CV-22-00471-TUC-RCC**

If objections are not timely filed, they may be deemed waived.

Dated this 25th day of July, 2023.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge