**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Sharmila Kirwin, et al., | No. CV-22-00471-TUC-RCC |
| Plaintiffs, | **ORDER** |
| v. | |
| Dariusz Kot, et al., | |
| Defendants. | |

Plaintiffs Sharmila and Levi Kirwin filed a Complaint alleging various constitutional violations occurred when their child, A.K., was removed from their custody.[1] (Doc. 1.) Arizona Department of Child Services ("AZDCS") Defendants Dariusz Kot, Mildred Jimenez, Daniel Nido, Melissa Fuentes, Kimberly Egbert, Mandy Chamberlin, David Necoechea, Cecilia Rojas-Adnachiel, Aiza Huerta, and Pauline Machiche filed a Motion to Dismiss. (Doc. 44.) This matter has been fully briefed and oral argument held. (Docs. 54, 58–59.) On June 26, 2023, Magistrate Judge Bruce G. Macdonald issued a Report and Recommendation ("R&R") addressing the Motion to Dismiss. (Doc. 60.) The Magistrate Judge informed the parties they could file objections and responses, but no replies were permitted without the Court's leave. (*Id.* at 51.) Plaintiffs objected (Doc. 73),

---

[1] Plaintiffs voluntarily dismissed Claims Two (Docs. 36, 40), Five (Doc. 68), and Seven (Doc. 67), and agree to the dismissal of Claims Six, Twelve, Fourteen and Fifteen with prejudice, and Claims Four and Eight without prejudice (Doc. 73 at 26). The Complaint did not include a Claim Ten. Plaintiffs also agree to dismissal of AZDCS Defendants Fuentes, Chamberlain, and Machiche. (Doc. 73 at 26.) The Court addresses de novo the remaining Claims One, Three, Nine, Eleven, and Thirteen.

AZDCS responded (Doc. 80), Plaintiffs filed a notice of Supplemental Authority (Doc. 78) and a reply without leave (Doc. 82). Plaintiffs then asked the Court to order that the reply was timely. (Doc. 83.)

Regardless of timeliness, Plaintiffs did not request leave to file a reply. This matter has been extensively briefed—the R&R is fifty-one pages, and Plaintiffs were permitted to file an extended twenty-six-page objection and provide supplementation. The Court must review the issues raised de novo. Additional briefing is unnecessary for a fair adjudication of the motion. Therefore, the Court will deny the Motion for Leave *Nunc Pro Tunc* to Reply to AZDCS's Response to Plaintiffs' Objections (Doc. 83) and strike the reply (Doc. 82).

## I.   PLAINTIFFS' COMPLAINT

The Complaint alleges the following:

Around May 2020, Plaintiffs' child, A.K., expressed that they[2] identified as transgender. (Doc. 1 at 7, ¶ 18.) A.K. contemporaneously exhibited signs of "anxiety, panic attacks, social anxiety, depression, gender dysphoria, hallucinations, self-harm, suicidal ideations, [and a] conflicted relationship with family." (*Id.* at ¶ 20.) Plaintiffs sought counseling for A.K. and distributed prescribed medication. (*Id.* ¶¶ 17, 20.) A.K.'s struggles culminated in a suicide attempt on September 24, 2020, by overdosing on the prescribed medication. (*Id.* at ¶ 32.) A.K. was admitted to Tucson Medical Center for treatment, but after A.K. stated they had made five prior suicide attempts, Plaintiffs agreed to transfer A.K. to Palo Verde Behavioral Health ("PVBH") on September 26, 2020. (*Id.* at ¶¶ 32–36.)

The next day, PVBH Director Dr. Mark Helms conducted a psychiatric evaluation, diagnosing "A.K. with (1) major depression, recurrent, severe; (2) anxiety disorder, unspecified; and (3) gender dysphoria." (*Id.* at ¶ 38.) While at PVBH, A.K. disclosed that (1) they had been sexually abused by their brother around the ages of 7 to 13, (2) they wanted to kill themselves when they were living in Plaintiffs' home, and (3) they would like to be removed from the home. (*Id.* at ¶¶ 39, 41.) These allegations were reported to

---

[2] The parties use different pronouns when referring to A.K. For simplicity and inclusivity, the Court uses the pronouns they/them/theirs.

the AZDCS hotline. (*Id.* at ¶ 45.) As a result, AZDCS opened an investigation and assigned Dariusz Kot as lead investigator. (*Id.*) On October 1, 2020, Kot interviewed A.K. and Dr. Helms. (*Id.* at ¶ 46.) Kot informed A.K. that if A.K. threatened to harm themselves if returned to Plaintiffs' home, AZDCS could take them into custody and would support gender transition measures. (*Id.*)

Performing no further investigation, Kot drafted an Application and Proposed Order for a Court Authorized Removal ("CAR").[3] (*Id.* at ¶ 50.) AZDCS Investigation Supervisors Mildred Jimenez and Daniel Nido "were informed of the facts" and Kot's investigation thus far, "collaborated in the preparation of the allegations," and approved the submission of the CAR Application. (*Id.* at ¶¶ 51–52.) The grounds for seizure included "(1) Failure to protect a child from abuse or neglect, (2) Mental health issues, and (3) Unfit or unsafe home environment for a child." (*Id.* at ¶ 52.)

The judge signed the CAR Order, approving the removal of A.K. from Plaintiffs' custody on October 8, 2020, at 9:27 a.m. (*Id.*) Later that day, Kot spoke to Plaintiffs but did not inform them until 5:00 p.m. the following day that the judge had already given AZDCS temporary custody of A.K. (Doc. 1 at ¶¶ 53–54.)

Kot provided the Arizona Attorney General ("AAG") with a worksheet that "recorded alleged facts supporting an out-of-home dependency." (*Id.* at ¶ 61.) Based on AZDCS Defendants' information, the AAG filed a Dependency Petition and Petition for Child Support [Out-of-Home] ("Petition I"), along with proposed Temporary Orders and Findings. (*Id.* at ¶¶ 64, 67.) A juvenile judge signed Petition I on October 20, 2020, and Plaintiffs were served with Petition I and the Temporary Orders the next day. (*Id.* at ¶¶ 67–68.)

While in AZDCS's custody, A.K. was transferred from PVBH to VisionQuest–Madalyn House on November 10, 2020. (*Id.* at ¶ 78.) On January 1, 2021, AZDCS Defendant Kimberly Egbert was assigned as A.K.'s case manager. (*Id.* at ¶ 94.) Around January 7, 2021, Plaintiffs sent Egbert an email relaying their concerns about A.K.'s care

---

[3] The parties alternatively refer to the CAR Order as an Ex Parte Order for the Removal of a Child.

at VisionQuest, mentioning that A.K. had been smoking marijuana, using birth control, and may have been engaging in a sexual relationship. (*Id.* at ¶ 101.) Plaintiffs asked Egbert to help prevent A.K. from engaging in these activities. (*Id.*) Egbert discussed the email with A.K.'s case manager at Madalyn House, Miranda Millage, and together they decided not to share this information. (*Id.* at ¶ 103.) Amy Liechty became A.K.'s therapist on January 21, 2021, but Egbert did not tell Liechty about Plaintiffs' email or A.K.'s behavior. (*Id.* at ¶ 109.) Plaintiffs surmise Egbert decided to keep the email secret because it "would negatively impact the Defendants' process of splitting A.K. from her family" and would "further[] the goal of A.K.'s gender transition." (*Id.* at ¶ 103.)

On January 26, 2021, Plaintiffs submitted a complaint to the Ombudsman, stating they were concerned about AZDCS's attempts to separate them from A.K. and further A.K.'s transgender conversion. (*Id.* at ¶ 122.) Staff from the Ombudsman's office spoke with Egbert, and "Egbert denied, lied and misrepresented the true facts, and the staffer accepted those explanation[s]." (*Id.* at ¶ 124.)

\*\*\*

On April 2, 2021, a juvenile judge found that no dependency existed and ordered A.K.'s return to Plaintiffs' custody. (*Id.* at ¶ 126.) Prior to the termination order, Plaintiffs allege Egbert "concealed from Plaintiffs, the AAG, and the juvenile judge the extent of A.K.'s deterioration in the custody of VisionQuest" and failed to take adequate measures to coordinate A.K.'s successful transition to Plaintiffs' custody. (*Id.* at ¶ 127.) Instead, sometime after 12:00 p.m., Egbert simply told A.K. over the phone "your parents won, they are coming to get you." (*Id.* at ¶ 132.)

At 1:43 p.m., in a phone call between A.K. and Liechty, A.K. said after Egbert informed them of the end of the dependency, they had decompensated, "tried to 'run into traffic,' had cut [themselves] in an attempt to 'bleed out,' and would continue self-harming if returned to [their] parents and would probably return to 'the psycho ward.'" (*Id.* at ¶¶ 133–34.) Within ten minutes of Liechty's call, Plaintiff Sharmila Kirwin, the Crisis Mobile Team, and Plaintiffs' private investigator arrived at VisionQuest, with the Tucson Police

Department ("TPD") and Tucson Fire Department arriving soon thereafter. (*Id.* at ¶¶ 135–39.) Plaintiffs agreed to A.K.'s transport to Alternative Community Engagement Services ("ACES") where A.K. "would be allowed a cool down period, and may be held overnight." (*Id.* at ¶¶ 138, 142.) However, when ACES refused to admit A.K., TPD Officer Muckenthaler transported A.K. to TPD's Midtown Station without Plaintiffs' consent or knowledge. (*Id.* at ¶¶ 142, 145.)

By 10:33 p.m. that day, Necochea prepared—and his supervisor Rojas-Adnachiel approved—a Second Application and Declaration for Ex Parte Removal of a Child ("Second CAR") based on information provided by Egbert, Millage, and Muckenthaler. (*Id.* at ¶ 147.) The judge signed the Second CAR Order at 10:50 p.m. (*Id.*) Officer Muckenthaler then transported A.K. to Sonoran Behavioral Health Center and into AZDCS's custody. (*Id.* at ¶ 148.)

Sometime between April 2 and April 7, 2021, the AAG filed a Dependency Petition and Petition for Child Support [Out-of-Home] ("Petition II") and Temporary Orders and Findings. (*Id.* at ¶ 155.) The juvenile judge signed these documents on April 8, 2021. (*Id.*)

A.K. subsequently "announced [their] intent to sever all ties with Plaintiffs and directed [their] lawyer in the dependency case to accomplish that goal . . . ." (*Id.* at ¶ 166.)

## II.   STANDARD OF REVIEW

### a.   Magistrate's R&R

Where there is no objection to a magistrate's factual or legal determinations, the district court need not review the R&R "under a *de novo* or any other standard." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). However, when a party objects, the district court must "determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1).

///

///

### b.  Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While Rule 8 does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed–me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint must contain more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Bell Atl. Corp.*, 550 U.S. at 555. Moreover, conclusory and vague allegations will not support a cause of action. *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982); *Hill v. Kernan*, No. 19-16759, 2021 WL 4870832, at *1 (9th Cir. Oct. 19, 2021).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context–specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. So, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id.* at 681. In determining the sufficiency of the complaint, the court takes a plaintiff's factual allegations as true, and makes any reasonable inferences in favor of the nonmoving party. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

If the plaintiff "fails to state a claim on which relief may be granted," the district court must dismiss. 28 U.S.C. §1915(e)(2)(B)(ii). However, if the pleading can be remedied through the addition of facts, the claimant should be granted an opportunity to amend the complaint prior to final dismissal. *Lopez v. Smith*, 203 F.3d 1122, 1127–29 (9th Cir. 2000).

### c.  Allegations of Judicial Deception

Parents enjoy "a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of civil child custody cases." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1146 (9th

Cir. 2021). A judicial deception claim must establish that there was "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Id.* at 1147. Judicial deception allegations must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Id.* at 1148–49 (finding judicial deception claims met heightened pleading standard in child custody case); *A.H. v. Sacramento Cnty. Dep't of Child, Fam., and Adult Servs.*, No. 2:21-cv-00690-DAD-JDP, 2023 WL 2938380, at *3 (E.D. Cal. Apr. 13, 2023) (determining heightened pleading necessary for allegations that child services fraudulently reported child abuse to obtain protective custody warrant); *McCoy v. State Dep't of Hum. Servs.*, No. 21-00063 LEK-RT, 2021 WL 5040197, at *9 (D. Haw. Oct. 29, 2021) (requiring heightened pleading for claim of misrepresentation in a petition for temporary custody); *Anderson v. City of Pasadena*, No. 94-56301, 1996 WL 109394, at *3–4 (9th Cir. Mar. 12, 1996) (mandating heightened pleading for allegations of judicial deception in obtaining warrant).[4] This means a plaintiff must state "the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false[.]" *Benavidez*, 993 F.3d at 1145.

### III.   PLAINTIFFS' OBJECTION

Plaintiffs' objection challenges the Magistrate Judge's conclusions that (1) Claims One and Three are barred by the statute of limitations; (2) AZDCS Defendant Egbert is entitled to qualified immunity on Claim Nine; (3) Plaintiffs' judicial deception claim was insufficiently pled in Counts Eleven and Thirteen; and (4) punitive damages should be denied. (Doc. 73.) The Court addresses the objections de novo.

### IV.   CLAIMS ONE AND THREE: STATUTE OF LIMITATIONS

In Arizona, a plaintiff has two years from the accrual of a claim to file a civil rights

---

[4] Plaintiffs object to the Magistrate Judge's application of Federal Rule of Civil Procedure 9(b)'s pleading standard to their claims of judicial deception. The Court finds their position unsupported—a judicial deception claim in a child custody case should be subject to heightened standards because the claims are grounded in fraud. *See A.H.*, 2023 WL 2938380, at *3 (quoting *Benavidez*, 993 F.3d at 1148) ("A claim for judicial deception must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b) because the claim is one 'involving fraud.'").

complaint. *DeLuna v. Farris*, 841 F.2d 312, 313 (9th Cir. 1988). State law determines the length of the statute of limitations, but the district courts look to federal law to calculate the accrual date. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Maldonado v. Harris*, 370 F.3d 945, 955 (9th Cir. 2004).

Claim One alleges AZDCS Defendants Kot and Nido violated Plaintiffs' First and Fourteenth Amendment rights to familial association through judicial deception when they prepared and submitted the CAR Application. (Doc. 1 at 40–41.) Claim Three asserts Defendants Kot, Jimenez, and Nido violated Plaintiffs' First and Fourteenth Amendment rights through judicial deception when they made material misrepresentations to the AAG when securing Petition I. (*Id.* at 15, 44.)

The Magistrate Judge determined Claims One and Three were barred by the statute of limitations. (Doc. 60 at 10.) The Magistrate found that Plaintiffs' claims accrued on October 6, 2020, when Plaintiffs were interviewed by law enforcement. (*Id.* at 9 (citing Doc. 1 at 12, ¶ 48).) On this date, the Magistrate stated, Plaintiffs knew of their injury because "Plaintiffs became aware that charges may be brought for the perpetration of abuse, or lack of protection from the abuser . . . ." after A.K. (1) attempted suicide, (2) made allegations of sexual abuse, and (3) stated they wanted to kill themselves when at home. (*Id.* at 9–10.) Therefore, the Magistrate concluded, the October 7, 2022 Complaint was beyond the two-year statute of limitations. (*Id.* at 10.)

AZDCS Defendants originally argued that the accrual date was October 1, 2020—the date Kot's investigation began. (Doc. 44 at 9–10.) However, AZDCS Defendants now agree with the Magistrate's accrual date. (Doc. 80 at 4.) Plaintiffs counter that Claims One and Three accrued on October 8, 2020, the date "Defendants secured the CAR that *caused the initial injury of depriving [Plaintiffs] of the custody of their child*." (Doc. 73 at 7.)

\*\*\*

The Magistrate Judge's accrual analysis relied solely on *Maldonado v. Harris*, 370 F.3d 945 (9th Cir. 2004), but *Maldonado* is inapposite. In the early 1990s, Maldonado

- 8 -

posted billboard advertisements on his property. *Id.* at 948. The advertisements were prohibited under California's Outdoor Advertising Act ("COAA"). *Id.* California Department of Transportation ("CalTrans") filed a nuisance suit against Maldonado in July 1998 and obtained an injunction that prevented him from posting more billboard advertisements. *Id.* Years later, shortly before filing suit, Maldonado posted another billboard in violation of the COAA. *Id.* at 949. Maldonado then preemptively filed a § 1983 claim against CalTrans, challenging the constitutionality of the COAA. *Id.*

The Ninth Circuit determined that although CalTrans had not enforced the COAA against Maldonado's most current billboard, his claims were ripe for adjudication. *Id.* at 953–54. The court then found that Maldonado's challenge to the COAA as to the current billboard was within the statute of limitations, but that any challenge to the billboards posted in the early 1990s were time barred because "Maldonado certainly knew that CalTrans was enforcing the COAA against his . . . advertisements" when it filed the nuisance claim and obtained an injunction. *Id.* at 955.

There are three reasons the application of *Maldonado* to this case is misplaced. First, *Maldonado* does not stand for the proposition that a claim accrues when there is knowledge of a possible future injury. In *Maldonado*, the statute of limitations had passed as to the earlier billboards because Maldonado had reason to know he had been injured when CalTrans obtained the injunction. And the court did not analyze the accrual date as to the final billboard because the claim was within the statute of limitations. Instead, the court determined a challenge to the final billboard was ripe for adjudication.

Second, ripeness differs from accrual, and *Maldonado's* ripeness analysis cannot be used to conclude that Plaintiffs' claims accrued prior to when Plaintiffs lost custody of A.K. The *Maldonado* court determined that plaintiff could challenge the constitutionality of the state statute "before its enforcement was ripe for review" because plaintiff purposefully violated the law and the injunction was a threat to enforce the law. *Id.* at 953. Here, Plaintiffs were not actively violating the law so that they could raise a claim, and there was no previous enforcement or removal of A.K. from Plaintiffs' custody. Furthermore, on October 6, 2020, Plaintiffs' constitutional claim based on the unlawful removal of A.K.

- 9 -

from Plaintiffs' custody was premature because AZDCS had not yet taken custody. At that point there was no actual case or controversy ripe for adjudication.

Third, *Maldonado* does not establish when accrual occurs in child custody cases. "[I]t is the standard rule that [a claim accrues] when the plaintiff has a complete and present cause of action . . . that is, when the plaintiff can file suit and obtain relief." *Wallace*, 549 U.S. at 388 (citations and quotation marks omitted). Other courts agree that "civil rights claims based on child removal accrue . . . when the child is removed from the parent." *Claraty v. Hall-Mills*, No. 18-CV-06861-JCS, 2019 WL 1228237, at *4 (N.D. Cal. Mar. 15, 2019) (first citing *Belinda K. v. Cnty. of Alameda*, No. 10-CV-05797-LHK, 2011 WL 2690356, at *6 (N.D. Cal. July 8, 2011), then citing *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 606 F.3d 301, 307 (6th Cir. 2010)); *Stephens v. Arizona*, No. CV-22-016050PHX-DJH, 2023 WL 4136607, at *9 (stating plaintiff was aware of the injury when the judge "signed his order authorizing DCS to remove the children . . . based on [the DCS caseworker's] declaration, which allegedly contained omissions material to the findings of probable cause."). Moreover, the idea that accrual in a civil rights action occurs upon knowledge of the unlawful act—not the injury—is unsupported. *See Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1049 (9th Cir. 2008) ("[A] plaintiff's action accrues when he discovers that he has been injured, not when he determines that the injury was unlawful.").

On October 6, 2020, Plaintiffs did not have a "complete and present cause of action" because the injury—the removal of A.K. from Plaintiffs' custody—had yet to occur. Plaintiffs' knowledge of an investigation alone did not create an actionable claim because Plaintiffs did not suffer an injury until AZDCS took temporary custody of A.K. on October 8, 2020, after purportedly engaging in judicial deception. To find otherwise would create a conundrum wherein the statute of limitations could run *before* a child is removed, requiring parents to preemptively file § 1983 claims in anticipation of losing custody of their child.

The Court finds Claims One and Three did not accrue until October 8, 2020, the date that the CAR Order was entered and Plaintiffs lost custody of A.K. Thus, the

Complaint, filed October 7, 2022, is timely. Therefore, the Court must conduct a de novo review of Claims One and Three.

## V.   CLAIMS ONE AND THREE: VIOLATION OF FAMILIAL ASSOCIATION THROUGH JUDICIAL DECEPTION–KOT, NIDO, & JIMENEZ

Claim One alleges Kot was required—pursuant to A.R.S. § 8-456(C)(1), Arizona Administrative Code § R21-4-104(A), and AZDCS policy—to thoroughly investigate any allegations of child abuse. (Doc. 1 at ¶¶ 171–73.) In addition, AZDCS's Information Gathering Policy ("IG Policy") required investigators to review medical, school, and behavioral health records, as well as any police reports when "[t]here is reason to believe these records contain information that will fill a gap or reconcile inconsistency in the information about safety and risk . . . ." (*Id.* at ¶ 174–75.) Furthermore, AZDCS's Family Functioning Assessment Policy ("FFA Policy") required personal observation of the child, interviews, and in-person observations, including an investigation into a child's "healthcare history" and "sibling relationships." (*Id.* at ¶ 178.) Moreover, AZDCS's Facilitator's Guide for Removal mandates that a CAR Application:

> Be as specific as possible by including results of in-person observations, **interviews with** children, **parents, and collateral contacts**, information from medical records, police records, education records, etc.; For present danger circumstances: include a description of the specific actions, behaviors, emotions, or out-of-control conditions in the home that are significant, and how the condition or behavior is immediately endangering the child.

(*Id.* at ¶¶ 179–80 (emphasis added).)

Plaintiffs claim Kot falsely asserted in the CAR Application that:

a. Plaintiffs disapprove of the LGBT community.

b. Plaintiffs terminated therapy because the therapist was siding with A.K.

c. Plaintiffs excessively punished, verbally abused, held "a negative perception of" and "extremely unrealistic expectations for" A.K. Plaintiffs negative perception of A.K "clearly contributed to [A.K.'s] making a suicide attempt."

- 11 -

d. TPD was investigating [A.K.'s] allegations [that her brother sexually abused A.K. for six (6) years], that the abuse was an ongoing concern because the brother remained in the home, and that the parents were unable to protect A.K. from the abuse, in part because they were unwilling to press charges against the brother.

e. Although attempts were made, no appropriate relatives or kinship placement existed.

(*Id.* at ¶ 182; 44, ¶ 198.)

Investigation Supervisors Nido and/or Jimenez were informed of Kot's investigation. (*Id.* at ¶ 51.) Nido and Jimenez "collaborated" with Kot and approved the CAR Application. (*Id.* at ¶¶ 51–52.) Kot, Nido, and Jimenez then decided to seek a dependency, "no matter what evidence or information would be disclosed . . . ." (*Id.* at ¶ 60.)

Claim Three alleges that Kot, Jimenez, and Nido violated Plaintiffs' First and Fourteenth Amendment rights when they provided the same material misrepresentations included in the CAR Application to the AAG, which was then used as the basis for Petition I. (*Id.* at ¶¶ 197–201.) Furthermore, these Defendants did not provide "exculpatory evidence learned by them from the interviews of the Plaintiffs subsequent to Kot's filing of the [CAR A]pplication." (*Id.* at ¶ 202.) As a result, the AAG filed Petition I and Temporary Orders and Findings, which were signed by the juvenile judge, causing Plaintiffs to lose custody of A.K. (*Id.* at ¶¶ 201–03.)

### a. Kot

Plaintiffs allege that prior to drafting the CAR Application, Kot was required to interview Plaintiffs and other collateral contacts under the aforementioned statutes and policies. (*Id.* at ¶¶ 50, 180.) Had Kot done so, he could have discovered Plaintiffs were concerned about A.K. surgically transitioning but supported A.K.'s transgender identification. (*Id.* at ¶¶ 21, 24–25.) Kot also could have reported that Plaintiffs were willing to address AZDCS's concerns about the alleged sexual abuse by allowing a "safety monitor" in the home or having A.K.'s brother live at a different residence, but Kot never informed Plaintiffs this was an option. (*Id.* at ¶ 184.) Kot would have learned that the sexual

molestation allegations could have conceivably been attributed to "sexual exploration," that molestation was not continuing to occur, and that Plaintiffs were willing to separate the siblings. (*Id.* at ¶¶ 47–48.) Plaintiffs also claim they could have identified a kinship placement. (*Id.*) Moreover, Kot would have learned A.K. suffered from multiple mental disorders "which rendered [their] ability to be an accurate historian suspect." (*Id.* at ¶ 184.) Finally, Kot omitted that Dr. Helms had repeatedly recommended A.K.'s return to Plaintiffs' custody. (*Id.*) In short, had Kot followed the mandated procedures and not omitted material facts, protective measures could have been taken and there would not have been probable cause to remove A.K. from Plaintiffs' home.

A deprivation of a constitutional right occurs when an official commits "an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). However, "mere allegations that defendants . . . violated state regulations, without more, cannot serve as the basis for a claim under § 1983." *Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101, 1115 (9th Cir. 2010). A judicial deception claim must establish that there was "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Benavidez*, 993 F.3d at 1147.

The Court finds that Claims One and Three sufficiently plead First and Fourteenth Amendment judicial deception violations. Plaintiffs allege Kot had an affirmative duty to interview them and collateral contacts prior to the submission of the CAR Application. Because Kot failed to conduct these interviews, he did not obtain information that would have prevented A.K.'s removal from Plaintiffs' custody, and he submitted false statements about A.K.'s safety. Allegedly, Kot omitted material facts about Plaintiffs' parenting and their willingness and ability to protect A.K. Taking the allegations as true—as the Court must at this stage—Kot's failure to conduct the required investigation resulted in, at least, a reckless disregard for the truth that was material to the judge's CAR Order.

The Court now turns to the question of whether Kot was entitled to qualified immunity. The affirmative defense of "qualified immunity involves two inquiries: (1)

- 13 -

1    whether, taken in the light most favorable to the party asserting the injury, the facts alleged

2    show the officer's conduct violated a constitutional right; and (2) if so, whether the right

3    was clearly established in light of the specific context of the case." *O'Brien v. Welty*, 818

4    F.3d 920, 936 (9th Cir. 2016) (quoting *Krainski v. Nevada ex rel. Bd. of Regents of Nev.*

5    *Sys. of Higher Educ.*, 616 F.3d 963, 970 (9th Cir. 2010)).

6          On the face of the Complaint, the Court cannot determine whether Kot is entitled to

7    qualified immunity because it is unclear whether it was clearly established that Kot's failure

8    to further investigate—which led to a CAR Order and Petition I with various

9    misrepresentations and omissions—violated Plaintiffs' rights. Further fleshing out of the

10   facts and Kot's duties may allow the Court to decide qualified immunity at a later date. *See*

11   *id.* (stating dismissal on a 12(b)(6) motion "is not appropriate unless we can determine,

12   based on the complaint itself, that qualified immunity applies"). Therefore, the Court will

13   require Defendant Kot to answer Claims One and Three.

14              ***b. Jimenez and Nido***

15         In contrast to the allegations against Kot, the allegations in Claims One and Three

16   against Nido and Jimenez are sparse and conclusory. "There is no *respondeat superior*

17   liability under section 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation

18   omitted). "A supervisor is only liable for constitutional violations of his subordinates if the

19   supervisor participated in or directed the violations, or knew of the violations and failed to

20   act to prevent them." *Id.*; *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir.

21   2013).

22         The Court finds that the allegations in Claims One and Three against Nido and

23   Jimenez fail to meet the heightened pleading standard for judicial deception. Judicial

24   deception claims must indicate "the who, what, when, where, and how of the misconduct

25   charged, including what is false or misleading about a statement, and why it is false[.]"

26   *Benavidez*, 993 F.3d at 1145. Nido and Jimenez cannot be held liable for Kot's alleged

27   misrepresentations because Plaintiffs have not explained how they knew and participated

28   in any constitutional violation. Simply stating Nido and Jimenez "collaborated" in and

     "approved" of Kot's sworn allegations is insufficient. In addition, Jimenez and Nido are

immune from suit because it was not clearly established that Jimenez and Nido's approval of Kot's sworn CAR Application would constitute a violation of Plaintiffs' rights. Claims One and Three against Defendants Nido and Jimenez will be dismissed.

## VI.    CLAIM NINE: FIRST AMENDMENT RETALIATION–EGBERT

Claim Nine alleges that Egbert's actions on April 2, 2021, informing A.K. that the dependency had ended, were in retaliation for Plaintiffs "submission of the complaint with the Ombudsman, as well as their documented criticism of the agency's treatment of themselves and [A.K.]." (Doc. 1 at ¶ 239.) Plaintiffs allege Egbert was required to collaborate with them, A.K.'s therapist Liechty, and other unknown professionals to safely return A.K. to their custody. (*Id.* at ¶ 240.) If Egbert had acted appropriately, Plaintiffs assert, "the crisis, which Defendant hoped would ensue, and which did ensue, would not have happened, and the agency would not have had the pretextual grounds to seize A.K. a second time and recommence dependency proceedings." (*Id.*)

A First Amendment retaliation claim requires Plaintiffs allege facts showing "that (1) [they were] engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity[,] and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien*, 818 F.3d at 932. Plaintiffs must also show but-for causation, "meaning that the adverse action against [Plaintiffs] would not have been taken absent the retaliatory motive." *Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012, 1019 (9th Cir. 2020) (citing *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)).

The Magistrate Judge found that Plaintiffs had not stated a plausible claim of retaliation and that Egbert was protected by qualified immunity. (Doc. 60 at 28–36.) Plaintiffs have objected. Upon de novo review, the Court need not reach the issue of qualified immunity because it finds the claim is insufficiently pled.

Claim Nine is limited to actions or omissions occurring on April 2, 2021. From the Complaint, Egbert's actions/omissions included:

> 1)  Not following "protocol" when informing A.K. that Plaintiffs had custody by telling A.K. that "your parents won, they are coming to get you";

2) Informing the Crisis Response Team that A.K.'s dependency case was closed;

3) Not disclosing the "extent of A.K.'s deterioration";

4) "Giving false and misleading information about Plaintiffs and their intentions" to Defendants AZDCS Investigator Necoechea and supervisor Rojas-Adnachiel, who then prepared and approved the submission of the Second CAR Order."

(*Id.* at ¶¶ 143, 239–40.)

These allegations do not state a prima facie claim for First Amendment retaliation because (1) Plaintiffs have not established their protected speech was a motivating factor for Egbert's actions and (2) Plaintiffs cannot show but-for causation. In general, the Court agrees with the Magistrate Judge that it is more likely that Egbert's responses that day were in reaction to a swiftly changing situation. *See Iqbal*, 556 U.S. at 679 (finding the court must draw all reasonable inferences in non-moving parties favor but must also assess whether there are "more likely explanations" for a defendant's conduct).

The morning the dependency was dismissed, Egbert truthfully (but perhaps insensitively) informed A.K. the dependency had been terminated. She confirmed the termination with the Crisis Response Team when contacted, before she was informed of A.K.'s suicidal response to the news. Plaintiffs have provided no more than a barren allegation that Egbert was required to follow "protocol"—to tell A.K. in a certain manner of the end of the dependency. Moreover, Plaintiffs have not offered any facts showing the failure to follow said "protocol" was because of their complaints. The information Egbert provided to A.K. would not have materially differed absent Plaintiffs' criticism of AZDCS and Ombudsman Complaint—the dependency was over and Plaintiffs had been awarded custody.

Furthermore, the Complaint is unclear about what Plaintiffs mean by A.K.'s "deterioration." A.K. suffered from "anxiety, panic attacks, social anxiety, depression, gender dysphoria, [visual and auditory] hallucinations, self-harm, suicidal ideations, [and a] conflicted relationship with family" well before Egbert's involvement. (*See* Doc. 1 at ¶¶

- 16 -

20, 112.) The Court can only presume that by "deterioration" Plaintiffs mean A.K.'s alleged marijuana, birth control use, and sexual conduct for which Plaintiffs communicated their concern in the email and Ombudsman Complaint. However, Plaintiffs have not explained how disclosing A.K.'s recreational and sexual activities or discussing the matter with Plaintiffs and Liechty would have resulted in an "appropriate protocol for the transfer of A.K. to an appropriate facility" or prevented the second dependency. (*See id.* at ¶ 240.)

Finally, Plaintiffs have not detailed what specific information Egbert shared or failed to share with Necoechea and Rojas-Adnachiel that led to the second dependency proceeding. Nor have they detailed how any specific information was false or misleading. Although the Court can look to Claim Eleven against Egbert to infer a list of alleged misrepresentations made in the original CAR Application, the Complaint does not indicate whether Egbert knew any information from the original CAR Application was false or misleading and how she knew. The Court will dismiss this claim without leave to amend.

## VII.   CLAIM ELEVEN: JUDICIAL DECEPTION IN THE SECOND CAR APPLICATION – EGBERT, NECOECHEA, & ROJAS-ADNACHIEL

Claim Eleven alleges that after A.K. was transported to TPD's Midtown Station, Egbert spoke to Necoechea, who prepared the Second CAR Application with supervisor Rojas-Adnachiel's approval. (Doc. 1 at ¶¶ 243–44.) Plaintiffs claim if the misleading allegations in the Second CAR Order had been omitted, there was no probable cause for removal. (*Id.* at ¶¶ 245, 249.)

The Magistrate Judge determined that this judicial deception claim was insufficiently pled. (Doc. 60 at 37–40.) As in Claim Nine, the Magistrate indicated, the allegations against Egbert did not explain what false statements and misrepresentations were made and so Egbert enjoyed qualified immunity. (*Id.* at 37.) The Magistrate Judge added it was unclear whether Necoechea knew A.K. had been transferred to TPD's Midtown Station. (*Id.* at 37, 39.) In fact, the Magistrate noted the Complaint did not describe whose decision it was to take A.K. to Midtown Station and Necoechea's actions could be construed as a failure to check for accuracy, but none amounted to judicial deception. (*Id.* at 38–39.) Moreover, the Magistrate noted the Complaint did not connect

Necoechea's omission to Plaintiffs' right to familial association, and that it was unclear why failing to tell Plaintiffs A.K.'s location constituted judicial deception. (*Id.* at 38.)

Addressing Rojas-Adnachiel, the Magistrate found that "mere approval of an Application does not sufficiently plead facts for a claim of judicial deception," and qualified immunity applied because "liability under a theory of *respondeat superior* is precluded." (*Id.* at 39–40.)

Plaintiffs claim the Magistrate failed to discuss the "actual misrepresentation and omissions" in Claim Eleven, pointing to paragraphs 243 and 244 of the Complaint. (Doc. 73 at 15.) In summary, paragraph 243 says the Second CAR Application **falsely asserted**:

a. Plaintiffs held "an extremely negative perception of" and "extremely unrealistic expectations for" A.K., and A.K. feared for her safety in Plaintiffs' custody;

b. A.K. had "100+ cut marks" from wrist to elbow;

c. Plaintiffs refused to allow A.K. the level of care recommended by "the officers, group home staff, Tucson Fire, and Mobile Crisis Team";

d. AZDCS was previously granted custody "due to concerns of sexual abuse";

e. No other options existed other than the Second CAR Application;

f. Plaintiffs refused the immediate medical help necessary for A.K.

(Doc. 1 at ¶ 243.)

Furthermore, paragraph 244 contends the Second CAR Application **omitted**:

a. Egbert and her superiors knew Plaintiffs were working with professionals to come up with a plan how best to inform A.K. of the dismissal;

b. Egbert knew Plaintiffs were unaware of A.K.'s "decompensation";

c. Egbert's phone call to A.K. "torpedoed the strategy";

d. A.K. did not suffer injuries requiring medical care;

e. Crisis Mobile Team Leader Caren Jablonsky and Rojas-Adnachiel approved of Plaintiffs' plan for A.K. "safe release";

f. Necoechea and Rojas-Adnachiel failed to interview Liechty and Plaintiffs about what happened that day and investigate allegations against Plaintiffs.

(Doc. 1 at ¶ 244.)

### a. Egbert

In Claim Eleven, some of the misrepresentations mirror those included in the original CAR Order, but it is unclear whether or how Egbert, Necoechea, or Rojas-Adnachiel knew the allegations in the original CAR Order were false or misleading. (*See* Doc. 1 at ¶¶ 243(a), (c)–(d), (f).) Second, the Complaint concedes Egbert was not on scene on April 2, 2021, and she offered "no help" until she "backgrounded" Necoechea after A.K.'s transfer to Midtown Station. (*See id.* at ¶¶ 141, 143.) The Complaint has not alleged or explained how Egbert knew of the events of April 2, 2021 between the time she called A.K. until after A.K. was transported, and so it is unclear whether or how Egbert knew and relayed certain misrepresentations about the events of the day to Necoechea. (*See id.* at ¶¶ 243(a)–(d), (f), 244(d)–(g).) Furthermore, as stated in Claim Nine, it is unclear what "decompensation" means. In addition, certain allegations assert misrepresentations made to Plaintiffs, not to a judge, which do not constitute judicial deception. (*See e.g., id.* at ¶ 244(b).)

The Complaint states that Egbert was required to follow state statutes and AZDHS policy when formulating the Second CAR Application and did not do so. (*Id.* at ¶ 245.) Here, however, the Court is unclear whether the same statutory and procedural rules that applied to investigator Kot also applied to case manager Egbert. Moreover, because of the ambiguity about who knew what and how, Plaintiffs have not met the specificity necessary for judicial deception. Like Plaintiffs' retaliation claim, the Court here cannot discern: (1) which statutory and AZDCS policies Egbert was required to follow, (2) whether Egbert knew the original CAR Order contained falsehoods, (3) what specific information Egbert provided to Necoechea and included in the Second CAR Application, (4) how Egbert knew this information was misleading, (5) what alleged misrepresentations were taken from the original CAR Application, (6) why any relayed information was false. However, the addition of facts may remedy this shortcoming. Accordingly, the Court will dismiss Claim Eleven against Egbert without prejudice.

### b. Necoechea

The Complaint alleges Necoechea prepared the CAR Application with the

information gleaned from Egbert, Millage, and Officer Muckenthaler. (*Id.* at ¶ 147.) Plaintiffs assert Necoechea knew he needed more information "and needed to interview the Plaintiffs and collaterals, but he took no such steps." (*Id.* at ¶ 146.) Like it alleges against Kot, the Complaint states that "Defendant Necoechea's investigative actions were governed by statute, rule and AZDCS policy and procedure . . . [and] the constitutional rights of familial association and due process . . ."[5] (*Id.* at ¶ 170.)

Like their claims against investigator Kot, Plaintiffs allege investigator Necoechea had a duty to investigate and failed to meet these requirements. But Claim Eleven is unclear (1) which rules and procedures Necoechea was required to follow, (2) how Necoechea failed to follow such procedures, (3) whether Necoechea provided information he knew to be false, (4) what specific misrepresentations and omissions were provided by Necoechea, and (5) how the statements were false. Moreover, the Court agrees with the Magistrate Judge that Necoechea's failure to disclose to Plaintiffs that A.K. had been transferred to Midtown Station does not constitute judicial deception.

The Court finds this claim is too vague to show Necoechea engaged in judicial deception in the preparation of the Second CAR Order. However, the Court cannot determine that amendment is futile. Therefore, the Court will dismiss Claim Eleven against Necoechea without prejudice.

### c. *Rojas-Adnachiel*

The Complaint alleges at some time on April 2, 2020, Plaintiff Levi Kirwin told supervisor Rojas-Adnachiel that Plaintiffs had a safety plan in place, approved by A.K.'s therapist Liechty, which included keeping A.K. on suicide watch upon returning home. (*Id.* at ¶¶ 129, 140.) When A.K. attempted to run into traffic and threatened to kill their parents, Rojas-Adnachiel originally "agreed that that was an appropriate plan." (*Id.* at ¶ 140.) However, after A.K. was transported to TPD's Midtown Station, Rojas-Adnachiel spoke to

---

[5] The Court notes this allegation is briefly included in Claim One, a claim that is not against Necoechea. Claim Eleven merely states Necoechea did not conduct interviews of Plaintiffs and collateral contacts. (*See id.* at 50, ¶ 239; 53, ¶ 244(g).) If Plaintiffs choose to amend, within each claim Plaintiffs must clearly (1) state the defendant's actions and (2) demonstrate how said action led to a constitutional violation.

Egbert, who provided "backgrounding" "on the department's past actions." (*Id.* at ¶ 143.) Rojas-Adnachiel then approved Necoechea's CAR Application, without (1) disclosing she previously approved the safety plan, or (2) interviewing Plaintiffs or collateral contacts. (*Id.* at ¶¶ 14, 244(f)–(g).)

"There is no *respondeat superior* liability under section 1983." *Taylor*, 880 F.2d at 1045. "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Id.*; *Maxwell*, 708 F.3d at 1086. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam).

The Court agrees with the Magistrate Judge—Rojas-Adnachiel's actions do not amount to judicial deception and qualified immunity applies. There are no allegations Rojas-Adnachiel directed or knew of any deception and failed to act. Rojas-Adnachiel's prior approval of a safety plan is inconsequential after the superseding events. The situation changed swiftly, A.K. tried to commit suicide, threatened further self-harm if returned to Plaintiffs, threatened to kill Plaintiffs, and was transferred to TPD custody. A reasonable caseworker would not have known failing to disclose her earlier approval of a safety plan amounted to a constitutional violation. Finally, a reasonable supervisor would not have known that her approval of background facts sworn and provided by Necoechea violated Plaintiffs' rights. The Court will dismiss Claim Eleven as to Rojas-Adnachiel with prejudice.

## VIII. CLAIM THIRTEEN: JUDICIAL DECEPTION IN PETITION II: EGBERT, NECOECHEA, AND ROJAS-ADNACHIEL

Claim Thirteen alleges Defendants Egbert, Necoechea, and Rojas-Adnachiel violated Plaintiffs' right to familial association when they made misrepresentations and omissions to the AAG, who then prepared and submitted Petition II. (Doc. 1 at 55.)

The Magistrate Judge found the allegations in Claim Thirteen did not meet the heightened pleading standard and the communications between Defendants and the AAG

1
2

"fall under attorney/client privilege as submitted by [AZ]DCS Defendants." (Doc. 60 at 47–48.)

3
4
5
6

Plaintiffs claim the Magistrate failed to take the Complaint's allegations as true, applied the wrong standard, failed to consider whether the allegations constituted judicial deception, and erroneously dismissed based on attorney/client privilege. (Doc. 73 at 18–20.)

7

       ***a.   Immunity***

8
9
10
11
12

AZDCS Defendants' Motion to Dismiss argued they were entitled to absolute and prosecutorial immunity for "their submission of [Petition II] to the court as evidence in litigation" regardless of how they pursued the dependency. (Doc. 44 at 26.) AZDCS Defendants claimed they "had no obligation to provide information that the Plaintiffs preferred" over their own allegations. (*Id.* at 27.)

13
14
15
16
17
18
19
20
21
22
23

"[S]ocial workers are 'not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury, because such actions aren't similar to discretionary decisions about whether to prosecute." *Costanich*, 627 F.3d at 1109 (quoting *Beltran v. Santa Clara Cnty.*, 514 F.3d 906, 908 (9th Cir. 2008)); *Hervey v. Estes*, 65 F.3d 784, 788 (9th Cir. 1995) ("In a civil rights case, if an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, . . . he cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost.") (citations and quotation marks omitted).

24
25
26
27
28

AZDCS Defendants' attempt to shield themselves from liability through absolute and prosecutorial immunity is unavailing when the Complaint alleges judicial deception occurred during the investigation and filing of a dependency petition. *See Benavidez*, 993 F.3d at 1146 (There is "a constitutional right . . . to be free from judicial deception and fabrication of evidence in the context of civil child custody cases."). Although Egbert and Necoechea are not protected by qualified or absolute immunity, the Court must still address

whether the allegations of judicial deception, as pleaded in the Complaint, meet the pleading standard.

### b. Attorney/Client Privilege

Plaintiffs' Objection argues that the information provided by AZDCS Defendants to the AAG is not protected by the attorney/client privilege because AZDCS Defendants "are *not* the clients of the AAG." (Doc. 73 at 20 (*first citing Doubleday v. Ruh*, 149 F.R.D. 601, 612–14 (E.D. Cal. 1993); *then citing Merritt v. Arizona*, No. CV-17-04540-PHX-DGC, 2018 WL 3729757 (D. Ariz. Aug. 6, 2018)). AZDCS Defendants do not address the attorney/client privilege in their response.[6] The Court can find no case law stating that parents are prevented from discovering the information used to procure a petition of removal of their child because there is an attorney/client relationship between child services and the AAG. However, Plaintiffs case law is not precisely on point; the cases do not address the relationship between DCS and the AAG. The Court will not preclude this claim based on privilege at this time but, should Defendants later assert the privilege, the Court may require further briefing on the issue.

The Court now turns to the factual allegations in Claim Thirteen against Egbert, Necoechea, and Rojas-Adnachiel.

### c. Egbert

A judicial deception claim must establish that there was "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Benavidez*, 993 F.3d at 1147. A plaintiff must state "the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false[.]" *Id.* at 1145.

As pleaded, the judicial deception claim against Egbert fails. Like it could not with Claim Eleven, the Court cannot discern: (1) which statutes and AZDHS policies Egbert was mandated to follow, (2) whether Egbert knew of any falsehoods in the original CAR Order, (3) what information Egbert provided to the AAG, (4) how Egbert knew this

---

[6] Insofar as Defendants are also claiming attorney/client privilege for Claim Three in the original CAR Application, the Court's analysis is the same.

information was misleading, (5) what misrepresentations were from the original CAR Application, (6) why any information was false. The Court finds the allegations are not specific enough to state a judicial deception claim against Egbert and will dismiss this claim without prejudice.

### d. Necoechea

The claim against Necoechea also fails because the Court cannot discern what false information was provided by Necoechea to the AAG. The Complaint merely states Necoechea contacted the AAG, "and supplied her with alleged facts supporting" removal, then prepared and submitted a dependency petition worksheet. (Doc. 1 at ¶ 154.)

Like Claim Eleven, Claim Thirteen offers no description about (1) whether Necoechea provided information he knew to be false, (2) what specific misrepresentations and omissions Necoechea provided, and (3) how any statements were false. It is possible that amendment may clarify Necoechea's involvement if Plaintiffs can delineate the knowledge and actions taken by Necoechea. Therefore, the Court will dismiss the claim against Necoechea with leave to amend.

### e. Rojas-Adnachiel

"There is no *respondeat superior* liability under section 1983." *Taylor*, 880 F.2d at 1045. "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Id.*; *Maxwell*, 708 F.3d at 1086.

For the reasons stated in Section VII(c), Rojas-Adnachiel enjoys qualified immunity and this claim will be dismissed.

## IX. PUNITIVE DAMAGES

A § 1983 claim may allow for punitive damages "when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Spears v. Ariz. Bd. of Regents*, 372 F. Supp. 3d 893, 926 (D. Ariz. 2019) (quoting *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005)). "An act is done in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety, rights, or the defendant acts in the face of a

perceived risk that its actions will violate the plaintiff's rights under federal law." *Id.*

The Magistrate Judge reasoned that dismissal of punitive damages was appropriate because "the facts of the Complaint lack the evil motive or intent or reckless or callous indifference to the constitutional rights of others . . . ." (Doc. 60 at 5.) The Magistrate Judge referenced Arizona Revised Statute § 12-820.04 because AZDCS Defendants argued the statute precluded Plaintiffs from seeking punitive damages against state employees acting within the scope of their employment. (*Id.* at 48.) However, the Magistrate Judge ultimately found that the "hostility" alleged did not amount to the "evil" required to recover punitive damages under federal law, 18 U.S.C. § 1983. (*Id.*)

Based on the allegations in the Complaint, the Court finds dismissing the claims for punitive damages at this juncture is inappropriate. The Complaint alleges that Defendant Kot deviated from statutory and internal policies, misrepresented and omitted facts in the CAR Application to procure probable cause to seize A.K., and did so with the intention of "breach[ing] the familial association of parents and child" and "obstruct[ing] the parents' reconciliation," no matter whether the evidence supported the dependency or not. (Doc. 1 at ¶¶ 60, 153.) This intention, if proven, could constitute complete indifference to Plaintiffs' rights. The request to dismiss punitive damages is denied without prejudice.

///
///
///
///
///
///
///
///
///
///
///
///

### X. AMENDMENT

If Plaintiffs choose to amend any claims dismissed without prejudice, they must write short, plain statements telling the Court: (1) the constitutional right Plaintiffs believe was violated; (2) the name of the Defendant who violated the right; (3) specifically what that Defendant did or failed to do; (4) how the action or inaction of that Defendant is connected to the violation of Plaintiffs' constitutional right; and (5) what specific injury Plaintiffs suffered because of that Defendant's conduct. *See Rizzo v. Goode*, 423 U.S. 362, 371–72, 377 (1976). For each constitutional violation against a Defendant, Plaintiffs must indicate how this constitutional right was clearly established and provide the applicable case law. Allegations of judicial deception must meet the heightened pleading standard as fully outlined above.

If Plaintiffs fail to affirmatively link the conduct of each named Defendant with the specific injury suffered by Plaintiffs, the allegations against that Defendant will be dismissed for failure to state a claim. Conclusory allegations that a Defendant has violated a constitutional right are not acceptable and will be dismissed.

Accordingly, **IT IS ORDERED**:

1) **Plaintiffs' Motion** for Leave *Nunc Pro Tunc* to Reply to AZDCS's Response to Plaintiffs' Objections is **DENIED**. (Doc. 83.)

2) **Plaintiffs' Reply** is **STRICKEN** from the record. (Doc. 82.)

3) The **Report and Recommendation** is **ADOPTED IN PART and DENIED IN PART** as described in this Order. (Doc. 60.)

4) **AZDCS Defendants' Motion to Dismiss** is **GRANTED IN PART** and **DENIED IN PART** as described in this Order. (Doc. 44.)

5) **Defendant Kot** must **ANSWER Claims One and Three**.

6) **Claims One** and **Three** against **Defendants Nido and Jimenez** are **DISMISSED WITH PREJUDICE.**

7) **Claims Six, Twelve, Fourteen and Fifteen** are **DISMISSED WITH PREJUDICE**.

8) **Claims Four and Eight** are **DISMISSED WITHOUT PREJUDICE**.

9) **Claim Nine** against **Defendant Egbert** is **DISMISSED WITH PREJUDICE**.

10) **Claim Eleven** against **Defendants Egbert and Necoechea** are **DISMISSED WITHOUT PREJUDICE**.

11) **Claim Eleven** against Defendant **Rojas-Adnachiel** is **DISMISSED WITH PREJUDICE.**

12) **Claim Thirteen** against **Defendants Egbert and Necoechea** are **DISMISSED WITHOUT PREJUDICE**.

13) **Claim Thirteen** against **Defendant Rojas-Adnachiel** is **DISMISSED WITH PREJUDICE**.

14) **Defendants Fuentes, Chamberlain, and Machiche** are **DISMISSED WITH PREJUDICE**.

Dated this 1st day of March, 2024.

_____

Honorable Raner C. Collins
Senior United States District Judge