1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                 **FOR THE DISTRICT OF ARIZONA**

8

9    Sharmila Kirwin, et al.,                        No. CV-22-00471-TUC-RCC

10              Plaintiffs,                           **ORDER**

11   v.

12   Dariusz Kot, et al.,

13              Defendants.

14

15          Plaintiffs Sharmilla and Levi Kirwin's First Amended Complaint ("FAC") raises

16   four judicial deception claims against Arizona Department of Child Services ("AZDCS")

17   Defendants Dariusz Kot, Kimberly Egbert, and David Necoechea. (Doc. 93.) The

18   allegations arise from purported misstatements and omissions in two Court Authorized

19   Removal ("CAR") Applications and Dependency Petitions, which resulted in the removal

20   of their child, A.K., from their custody.

          Before the Court is Defendants' Motion to Dismiss the FAC. (Doc. 100.)

21   Defendants argue for dismissal based on: (1) qualified immunity; (2) issue preclusion, (3)

22   lack of personal involvement, and (4) failure to meet the pleading standard for judicial

23   deception. (*Id.*) Plaintiffs counter that: (1) Defendants' false statements and omissions bar

24   qualified immunity; (2) issue preclusion should not be decided on a motion to dismiss

25   and, regardless, the claims were not litigated in juvenile court; (3) Defendants actively

26   violated Plaintiffs' rights; and (4) the allegations meet the pleading standards. (Doc. 105.)

27   ///

28   ///

**I. Legal Standard**

> *a.* **Allegations of Judicial Deception**

Parents enjoy "a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of civil child custody cases." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1146 (9th Cir. 2021). A judicial deception claim must establish that there was "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Id.* at 1147. Judicial deception allegations must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Id.* at 1148–49. Specificity is crucial, a complaint must provide concrete facts about the alleged deception, rather than general or conclusory statements. Meaning, a plaintiff must state "the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false[.]" *Id.* at 1145.

**II. Factual and Procedural History**

> *A. First Amended Complaint*

Plaintiffs' FAC documents A.K.'s mental health struggles, and the incidents that occurred after A.K. informed Plaintiffs of their[1] desire to identify as transgender. On September 25, 2020, after an argument about gender identity, A.K. told Plaintiff Sharmila Kirwin that they attempted suicide by overdosing on Xanax. (Doc. 93 ¶ 25–29.) A.K. was then admitted to Tucson Medical Center for treatment, but after A.K. stated they made five prior suicide attempts, Plaintiffs agreed to transfer A.K. to Palo Verde Behavioral Health ("PVBH") on September 26, 2020. (*Id.* ¶¶ 31–33.) PVBH Director and psychiatrist Dr. Mark Helms conducted a psychiatric evaluation and diagnosed A.K. with major depression, anxiety, and gender dysphoria. (*Id.* ¶ 35.) While at PVBH, A.K. disclosed that they (1) had been sexually abused by their brother between the ages of approximately 7 to 13, (2) wanted to kill themselves when they were living with Plaintiffs, and (3) wanted to be removed from Plaintiffs' home. (*Id.* ¶¶ 36–37, 43.) These

---

[1] The parties use different pronouns when referring to A.K. For simplicity and inclusivity, the Court uses the pronouns they/them/theirs.

1    allegations were reported to the AZDCS hotline. (*Id.* ¶ 41.)

2         AZDCS then opened an investigation and assigned Darisz Kot as case

3 investigator. (*Id.* ¶ 42.) On October 1, 2020, Kot interviewed A.K. and Dr. Helms. (*Id.* ¶

4 43.) Kot learned from A.K. that the molestation by A.K.'s brother had ceased two years

5 earlier. (*Id.*) Kot informed A.K. that if A.K. threatened to harm themselves if returned to

6 Plaintiffs' home, AZDCS could take them into custody and would support gender

7 transition measures. (*Id.*)

8         On October 6, 2020, Sergeant Lisa Davila spoke to Plaintiffs about the molestation

9 allegations. (*Id.* ¶ 45.) Plaintiffs agreed to separating the children upon A.K.'s return and

10 working with AZDCS to resolve any further concerns. (*Id.*) Davila concluded that

11 Plaintiffs' response was appropriate, and that no charges would be brought. (*Id.* ¶¶ 45–

12 46.) Davila reported her conclusions to Kot. (*Id.* ¶ 46.)

13         With no further investigation and without speaking to Plaintiffs, on October 8,

14 2020, Kot drafted and swore to the First CAR Application. (*Id.* ¶ 47.) "The legal grounds

15 for seizure were identified as (1) Failure to protect a child from abuse or neglect; (2)

16 Mental health issues; and (3) Unfit or unsafe home environment for child." (*Id.* ¶ 49.) The

17 First CAR Application included the following misrepresentations:

18      a. Plaintiffs "disapprove of the LBGT community entirely";

19      b. Plaintiffs terminated the therapy that they had previously obtained for
20        A.K. seven (7) weeks ago "because the therapist 'was siding with her'";

21      c. Plaintiffs "would take furniture away from her room, take away her
       electronic gadgets, and keep her grounded for extensive periods of time";
22

23      d. "Tucson Police Department is currently investigating [A.K.'s]
       allegations [about the brother]";

24      e. "According to Sarge[a]nt Davila from Child Sex Crime Unit, Tucson
25        Police Department would arrest [A.K.'s] brother, but it is depending on
       whether the parents wanted to press charges";
26

27      f. "It does not appear that the parents are willing to press charges [against
       the brother] at this time";
28

     g. Plaintiffs engaged in "verbal abuse" of A.K.;

1

2

3

4

       h. There were '[n]o appropriate relatives or kinship placement";

       i. Plaintiffs "have a very negative perception of the child . . . [t]hey demonstrated it over a long period of time, which clearly contributed to [A.K.'s] making a suicide attempt";

5

6

7

8

       j. "There is also a concern about the reported sexual abuse and the brother continuing to reside in the home"; and

       k. "[Plaintiffs are] unable to perform essential parental responsibilities for [their] daughter, [A.K.], due to evidence of sexual abuse in the home and [their] inability/unwillingness to take any protective action."

9

10

(*Id.* ¶ 164.) In addition, Kot omitted the following from the First CAR Application:

11

12

       a. Kot had not interviewed the parents and knew nothing about their parenting abilities or expectations;

13

14

       b. Kot had not interviewed A.K.'s brother;

15

       c. "Plaintiffs could identify appropriate family and kinship placements for A.K.," but Kot had not inquired;

16

17

       d. "Plaintiffs were prepared to have a 'safety monitor' reside in the home to satisfy AZDCS's concerns about A.K.'s return";

18

19

       e. Plaintiffs were willing "to have [the brother] reside in another place," but Kot did not inform them of this option;

20

       f. AZDCS had not formed an "In Home Safety Plan";

21

22

       g. Dr. Helms had "consistently documented his recommendation that, upon release from PVBH, A.K. be returned to Plaintiffs";

23

24

       h. "A.K. suffered from multiple mental disorders, which rendered her ability to be an accurate historian suspect"; and

25

26

       i. The investigation into sexual abuse had concluded and was found to "likely [be] sibling exploration that is not uncommon," Plaintiffs did not know of it, and it had ceased years before.

27

28

(*Id.* ¶ 165.) Within an hour of submission, a Maricopa County judge issued the First CAR Order on October 8, 2020. (*Id.* ¶ 49.)

1

2

3

4

5

6

7

On October 19, 2020, Kot provided the Arizona Assistant Attorney General ("AAG") a dependency worksheet documenting the allegations supporting an out-of-home dependency, and a Team Decision-Making Meeting summary. (*Id.* ¶¶ 58, 60.) The following day, the AAG filed AZDCS's Dependency Petition ("Petition I") with proposed Temporary Orders and Findings ("Temporary Orders I"), including the allegations provided and verified by Kot. (*Id.* ¶¶ 61–62.)  The juvenile judge granted Petition I and Temporary Orders I, giving AZDCS custody of A.K that day. (*Id.* ¶ 64.)

8

9

10

11

12

13

14

15

With A.K. residing at PVBH, Plaintiffs allege there was no need to rush the First CAR Application. (*Id.* ¶ 50.) Kot had ample time to conduct a thorough investigation, but did not interview Plaintiffs until after the First CAR Order issued. (*Id.*) Plaintiffs also claim Dr. Helms' recommendations were influenced by the First CAR Order—he first recommended A.K.'s return, but then supported AZDCS placement because of the misrepresentations and omissions included in the First CAR Order. (*Id.* ¶ 52.) Had Kot thoroughly investigated, Plaintiffs allege there was no probable cause for removal. (*Id.* ¶ 167.)

16

17

18

19

20

21

22

23

24

25

26

27

After A.K. was in AZDCS's custody and transferred to VisionQuest for care, they began to experience hallucinations. (*Id.* ¶¶ 72, 84.) On January 7, 2021, Plaintiffs emailed A.K.'s newly assigned case manager, Kimberly Egbert, informing her that they were worried about A.K.'s conduct at VisionQuest. (*Id.* ¶ 86.) Despite their concerns, Egbert did "nothing to remedy" the behavioral issues, which included smoking marijuana, using birth control, and having a sexual relationship. (*Id.*) Egbert knew of A.K.'s actions, but "approved [A.K.'s case manager at Madalyn House, Miranda] Millage's continued false reports of A.K.'s condition and behaviors in VisionQuest." (*Id.* ¶¶ 88, 92.) Egbert also ignored medical reports detailing A.K.'s increasingly serious mental health issues. (*Id.* ¶¶ 89–101.) She did not support A.K.'s recovery—she failed to follow professionals' recommendations and blocked therapy services for A.K. (*Id.*) These actions were allegedly intended to sever the familial relationship. (*Id.* ¶ 90.)

28

Months later, on April 2, 2021, a juvenile judge "issued an order finding there was no dependency and directing A.K. to be returned to Plaintiffs' custody." (*Id.* ¶ 106.)

Egbert "concealed from Plaintiffs, the AAG, and the juvenile judge the extent of A.K.'s deterioration in the custody of VisionQuest" and failed to take adequate measures to coordinate A.K.'s successful return to Plaintiffs' custody. (*Id.* ¶ 107.) Egbert was aware of A.K.'s fragile mental state and understood that Plaintiffs and A.K.'s therapist felt it was important to mentally prepare A.K. for the news. (*Id.* ¶¶ 108–112.) But, sometime after 12:00 p.m., Egbert simply told A.K. over the phone, "Your parents won, they are coming to get you." (*Id.* ¶ 112.)

At 1:43 p.m., in a phone call between A.K. and Arizona Children's Association therapist Amy Liechty, A.K. said after Egbert informed them of the end of the dependency, A.K. "had tried to 'run into traffic,' had cut [themselves] in an attempt to 'bleed out,' and would continue self-harming if returned to [their] parents and would probably return to 'the psycho ward.'" (*Id.* ¶ 114.) Within ten minutes of the call, Plaintiff Sharmila Kirwin, the Crisis Mobile Team, and Plaintiffs' private investigator arrived at VisionQuest, with the Tucson Police Department ("TPD") and Tucson Fire Department arriving soon after. (*Id.* ¶¶ 115–18.) Plaintiffs agreed to A.K.'s transport to Alternative Community Engagement Services ("ACES"). (*Id.* ¶ 118.) But, when ACES refused admission, A.K. was transported to TPD's Midtown Station. (*Id.* ¶¶ 122–23.)

By 10:33 p.m., allegedly at Egbert's direction, AZDCS Investigator David Necochea prepared a Second Application and Declaration for Ex Parte Removal of a Child ("Second CAR"). (*Id.* ¶ 127.) Necochea did not check that the information was accurate. (*Id.*) A Maricopa County judge signed the Second CAR Order at 10:50 p.m. (*Id.*) A.K. was then transported to Sonoran Behavioral Health Center and returned to AZDCS's custody. (*Id.* ¶ 148.)

Sometime between April 2 and April 7, 2021, Necochea provided the AAG with the factual allegations that were included in AZDCS's Second Dependency Petition and Petition for Child Support [Out-of-Home] ("Petition II") and Temporary Orders and Findings. (*Id.* ¶¶ 134–35.) The judge signed these documents April 8, 2021. (*Id.* ¶ 135.)

A.K. subsequently "announced [their] intent to sever all ties with Plaintiffs . . . ." (*Id.* ¶ 141.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*B. Original Complaint and Motion to Dismiss*

Magistrate Judge Bruce G. Macdonald issued a Report and Recommendation, addressing Defendants' Motion to Dismiss Plaintiffs' original Complaint. (Doc. 60.) The Court adopted the R&R in part, allowing Claims One and Three against Defendant Kot to proceed, and dismissing Claims Eleven and Thirteen against Defendants Egbert and Necoechea without prejudice.[2] (Doc. 86 at 26–27.)

Plaintiff filed a First Amended Complaint ("FAC"), asserting four claims of judicial deception: Claims One and Three against Kot, Claim Eleven against Egbert and Necoechea, and Claim Thirteen against Necoechea. (Doc. 93 at 33–46.)

**II.    Analysis**

> *a. Claims One & Three: Judicial Deception in the First CAR Application & Petition I—Kot*

In the original Complaint, Claim One alleged Defendant Kot engaged in judicial deception when submitting the First CAR Application on October 8, 2020. (Doc. 86 at 11.) The Court allowed the claim to proceed, explaining:

> Plaintiffs allege Kot had an affirmative duty to interview them and collateral contacts prior to the submission of the [First] CAR Application. Because Kot failed to conduct these interviews, he did not obtain information that would have prevented A.K.'s removal from Plaintiffs' custody, and he submitted false statements about A.K.'s safety. Allegedly, Kot omitted material facts about Plaintiffs' parenting and their willingness and ability to protect A.K. Taking the allegations as true—as the Court must at this stage—Kot's failure to conduct the required investigation resulted in, at least, a reckless disregard for the truth that was material to the judge's [First] CAR Order.

(*Id.* at 13.) The Court did not determine whether Kot enjoyed qualified immunity, stating "it is unclear whether it was clearly established that Kot's failure to further investigate— which led to a CAR Order and Petition I with various misrepresentations and omissions—violated Plaintiffs' rights." (*Id.* at 14.)

---

[2] The Court summarizes only the remaining claims and Defendants.

1

2

3

4

5

6

      Claim Three of the original Complaint alleged Kot, Jimenez, and Nido[3] deceived the juvenile court by submitting the same material misrepresentations included in the First CAR Application to the AAG, which was then used as the basis for Petition I. (*Id.* at 11.) The Court allowed the claim to proceed, again finding that Kot's actions could be considered reckless disregard for the truth, and that it was not appropriate to determine qualified immunity at this time. (*Id.* at 14.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

      Here again, Kot argues he is protected by qualified immunity as to Claims One and Three because it is not clearly established that Plaintiffs are entitled to have a child welfare investigation carried out in a particular manner, and mere violations of state regulations do not suffice. (Doc. 100 at 9 (citing *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001).) Plaintiffs counter the allegations are not used to show that the juvenile proceedings were not carried out in a manner that suited them. (Doc. 105 at 1–2.) Rather, Kot's failure to follow state policies and procedures show his actions were not reasonably measured to determine whether removal was appropriate. (*Id.* at 2.) Plaintiffs state the Arizona Revised Statutes, Arizona Administrative Code, and AZDCS's policies require AZDCS investigators to conduct a thorough investigation, including interviews of the parents and collateral contacts, as well as reviewing police, medical, and education records. (Doc. 93 ¶¶ 144–160.) Plaintiffs argue Kot violated their right to familial association because Kot failed to follow these established policies and procedures, causing him to fail to procure material information, and resulting in Kot securing the First CAR Order through false statements and omissions. (*Id.*)

22

23

24

      Qualified immunity protects officials from suit unless "the [official's] conduct violated a constitutional right," and "that right was clearly established at the time of the events at issue." *David v. Kaulukukui*, 38 F.4th 792, 799 (9th Cir. 2022). It is clearly

25

26

27

28

---

[3] The Court dismissed Claim Three against Jimenez and Nido with prejudice. (Doc. 86 at 14–15.) Plaintiffs have added facts related to Nido and Jimenez in the FAC, but admit they are not attempting to raise claims against the dismissed Defendants. (Doc. 105 at 18–19.) Defendants object to the additional facts. (Doc. 100 at 19.) "An amended motion supersedes an original motion" and "after amendment, the Court [treats] an original motion as nonexistent." *Ferdik v. Bonzelet,* 963 F.2d 1258, 1262 (9th Cir. 1992). The 48-page FAC also contains several factual allegations related to other dismissed Defendants. The Court finds the addition does not prejudice the remining Defendants, nor does it raise claims that were dismissed with prejudice. Therefore, the Court will allow them.

1
2
3
4
5
6
7
8
9
10

established that "as part of the [constitutional] right to familial association, parents and children have a right to be free from judicial deception in child custody proceedings and removal orders." *Id.* (cleaned up). A defendant may be liable for the deprivation of a constitutional right when an official commits "an affirmative act, participates in another's affirmative acts, or [fails] to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). However, "mere allegations that defendants . . . violated state regulations, without more, cannot serve as the basis for a claim under § 1983." *Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101, 1115 (9th Cir. 2010) (quoting *Devereaux*, 263 F.3d at 1076).

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

The Court reaffirms its prior conclusions. A judicial deception claim requires showing a material misrepresentation made to a judicial officer with deliberate or reckless disregard for the truth. *Benavidez*, 993 F.3d at 1147. Kot allegedly had a duty to conduct a thorough investigation, including interviewing Plaintiffs and researching salient records. His failure to perform these tasks is pertinent to whether the misrepresentations and omissions in the First CAR Application were made with reckless disregard for the truth, leading to the deprivation of Plaintiffs' right to familial association. *See Groh v. Ramirez*, 540 U.S. 551, 564 (2004) ("the guidelines of [the officer's] own department placed him on notice that he might be liable . . . ."); *Krause v. City of Mohave*, 459 F. Supp. 3d 1258, 1268–70 (D. Ariz. 2020) (stating opinions about pertinent regulations can inform a jury whether an officer's violation of a regulation "was the moving force behind the constitutional violation"); *see also Costanich*, 627 F.3d at 1115 ("reasonable government officials are on notice that deliberately falsifying evidence in a child abuse investigation and including false evidentiary statements in a supporting declaration violates constitutional rights where it results in the deprivation of liberty or property interests . . . ."). The claim is based not only on Kot's failure to investigate but also on his misrepresentations of the information he gathered.

28

Insofar as Kot argues the allegations have not been pled with particularity, the Court is unpersuaded. The FAC puts Kot on notice he misrepresented in the First CAR

1
2
3
4
5
6
7
8
9
10
11
12
13
14

Application that: (1) Plaintiffs were disapproving and abusive, (2) no kinship placement was available, (3) A.K.'s brother was *currently* being investigated for molestation, and (4) Plaintiffs were unwilling to protect A.K. from the brother. (Doc. 93 ¶ 164(a)–(k).) In addition, Kot failed to include that he (1) had not interviewed Plaintiffs or A.K.'s brother, (2) had not provided any safety plan, and (3) had no basis to believe Plaintiffs were unwilling to follow AZDCS's instruction how to protect A.K. (*Id.* ¶ 166(a)–(i).) Moreover, Plaintiffs allege that until the issuance of the CAR Order, Dr. Helms' recommendation was to return A.K. to Plaintiffs' custody, and it was only after Kot submitted the false allegations that Dr. Helms changed his recommendation. (*Id.* ¶ 52.) It is also possibly relevant that Kot encouraged A.K. to renounce Plaintiffs and promised A.K.'s gender transition would be supported in AZDCS custody. (*See id.* ¶ 43.) Thus, at the motion to dismiss stage, Kot's actions could have ensured the securing of the First CAR Order and Petition I and violated Plaintiffs' constitutional rights. As before, the Court will allow Claims One and Three against Kot to proceed.

15
16

       b. *Claims Eleven and Thirteen: Judicial Deception in Second CAR Order—Egbert and Necoechea*

17

          i.   Egbert

18
19
20

       Claim Eleven of the original Complaint alleges Egbert spoke to Necoechea, who then prepared the Second CAR Application, which included misleading statements and omitted material facts. (Doc. 1 at 51–54.) The Court dismissed Egbert because:

21
22
23
24

> The Complaint has not alleged or explained how Egbert knew of the events of April 2, 2021 between the time she called A.K. until after A.K. was transported, and so it is unclear whether or how Egbert knew and relayed certain misrepresentations about the events of the day to Necoechea. (*See id.* at ¶¶ 243(a)–(d), (f), 244(d)–(g).) Furthermore, . . . it is unclear what "decompensation" means.

25

The Court also found it was unable to determine:

26
27
28

> (1) which statutory and AZDCS policies Egbert was required to follow, (2) whether Egbert knew the original CAR Order contained falsehoods, (3) what specific information Egbert provided to Necoechea and included in the Second CAR Application, (4) how Egbert knew this information was

misleading, (5) what alleged misrepresentations were taken from the original CAR Application, (6) why any relayed information was false.

(Doc. 86 at 19.)

The FAC alleges the Second CAR Application included the following misrepresentations:

    a. Plaintiffs held "an extremely negative perception of" and "extremely unrealistic expectations for" A.K., and A.K. feared for her safety in Plaintiffs' custody;

    b. A.K. had "100+ cut marks" from wrist to elbow;

    c. Plaintiffs refused to allow A.K. the level of care recommended by "the officers, group home staff, Tucson Fire, and Mobile Crisis Team";

    d. AZDCS was previously granted custody "due to concerns of sexual abuse";

    e. No other options existed other than the Second CAR Application; and

    f. Plaintiffs refused the immediate medical help necessary for A.K.

(Doc. 93 at ¶ 182.) As applicable here, the Second CAR Application omitted:

    a. Egbert and her superiors knew Plaintiffs were working with professionals to come up with a plan how best to inform A.K. of the dismissal and Egbert's phone call to A.K. "torpedoed the [reunification] strategy";

    b. A.K. did not suffer injuries requiring medical care; and

    c. Necoechea and Egbert failed to interview Plaintiffs and collateral contacts.

(*Id.* ¶ 183.) Defendants argue the FAC's allegations against Egbert are conclusory and must be dismissed. (Doc. 100 at 14.) Plaintiffs counter Egbert was the case manager prior to the Second CAR Application, "took over case management" after the Second CAR Order, swore to the factual allegations in Petition II, and therefore should be held liable for the deception. (Doc. 105 at 12.)

The FAC alleges Egbert was actively seeking to divide the family and affirm A.K.'s transgender identification—at the expense of both family reunification and A.K.'s mental health. (Doc. 93 ¶¶ 67, 83, 86, 88–93, 100.) The FAC states Egbert knew A.K. was smoking marijuana and having hallucinations. (*Id.* ¶¶ 100–101.) It is alleged that when the dependency was dismissed, Egbert did not act in the best interests of the child

1    and failed to follow a safety plan provided by A.K.'s therapist. (*Id.* ¶¶ 101, 111–12.)

2    Instead of following A.K.'s therapist's recommendations, Egbert responded in a matter

3    intended to throw A.K. into a panic and prevent reunification. (*Id.* ¶¶ 101, 112.) After

4    A.K. ran into traffic, Egbert took a call from the Crisis Mobile Team and learned of the

5    events that subsequently occurred. (*Id.* ¶ 123.) She then allegedly "conferred with her

6    superiors" and Necoechea, updated them on the history of the case, and stated she wanted

7    AZDCS to take custody of A.K. (*Id.* ¶ 123.) Then, "[b]ased on the information provided

8    by Egbert," Necoechea prepared the Second CAR Application. (*Id.* ¶ 126.)

9         The FAC has presented allegations linking Egbert to several misstatements and

10   omissions included in the Second CAR Application. In addition her misstatements and

11   omissions, her actions leading up to the Second CAR Application—including the abrupt

12   notification of the dependency termination and disregard of the Plaintiffs' requests and

13   mental health experts' recommendations—potentially contributed to probable cause for

14   removal. Defendants would like further details about *how* Egbert provided the

15   information to Necoechea, but this would be difficult to produce before discovery. At the

16   pleading stage, the FAC alleges (1) Egbert was the family's case manager, (2) Egbert

17   spoke to others about the events that occurred after A.K. was informed they would be

18   returned to Plaintiffs, and (3) Egbert subsequently verified Petition II, which included the

19   same misrepresentations and omissions as the Second CAR Application. This is enough

20   to surmise that she was also involved in, and knew of, the judicially deceptive statements

21   in the Second CAR Application. The Court will allow Claim Eleven against Egbert to

22   proceed past the motion to dismiss stage.

                    ii.    Necoechea

23        The Court previously dismissed the claims against Necoechea, stating that the

24   original Complaint lacked allegations explaining "whether Necoechea provided

25   information he knew to be false." (Doc. 86 at 20.)

26        Defendants argue Necoechea is entitled to qualified immunity as to Claim Eleven.

27   (Doc. 93 ¶¶ 127, 182–83.) Defendants further state Claim Thirteen should be dismissed

28   because he was not involved in the preparation of Petition II. (Doc. 100 at 13–15.)

1
2
3

Plaintiffs counter that Necoechea should be held liable because he submitted the Second CAR Application, containing allegations he knew to be false, did not verify them, and set events in motion. (Doc. 105 at 1–2, 10–11.)

4
5
6

Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132–33 (9th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

7
8
9
10
11
12
13
14
15
16

The FAC's assertion that Necoechea knew the statements were false is conclusory. Necoechea allegedly prepared the Second CAR Application "[b]ased on information provided by Egbert, Millage and Muckenthaler." (Doc. 93 ¶ 127.) The FAC notes Necoechea did not interview Plaintiffs and collateral contacts. (*Id.* ¶ 183(g).)  However, the FAC asserts Necoechea was "assigned to re-open the case and secure A.K.'s return of custody to [AZDCS]" after A.K. attempted to run into traffic, and filed the Second CAR Application and Temporary Custody Notice within hours of the incident. (*Id.* ¶ 123.) There is no suggestion Necoechea had reason to question the veracity of the statements he collected. Moreover, there are no facts supporting Plaintiffs' claim that Necoechea was involved in Petition II; it is Egbert's sworn signature on Petition II, not Necoechea's.

17
18
19
20
21
22
23
24

The Court cannot conclude that Necoechea's actions were incompetent or that he knowingly violated the law. Nor have Plaintiffs alleged it is clearly established that a case worker's submission of the factual basis provided by information gathered by others is a constitutional violation. Here, Plaintiffs seek to have an investigation run in a certain manner. The Court finds Necoechea is entitled to qualified immunity and will dismiss Claims Eleven and Thirteen with prejudice. *See Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

*IV. Issue Preclusion*

25
26
27
28

Defendants argue that Plaintiffs' claims are precluded because the issues raised were already litigated in state court. (Doc. 100 at 10–13.) Defendants state, "the factual issue that was actually litigated in the dependency case in juvenile court is the same: whether probable cause existed to support the court's orders for temporary custody or

1
2
3
4
5
6
7
8

whether the CAR Application and Dependency petition were based on misstatements, omissions, and misrepresentations or concealed facts and suppressed truth." (Doc. 108 at 6.) Defendants include the underlying state court documents. (Exs. 1–12, Docs. 101-1 to 101-12.) Plaintiffs counter issue preclusion should not be determined on a motion to dismiss because the Court "may not take judicial notice of disputed facts" and cannot notice a judicial document "for the truth of the facts asserted within." (Doc. 105 at 3 (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).) Defendants note Plaintiffs have not pointed to any material disputed facts. (Doc. 108 at 5.)

9
10
11
12
13
14

Judicial filings in other courts "may be considered on a Rule 12(b)(6) motion to dismiss." *ASARCO, LLC v. Union Pac. R.R.*, 765 F.3d 999, 1008 n.2 (9th Cir. 2014). But, "when a court takes judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." *Lee*, 250 F.3d at 690 (citation and quotation marks omitted).

15
16
17
18
19
20
21
22
23
24
25
26

The Court agrees that it cannot determine issue preclusion at this time. The Court recognizes that Levi Kirwin filed a motion in state court, which challenged certain misstatements made by AZDCS in the Second CAR Application. (Docs. 101-2; 101-6.) However, the filings do not directly allege a constitutional violation of familial association. Moreover, Sharmila Kirwin is not included in the filings. In addition, when the state court denied the motion, it indicated it had "no legal authority for this Court to overturn the order of another Arizona Superior Court Judge *at this stage of proceedings*." (Doc. 101-3.) The Court notes the documents include a judicial opinion finding there was probable cause to take custody of A.K. However, the Court cannot decide whether the same allegations of misstatements or omissions were disputed without delving into the facts in the judicial opinion and making a comparison to those raised here. Defendants may re-raise issue preclusion on summary judgment.

27
28

///
///
///

IT IS ORDERED:

1) Defendants' **Motion to Dismiss the First Amended Complaint** is **GRANTED IN PART** and **DENIED IN PART**. (Doc. 100.)

2) **Claims One** and **Three** against Defendant **Darisz Kot** shall proceed.

3) **Claim Eleven** against Defendant **Kimberly Egbert** shall proceed.

4) **Claims Eleven** and **Thirteen** against Defendant **David Neceochea** are **DISMISSED WITH PREJUDICE**.

5) Within fourteen days of the date of this Order, the parties shall file a Joint Proposed Amended Scheduling Order with proposed remaining deadlines.

Dated this 31st day of March, 2025.

Honorable Raner C. Collins
Senior United States District Judge